DEPEW GILLEN RATHBUN & MCINTEER LC
8301 E. 21st Street North, Suite 450
Wichita, KS 67206-2936
Telephone: (316) 262-4000
Randy@depewgillen.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| PHYLLIS J. ZORN | ) |
| Plaintiff | ) |
| v. | ) Case No. |
| CITY OF MARION, KS; DAVID MAYFIELD, individually and in his official capacity; GIDEON CODY, individually and in his official capacity; ZACHARIAH "ZACH" HUDLIN, in his individual capacity; THE BOARD OF COUNTY COMMISSION OF MARION COUNTY, KS; SHERIFF JEFF SOYEZ, individually and in his official capacity; AARON CHRISTNER, in his individual capacity. | ) |
| Defendants | ) |

## COMPLAINT

COMES NOW the plaintiff and for her claims against the defendants, and each of them, alleges and states as follows:

1.     PHYLLIS J. ZORN is a resident of the State of Kansas.  At all times material to this action, Ms. Zorn was an award winning reporter for the Marion County Record ("the *Record*"), a weekly newspaper published in Marion, Kansas.

2.     MARION is a small town in central Kansas.  It is governed by a mayor and four council members.  DAVID MAYFIELD was the duly elected mayor of Marion at all times material to this action.  Mayfield was formerly a Kansas Highway Patrol trooper who later became Marion's police chief, and since 2020 has worked part-time for the Marion County Sheriff's Office transporting prisoners.

3.     GIDEON CODY was, at all times material to this action, the Chief of Police of Marion.   Cody has fled the jurisdiction and his current whereabouts are unknown.

4.     Officer ZACHARIAH "ZACH" HUDLIN at all times material to this action was a member of the Marion Police Department.

5.     The defendant BOARD OF MARION COUNTY COMMISSIONERS is comprised of duly elected county commissioners of Marion County, Kansas.   The defendant JEFF SOYEZ is the duly elected Sheriff of Marion County, Kansas.

6.     AARON CHRISTNER was, at all times material of this action, a detective with the Marion County Sheriff's Office.

7.     At all times material to this action, the defendants were acting under color of state law.  The Fourth Amendment to the United States Constitution forbids unreasonable searches and seizures.  The First Amendment to the United States Constitution guarantees that "Congress shall make no law … abridging the freedom of speech, or of the press." Accordingly, this action arises under the laws

of the United States and presents a federal question within this Court's
jurisdiction.  It is brought pursuant to 28 U.S.C. §§1331, 1343 and 42 U.S.C.
§1983, et seq.

8.     The parties are residents or political entities located in the state of
Kansas–except GIDEON CODY who has fled the jurisdiction for parts unknown.
Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a
substantial part of the events or omissions giving rise to this action, including the
unlawful practices alleged herein, occurred in this district.

## Background

9.     Marion was in need of a new police chief in 2023.  By April, the city
had identified three candidates: acting police chief Duane McCarty; Chris Mercer,
who works as a fire investigator for the state fire marshal and part time Marion
police officer; and Gideon Cody, a captain in the Kansas City, Missouri Police
Department.

10.     Gideon Cody had experienced a number of problems in his former
employment.  To the surprise of no one, when the *Record* reported that Gideon
Cody was a candidate for the Marion police chief position, the newspaper began
receiving tips about Cody from persons who were afraid to go on the record for
fear of retribution by Cody.

11.     According to one source, Cody was "the absolute worst commander I ever experienced," said "his ego would not allow him to listen to what anyone below his rank said," and described him as a "toxic/ego-centric commander."

12.      Three sources told the paper that Cody ran over a dead body at a crime scene.  The tipsters also reported that Cody was about to be demoted by the Kansas City Police Department from captain to sergeant because of offensive conduct towards other officers.

13.     Multiple sources reported a conversation in which Cody expressed his disdain for working in dispatch, and said if he had not been transferred out of dispatch he would have found "the skinniest and prettiest girl down there and f*cked her" to force a reassignment.

14.     Cody soon became aware that the *Record* was looking into his background in Kansas City.  This infuriated Cody and he later suggested to the plaintiff that she leave the paper and start a competing paper in Marion.  He promised her that he would invest with her and would enlist a number of others to do so as well.   The plaintiff laughed off the suggestion, not understanding the depth of his anger at the *Record*.  When Ms. Zorn disclaimed any interest in his proposal, she was moved to Cody's enemies list.

15.     In late April, Mayor Mayfield offered Cody the police chief position even before the City Council approved his hiring.  On May 1, Cody took the oath of office before the City Council voted to hire him.  In his new position, Cody  was

making only about half of what he had been making as a captain in the Kansas City, Missouri Police Department, where he had worked for 24 years.

16.     Cody was only "provisionally accredited" by the Kansas Commission of Peace Officers' Standards and Training.

*A Congressman Comes to Town*

17.     In late July, U.S. Congressman Jake LaTurner (R) announced he would be visiting Marion on August 1, 2023, for "Coffee With Your Congressman."  Rep. LaTurner represents Kansas' Second Congressional District; Marion County had recently moved from the First Congressional District to the Second Congressional District as part of Kansas' 2022 congressional reapportionment.

18.     Rep. LaTurner's Communications Director specifically reached out to *Record* editor and publisher Eric Meyer and invited him to attend the event.

19.     The event was to be held at Kari's Kitchen, a Marion coffee shop owned by Kari Newell, who also owns the upscale Chef's Plate in the Historic Elgin Hotel across the street.  Kari's Kitchen posted its own invitation to the event on its Facebook page, describing it as an "open meet and greet."

20.     *Record* editor Eric Meyer and Ms. Zorn attended the August 1st "open meet and greet."  While waiting for Rep. LaTurner to arrive, Kari Newell told the plaintiff to leave, saying "I will not have members of the media in my establishment. You have to leave."

21.     Shortly thereafter, Chief Cody approached both Meyer and Zorn and told them to leave; he said that Newell asked that the two journalists "be evicted." This action set the stage for what was about to happen and demonstrates the disdain that Cody held for the First Amendment in general and the plaintiff specifically.

*A Confidential Tip on Kari Newell*

22.     The following day, August 2, 2023, Ms. Zorn received a direct message on Facebook from Pam Maag, a resident of Marion, about Newell.  Maag, who requested anonymity, stated that Newell's driver's license was suspended due to a prior DUI conviction.

23.     The tipster also told Zorn that local law enforcement had known for years that Newell was driving without a valid driver's license.  It is a violation of the ordinances of the City of Marion and the laws of this county and state to operate a vehicle without a license.

24.     That same day the tipster sent Zorn, via Facebook messenger, a copy of an August 1, 2023, letter from the Kansas Department of Revenue to Newell. The letter had come from Newell's husband—who was at the time going through a divorce with Ms. Newell.  Apparently, Mr. Newell was frustrated that his wife had been able to drive around town without a license for years.  Ms. Zorn received the message on August 2.

25.     The letter in question was addressed to Ms. Newell and includes her full name, address, driver's license number and date of birth.  The letter set forth

various requirements Newell would have to meet in order to restore her driving privileges, including having an ignition interlock device installed on her car.

26.    The source told Ms. Zorn that she could confirm the information about Newell through the Kansas Department of Revenue website, by using Newell's name, address, driver's license number, and date of birth—all of which were on the letter from the Department of Revenue. The source also told Zorn she could obtain a copy of the August 1, 2023, letter from the Department of Revenue to Newell from the same website.

27.    Ms. Zorn printed the copy of the letter from Facebook and shared it with Meyer.  The following day, Meyer located the webpage titled "Kansas Driver's License Status Check" on the Kansas Department of Revenue website by performing a Google search.

28.    This webpage allows anyone to check the status of a Kansas driver's license so long as that person knows the driver's license number, first and last name, and date of birth of the driver they are checking on.  It does not require a log-in, does not require a username or password, and does not contain any warning about accessing information on the site.  In fact, the so-called "Disclaimer" on the Department of Revenue's website merely warns users that the information "is a summary only and will not display any sanctions from another state."

29.    Using the information from the August 1, 2023, Department of Revenue letter which the source had provided Zorn (Newell's first and last name, address, driver's license number, and date of birth) Meyer used the Kansas

Driver's License Status Check webpage to confirm Newell's DUI conviction and the fact Newell's license was suspended.

30.    Zorn then called the Kansas Department of Revenue and was told that the letter in question was available on the same public-facing website, a user simply must keep clicking to find the link.  Ms. Zorn then went to the same website Eric Meyer had used and saw that at the bottom of the same screen showing Newell's DUI conviction and suspension there was a box to click to view "Documents."

31.    When Ms. Zorn clicked on that box a form appeared on the webpage and asked for "Requester's Information." Zorn then inserted her own name into the form and entered Newell's driver's license number and address.

32.    The Kansas Driver's License Status Check webpage then required Zorn to check a box that read: "I will use the information requested in a manner that is specifically authorized by Kansas law and is related to the operation of a motor vehicle or public safety. (See section VI on the front of this form)."

33.    After Zorn checked the box and clicked "Accept," nineteen "Documents" appeared on the screen—the first of which was the August 1, 2023, letter from the Kansas Department of Revenue to Newell concerning the ignition interlock device, *i.e.*, the same document the source had previously provided Zorn.

34.    Having confirmed that the KDOR letter was legitimate, Zorn then closed the webpage and informed Meyer that she had verified that the information (and document) provided by the confidential source was accurate.

Ms. Zorn never claimed to be Ms. Newell at any time in her dealings with the website.

35.    The Kansas law on driver's license records is clear.  The very first sentence of the "Division of vehicles; records; disclosure" statute provides that all driver's license records "shall be subject to the provisions of the open records act, except" (a) "records which relate to the physical or mental condition of any person," (b) "records which have been expunged," or (c) "photographs [on] drivers' licenses." K.S.A. 74-2012(a)(1) & (b).

36.    Zorn's use of the Kansas Driver's License Status Check website to confirm that Newell's driver's license was suspended due to a DUI conviction—and that she could get her license reinstated only by installing an ignition interlock device—does not relate to any of the three exempted topics set forth in K.S.A. 74-2012(a)(1) & (b).

37.    Zorn's use of the Kansas Driver's License Status Check webpage to confirm that Newell's driver's license was suspended due to a DUI conviction—and that she could get her license reinstated only by installing an ignition interlock device—plainly related to the operation of a motor vehicle and to public safety.

38.    Accordingly, Zorn's use of the Kansas Driver's License Status Check website to confirm that Newell's driver's license was suspended due to a DUI conviction and that she could get her license reinstated only by installing an ignition interlock device was clearly legal.

39.     Despite the fact that Zorn's use of the public-facing Kansas Department of Revenue website to confirm that Newell's driver's license was suspended due to a DUI conviction and that she could get her license reinstated only by installing an ignition interlock device was legal, Meyer subsequently decided not to publish the information about Newell because he believed the paper was being drawn into a bitter divorce.

40.     While Meyer elected not to publish a report on Newell's DUI conviction and the fact she was driving without a valid license, he did write the Marion Police Chief and the Marion County Sheriff to "alert" them about the on-going violation of the law by an individual in Marion.

41.     Specifically, on Friday, August 4, 2023, Meyer e-mailed Chief Cody and Marion County Sheriff Jeff Soyez and told them that a confidential source had provided the paper a letter from the Kansas Department of Revenue "to a Marion businesswoman who recently had been in the news."  Meyer stated that the letter outlined the steps the businesswoman—whom Meyer did not identify by name—would need to take to get her driver's license reinstated, including installing an ignition interlock device on her car.

42.     The e-mail explained that the *Record* had checked with the Department of Revenue and was told "that anyone could obtain the document if he or she possessed the recipient's Kansas identification card number, name, and date of birth."  The e-mail also noted that "[o]ur source contends that local law enforcement officers are fully aware that she ... ha[s] been driving for some time without [an] active, valid license."

43.     Neither Chief Cody nor Sheriff Soyez ever responded to Meyer's offer to provide any additional information that might help in an investigation of an actual crime. An hour and a half before Meyer sent his e-mail to Chief Cody and Sheriff Soyez, on Friday, August 4, 2023, the Marion Vice Mayor, Ruth Herbel, sent an e-mail to the Marion City Administrator, Brogan Jones (who has subsequently resigned).

44.     Herbel attached to her e-mail a screenshot of the same August 1, 2023, letter from the Kansas Department of Revenue to Newell setting forth the requirement that Newell have an ignition interlock device installed on her car before her driver's license could be reinstated.

45.     Herbel told the City Administrator she had received the copy of the letter from a local resident, Pam Maag, who Herbel said had law enforcement connections. Maag would later publicly identify herself as the person who had provided the August 1, 2023, letter to Phyllis Zorn at the *Marion County Record* on August 2.

### *The City Refuses to Investigate the Ongoing Driving Violation*

46.     The City Administrator notified Marion Mayor David Mayfield of his communications with Herbel the very same day.  Specifically, the City Administrator e-mailed the Mayor and the City Clerk and stated that Chief Cody and the police department would not be looking into this and the City needed to stay out of this "hear say."

47.     Despite the City Administrator's declaration "that Chief/PD will not be looking into this," Mayor David Mayfield had a different plan to retaliate against those that sought to shine a light on this criminal conduct in Marion.

48.     Ruth Herbel assumed office as a member of the Marion City Council in 2020.  Since that time, the pages of the *Marion County Record* are full of reports of attacks and counterattacks between Herbel and Mayor Mayfield—with Herbel accusing the mayor of repeatedly violating the city charter, giving out unauthorized raises to favored city employees, holding illegal secret meetings, and much more.

49.     During that same time, editorials in the *Record* had referred to Mayor Mayfield as a dictator, a bully, as someone who "shows his disdain for the democratic process," as someone who "desires to take all power for himself," and as someone who lies so much he "metaphorically set[s] his pants on fire" on a regular basis.

*In Search of a Crime*

50.     At 7:53 a.m. on Monday, August 7, 2023, Brogan Jones, the City Administrator, forwarded to Mayor Mayfield and the other council members (but not Vice Mayor Herbel) Herbel's email from the Friday before in which Herbel had forwarded the August 1, 2023, Department of Revenue letter to Kari Newell.

51.     Shortly thereafter, both Mayor Mayfield and Council Member Zach Collett notified Kari Newell that Herbel had learned of Newell's DUI and falsely claimed that Herbel planned to use Newell's DUI conviction to oppose Newell's application for a liquor license for her upscale restaurant Chef's Plate, which was

12

coming before the city council later that same day.  Mayor Mayfield also told Newell the only way he could get Herbel off the city council was if she (Herbel) was convicted of a crime.

52.    Accordingly, that same day, Mayor Mayfield overruled the City Administrator and authorized Chief Cody to begin an investigation into Newell and the *Marion County Record.*

53.    Mayfield could do this because, according to the Marion City Code, the mayor "shall … [h]ave superintending control of all officers and affairs of the city." Code of the City of Marion, Kan. § 1-205(a).

54.    Chief Cody contacted Newell and told her someone had stolen her mail. When Newell said she did not believe anyone had stolen her mail, Chief Cody said he would get back to her.  When Chief Cody got back to Newell, he told her someone had stolen her identity in order to access her driver's license record.

55.    Specifically, Chief Cody told Newell that a reporter at the *Record* had stolen Newell's identity and provided Herbel with a copy of her driver's license record.  Chief Cody engaged in this "prevarication" even though he knew that Pam Maag—and not anyone at the *Record*—had provided Herbel with a copy of the August 1, 2023, letter from the Kansas Department of Revenue to Newell.

56.    Later the same day, Newell appeared before a meeting of the Marion City Council (at which Mayor Mayfield presided) as part of her attempt to obtain a liquor license for her restaurant, Chef's Plate.

57.    During her appearance, Newell lashed out at Ruth Herbel, calling her "vile," and repeated Chief Cody's false claim that the *Record* had "illegally"

obtained Newell's driver's record and had provided Herbel with a copy of Newell's record. Following Newell's appearance, Meyer—who was there to report on the council meeting—stood up and said that no one at the *Record* had provided Vice Mayor Herbel with a copy of Newell's driver's record or the August 1, 2023, Department of Revenue letter.

58..    Following the City Council meeting, Chief Cody stepped up his investigation into the non-existent "identity theft", coordinating his work with Mayor Mayfield and Marion County Sheriff Jeff Soyez. Sheriff Soyez appointed Marion County Sheriff's Detective Aaron Christner to assist in the investigation of Herbel and the *Marion County Record*.

## *The "Investigation"*

59.    On Monday, August 7, 2023, Marion Police Officer Zach Hudlin, at the direction of Chief Cody, "made contact with someone at KDOR in their information technology department" and was told that on Friday, August 4, "Phyllis Zorn" had accessed Kari Newell's driver'srecord via the Kansas Driver's License Status Check; Hudlin did not record the name of the person he spoke with, noting only the unidentified person was "female."

60.    This information was true and entirely consistent with what Meyer had told Chief Cody and Sheriff Soyez in his e-mail to the two men on Friday.  The act of accessing the Kansas Department of Revenue letter via the Kansas Department of Revenue Status Check tool was perfectly legal and the defendants knew it.

61.     Nevertheless, the very next day, Chief Cody requested Det. Christner to obtain a "preservation warrant" to serve on the *Marion County Record*'s internet provider.  Det. Christner, however, learned that the newspaper's "record domain is hosted by a small hosing [sic] company out of Wisconsin."

62.     Det. Christner told Chief Cody that he had "no legal authority" to make a request to the Wisconsin company and that "they may notify the Marion Record if I do so." Accordingly, Det. Christner told Chief Cody: "My advice is if you have PC for a search warrant is that we just write that and skip a preservation."

63.     By the next day, Det. Christner had drafted an application for a search warrant for the *Marion County Record*; but in his e-mail forwarding the draft to Chief Cody, Christner stated he was unwilling to sign it himself.

64.     The next morning, August 10, 2023, Chief Cody had taken Det. Christner's draft and prepared search warrant applications for the *Marion County Record*, Vice Mayor Ruth Herbel, and Pam Maag.  Chief Cody shared those drafts with Det. Christner.

65.     Later the same day, Chief Cody discussed the drafts with Sheriff Soyez, and a decision was made to add a fourth target of the raids: Meyer's home. In his applications for the search of the *Record* and the Meyers' home, Chief Cody falsely stated that the federal Driver's Privacy Protection Act applied to the Kansas Department of Revenue letter and stated that in order to access the information someone from the *Record* had to "l[ie] about the reasons why the record was being sought."

66.     By way of background, Congress has passed two acts which have application to this situation.  In 1994, the Driver's Privacy Protection Act was passed to govern the disclosure of personal information gathered by state Departments of Motor Vehicles.  An exception to the act relates to matters of "vehicle or drivers's safety" and specifically does not relate to a driver's status. Congress also passed the Privacy Protection Act in 1980.  This act requires that in most situations, law enforcement must seek to obtain information from journalists through use of a subpoena–as opposed to a surprise search without a warrant.

67.     Chief Cody's statements concerning both the Driver's Privacy Protection Act and the requirement that the Kansas Department of Revenue website requires a user to select "the reasons why the record was being sought" are false and Chief Cody either knew they were false or acted with reckless disregard for whether they were false.  KDOR specifically notes that an individual's "driver's status" is explicitly not "protected information" under the Act.

68.     Because the Act explicitly states that protected personal information "does not include information on vehicular accidents, driving violations, and driver's status," the information which the *Record* obtained from the Kansas Driver's License Status Check website (*i.e.*, the status of Newell's driver's license) is not covered by the Driver's Privacy Protection Act.

69.     Chief Cody either knew or should have known the Act does not apply to this information because the complete text of the federal Driver's Privacy

16

Protection Act—including the provision stating that the Act does not apply to information on a driver's status—is set forth on the Kansas Department of Revenue website; thus, it did not require any legal research to know that the Act did not apply to the information the *Record* accessed.

70.    In fact, following the raid, the official spokesperson for the Kansas Department of Revenue Department, Zach Denney, repeatedly stated to media outlets that so long as a person has the identifying information it is perfectly legal to use the Kansas Driver's License Status Check to verify the status of someone's driver's license.

   *    "That's legal. The website is public facing, and anyone can use it." (AP)

   *    "As long as the requestor has the required information, this information is public record and available online." (KC Star)

   *    "The motor vehicle driver's checker is public-facing and free-use. If you have my [identifying] information, you can pull it [my driver's record] out." (NBC News)

71.    The fact that Newell was driving without a valid license—which Newell has since repeatedly admitted was true and was well known by local law enforcement—plainly relates to "the operation of a motor vehicle [and] public safety."

72.    Equally false is Chief Cody's claim that in order to use the "Kansas Driver's License Status Check" a user has to provide a reason (or reasons) for accessing the information.  Rather, as noted above, a user only has to know a person's driver's license number, first and last name, and date of birth to access anyone's driver's license information, and to access the actual documents

concerning a person's license status a user must only agree to use the information in accordance with Kansas law.

73.     Thus, the entire premise of Chief Cody's claim that a crime had been committed by the *Record*'s use of the Kansas Department of Revenue Status Check tool to verify that the information and document which the paper's confidential source had provided about the status of Newell's driver's license was false and Cody either knew it was false or should have known it was false.

### *The Illegal Raid*

74.     On Friday, August 11, 2023, Chief Cody spearheaded a team of armed law enforcement officers in conducting raids on the offices of the *Marion County Record*, the home of Joan and Eric Meyer, and the home of Ruth Herbel.

75.     The raids were conducted pursuant to the invalid search warrants which Chief Cody had obtained under false pretenses.

76.     The first raid occurred at the offices of the *Marion County Record*, where Chief Cody led a squad including himself, Marion police officer Zach Hudlin, and Marion County Sheriff's detective Aaron Christner.

77.     The officers approached the building from the rear, where they confronted *Record* reporters Zorn and Deb Gruver.  Chief Cody forcibly yanked Gruver's cell phone from her hand, which Gruver indicates has injured her.

78.     The officers then entered the offices of the *Record*, led by Chief Cody.

*The Sham Preview Search*

79.     The warrant obligated the officers to conduct a "preview search" of any electronic devices so that the officers only seized items that were actually used in connection with the so-called "identity theft."

80.     In accordance with this requirement, Marion County Sheriff's Det. Aaron Christner connected an external drive via a USB port to reporter Phyllis Zorn's computer in the *Record*'s newsroom.  He then executed a software application titled osTriage, which he had previously loaded onto the external drive.

81.     The program allows a user to conduct a keyword search on the connected computer and its storage media, thereby allowing a user to make a determination in the field as to whether the device was used in the commission of a crime. But the keywords selected for the preview search of the *Record*'s computers were so vague and indistinct they constituted a sham search.  For example, one of the keywords was the word "vehicle," while another keyword was the word "Kansas."

82.     None of the "hits" from the "preview search" of Phyllis Zorn's computer were even suggestive of a crime.  Instead, it is obvious the keyword search terms were a sham and were never designed to comply with the search warrant's requirement that officers conduct a preview search "to exclude from seizure those which have not been involved in the identity theft." The name searches produced false "hits" 100% of the time.

83.     Despite the fact the "preview searches" revealed no evidence Phyllis Zorn's computer was used to commit any crime, Chief Cody nevertheless directed Zorn's computer be seized.

84.     While Det. Christner was running the preview search on Phyllis Zorn's computer, Ofc. Zach Hudlin was conducting a physical search of the *Marion County Record* newsroom, reading papers on countertops, going through reporter's purses, and rifling through files in reporter's desks.

85.     When Ofc. Hudlin got to Deb Gruver's desk (it was Gruver who had been investigating the tips which the paper had received about Chief Cody) Hudlin paid particular attention to the files in the bottom, right-hand drawer in Gruver's desk.

86.     Among the files Hudlin observed in Gruver's desk drawer was Gruver's investigative file on the confidential tips the *Record* had received about Gideon Cody from officers with the Kansas City, Missouri, Police Department describing Cody's rampant misconduct; the file was in a folder titled "Capt. Gideon Cody," which was Cody's rank in the Kansas City Police Department when he applied to be Marion's top cop. Also inside the folder was information about other confidential sources who provided information about Gideon Cody.

87.     After Hudlin rifled through Gruver's files—and while he was standing next to Gruver's desk—Hudlin began the following conversation with Chief Cody:

Hudlin: "You want to look through this desk?

Cody: "You have the right to look for yourself."

Hudlin: "I know, I'm asking do YOU want to look through this desk?

Cody: "Man, you got a right to ..."

Hudlin: "I understand. You will understand shortly."

88.     Chief Cody is then seen on Hudlin's body camera footage bending down to look inside Gruver's bottom right-hand desk drawer, where Gruver's file on Cody was located.  A short time later, Chief Cody is recorded as saying: "Hmm. ... Keeping a personal file on me."

89.     Chief Cody thereby admits to having viewed Gruver's file on her investigation of the many tips the *Record* had received about him, which included the name (and at least one photograph) of Gruver's confidential sources

90.     The Marion Police Department produced hours of video in response to a Kansas Open Records Act request for Chief Cody's body camera footage of the raids; that footage includes video of Cody relieving himself at Casey's General Store between the search of the Herbel home and the search of the Meyer home.

91.     While Chief Cody did not turn off his body camera while relieving himself, he apparently chose to turn it off while he reviewed Gruver's file on him, for the Marion Police Department did not produce any body camera footage from Cody of him looking through Gruver's file on him.

92.     According to the log created by the osTriage software application, Det. Christner began his "preview search" on Phyllis Zorn's computer at 11:11:57 AM.  That same log shows Christner did not complete the "preview search" until 12:32:05 PM.  Following the completion of the "preview search" on Zorn's computer, Ofc. Hudlin said, "We'd be here all freakin' day if we were going to do

that to all those computers." By noon, Chief Cody's body camera footage had already recorded him saying, "I'm "starvin."

93.     Shortly after Hudlin made his "all freakin' day" comment," Chief Cody spoke on the phone with Marion County Sheriff Jeff Soyez. Chief Cody brought Soyez up to speed on the search and is then heard saying, "Alright, we'll just take them all." Chief Cody then turned to Det. Christner and Ofc. Hudlin and said, "Let's get the f*ck out of here."

94.     Chief Cody's decision to ignore the requirement in the search warrant that he conduct a "preview search" to exclude devices not used in the so-called "identify theft" and, instead, to "just take them all," *i.e.* to seize the other newsroom computers without performing a "preview search" on them, was based on what he variously described on the body camera recordings as:

- "I have a feeling that numerous people had it in this office, and that's just the gut;"

- "I have a feeling it's on that one too;" and

- "This is just me playing instinct."

Yet, Chief Cody was repeatedly caught on body camera footage acknowledging he was out of his element:

- "If I'm forgetting something guys, you gotta let me know, I'm out of practice, you know;" and

- "I'm out of practice. You see something I'm forgetting you just let me know."

95.     Based on his "gut" and his growling stomach, Chief Cody then directed that Meyer's computer, Deb Gruver's computer, and the network file server be seized without attempting a preview search on those computers.

96.     Chief Cody's action in ordering the seizure of the four computers was in clear violation of the search warrant's requirement to conduct a preview search "to exclude from seizure those which have not been involved in the identity theft." By seizing the computers of Eric Meyer, Phyllis Zorn, Deb Gruver, and the network file server, Chief Cody seized all of the computers in the *Marion County Record*'s newsroom, effectively shutting down the newspaper.

97.     Similarly, Chief Cody directed that Ofc. Hudlin seize Ms. Zorn's cell even though no preview search of any sort was conducted on the phone.

98.     In addition to searching the newsroom and seizing the newsroom computers, Chief Cody also attempted to interrogate the *Record* staff, who were told they had to wait outside the *Record*'s offices, even though the temperature was near 100 degrees.

99.     Chief Cody called the staff members inside, one-by-one, so he could question them.  Cody first called Ms. Zorn into the newsroom and attempted to give her the *Miranda* warning, but he couldn't recall the wording of the warning. He nevertheless attempted to get Zorn to incriminate herself, but she said she believed she had done nothing wrong.

100.    Chief Cody also tried to get Zorn to incriminate Meyer, telling her she could disregard orders she believed were illegal; Zorn said she did not believe she did anything illegal.  Chief Cody asked Zorn if she used her phone to access the

Kansas Department of Revenue website and she said no.  Despite Zorn's denial, Chief Cody directed Ofc. Hudlin to seize Zorn's phone, without conducting a "preview search" of any sort on the phone.

101.    Chief Cody then asked Det. Christner for a copy of his (Det. Christner's) *Miranda* warning card so he could use it for continued interrogations.  But when Gruver came into the newsroom for her interview, Chief Cody realized he did not have his reading glasses with him and he could not read the card, so he directed Ofc. Hudlin to read it to Gruver.

102.    Gruver—having investigated Chief Cody and being aware of his incompetence— asserted her right to remain silent and did not answer Cody's questions.  Again, however, Chief Cody directed Ofc. Hudlin to seize Gruver's phone, even though Cody had no factual basis for believing that Gruver participated in the so-called "identity theft."

103.    When Meyer learned what was going on at his newspaper, he immediately drove to the office.  When Hudlin told Cody that Meyer was on his way to the *Record*, Cody told Hudlin, "if he interferes with anything put him in cuffs."

104.    When Eric Meyer arrived, he was denied entry by Chief Cody, who said Meyer could only enter the offices for the purpose of being *Mirandized* and then interrogated by Cody.  Meyer responded to Chief Cody by explaining that he needed access to his office to obtain the phone number of his attorney and that by denying him access to this office Cody was effectively denying him the right to

counsel. Chief Cody told his fellow officers he found Eric Meyer's complaints about being denied his right to counsel "amusing."

105.    Meyer then waited outside the *Record*'s offices for Chief Cody and his entourage to leave so that he could assess the damage done by the officers.

106.    As the raid was ongoing, Chief Cody received a text message from Kari Newell, wanting to talk about the status of the raid. Chief Cody later called Newell back and said, "we can't write anything," and Newell replied, "I understand." Chief Cody then proceeded to give Newell  a complete rundown on the status of the raids, telling her, for example, he tried to "download" files from the computers at the *Record*, "but that didn't work, so f*ck it," he just took the computers.

107.    After the raids were completed, Chief Cody then drove to the Marion County Sheriff's Office where he met with Sheriff Soyez to debrief him on the raids while sharing pizza and liquid refreshments.  As the pizza party was going on, Chief Cody told Sheriff Soyez that when he yanked Deb Gruver's cell phone out of her hand (it was Gruver who had been investigating why Cody left the Kansas City Police Department) it "made my day." When Sheriff Soyez pointed out to Chief Cody that he (Cody) had forgotten to turn off his body camera, Cody ordered Ofc. Hudlin to turn off Cody's body camera, saying "I can't get this damn thing to turn off."

108.    On Sunday, August 13, 2023, the KBI issued a statement that it was taking over the investigation.  On Tuesday, August 15, 2023, Chief Cody and Marion County Sheriff's Deputy Aaron Christner exchanged drafts of probable

cause affidavits supporting arrest warrants for Eric Meyer, Phyllis Zorn, and Ruth Herbel.

109.    On Wednesday, August 16, 2023, Chief Cody forwarded to the KBI the draft probable cause affidavits.  In the affidavits, Chief Cody sought arrest warrants based on more than a dozen  different alleged criminal charges.

*The County Attorney Panics*

110.    The pretense behind the raid soon began to fall apart.  On Wednesday, August 16, 2023, Marion County Attorney Joel Ensey filed a motion to release the evidence seized during the raids, which District Court Judge Benjamin Sexton granted the same day. At the same time he filed his motion, Ensey issued a press release stating that "insufficient evidence" exists "to establish a legally sufficient nexus" between any crime Chief Cody may have been investigating and "the places searched and the items seized."

111.    The press release stated that Ensey was asking local enforcement to return the items seized to their owners.  Ensey, however, did not "clear" the *Record* or any of its staff of wrongdoing, meaning they remained under criminal investigation.

112.    The same day, the KBI issued a media release in which it stated its investigation was ongoing and that "[o]nce our investigation concludes we will present findings to the Marion County Attorney for review."

113.     Later that same day, a forensic examiner retained by the *Record*'s attorney, arrived in Marion to retrieve the seized items, which were being stored

at the Marion County Sheriff's Office.  The transfer of the items to the examiner was personally supervised by Sheriff Soyez.

114.    As part of the transfer, forensic examiner was given an inventory of items seized from the *Marion County Record* during the raid.  The inventory did not include the digital drive which Det. Christner had used to extract data from Phyllis Zorn's computer during the raid on the *Record*'s offices.  As noted above, that drive revealed that the required "preview search" in fact showed no criminal activity, but instead produced "hits" for an advertisement for an animated children's movie, the district court's logo, and other innocent files.  That drive was not given to the examiner when he came to retrieve the items which the Court had ordered released.

115.    It was not until August 29, 2023—after the *Record*'s attorney threatened to attempt to hold the Sheriff in contempt—that the contents of the drive were finally released to the *Record* pursuant to a second order from District Court Judge Ben Sexton.

### *Chief Cody Destroys Evidence*

116.    As the unprecedented, unconstitutional, and illegal raids began to create international condemnation, Chief Cody became concerned his wrongdoing would be exposed. Accordingly, Chief Cody began e-mailing the contents of his file to his personal e-mail address.

117.    In addition, Chief Cody asked Kari Newell to destroy her text messages with Cody.  Chief Cody explained these flirtatious text messages could

be used against them.  Later, when Newell (who Cody referred to as "Honey")
became concerned with her own criminal liability for deleting her text messages
with the police chief, she texted Cody and asked, "If attorneys or kbi go digging
and see I deleted the texts as you asked me to, will I get in trouble?  Cody's
response: "Quit being paranoid."

118.    On October 2, 2023, Marion Police Chief Gideon Cody resigned and
fled the jurisdiction.  It is believed he may be somewhere in Hawaii.

## Claims of the Plaintiff

119.    As the above facts show, which are incorporated by reference,  the
defendants are co-conspirators in an unconstitutional effort to deny Ms. Zorn her
rights under the First and Fourth Amendments to the United States Constitution.
All of the defendants were acting under color of law when they took the actions
described above.

120.    The First Amendment to the United States Constitution guarantees
that "Congress shall make no law ... abridging the freedom of speech, or of the
press." The Fourteenth Amendment to the United States Constitution extends the
protection of the First Amendment to actions taken by local governments and by
local government officials.

121.    Prior to August 2023, it was clearly established that the First
Amendment guaranteed the press the right to gather information about matters
of legitimate public concern. Prior to 2023, it was also clearly established that the
First Amendment prohibited government officials, including the police, from

suppressing information that is critical of government action or inaction. The defendants engaged in a conspiracy to restricting Ms. Zorn's ability to gather information about a matter of legitimate public concern: whether law enforcement was allowing a high-profile local businesswoman to illegally operate a motor vehicle.  The underlying purpose of the raid was to abridge Ms. Zorn's First Amendment rights.  In addition, the illegal raid was in retaliation for Ms. Zorn exercising her First Amendment rights.

122.    Ms. Zorn's protections under the First Amendment were clearly established before August 2023.  The City of Marion, County of Marion and Sheriff Soyez are liable for their failure to train their officers as to the protections guranteed under the First Amendment.

123.    Under the Fourth Amendment to the United States Constitution, a person has the right to be free from an unreasonable search and seizure of her property.   Defendants Soyez, Cody, Hudlin and Christner conspired intentionally to deprive the plaintiff of her Fourth Amendment rights by exceeding the scope of an unlawfully obtained search warrant.  The seizure of the plaintiff's phone and computer exceeded the scope of the search warrant (which had been illegally obtained with knowingly false information).

124.    Ms. Zorn's protections under the Fourth Amendment were clearly established before August 2023.  The City of Marion, County of Marion and Sheriff Soyez wholly failed to train their officers as to the protections guaranteed under the Fourth Amendment.

125.    The plaintif has sustained damages as a result of the defendants' conduct.  Within days after the raid, Ms. Zorn began to suffer from Tonic Clonic seizures (commonly known as Grand Mal seizures).  Prior to the raid, her seizures were under good medical control and she had gone as long as five years without a seizure.   The seizures have been debilitating and have led to extreme depression and anxiety.

126.    The individual defendants are liable in punitive damages because of the malicious and reckless nature of their conduct.

WHEREFORE, the Plaintiff requests that she be awarded actual and punitive damages in the amount of $950,000 plus her attorney's fees pursuant to 42 U.S.C. § 1988(b), the costs of this action, and such other and further relief as this Court deems just or equitable.

Respectfully submitted,

DEPEW GILLEN RATHBUN & MCINTEER LC

/s/Randall K. Rathbun
Randall K. Rathbun #09765
8301 E. 21st Street N., Suite 450
Wichita, KS 67206-2936
(316) 262-4000
Randy@depewgillen.com
*Attorneys for Plaintiff*

## DESIGNATION OF PLACE OF TRIAL

COMES NOW the plaintiff and designates Kansas City, Kansas as the place of trial of this action.

Respectfully submitted,

DEPEW GILLEN RATHBUN & MCINTEER LC

/s/Randall K. Rathbun
Randall K. Rathbun #09765
*Attorneys for Plaintiff*

## REQUEST FOR JURY TRIAL

COMES NOW the plaintiff and respectfully requests a trial by jury with regard to the above-captioned action.

Respectfully submitted,

/s/Randall K. Rathbun
Randall K. Rathbun #09765
*Attorneys for Plaintiff*