IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| PHYLLIS J. ZORN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Civil Action No. 2:24-cv-2044-DDC-TJJ |
| | ) | |
| CITY OF MARION, KS; DAVID MAYFIELD, | ) | |
| individually and in his official capacity; | ) | |
| GIDEON CODY, individually and in his official | ) | |
| capacity; ZACHARIAH "ZACH" HUDLIN, | ) | |
| in his individual capacity; THE BOARD OF | ) | |
| COUNTY COMMISSION OF MARION | ) | |
| COUNTY, KS; SHERIFF JEFF SOYEZ, | ) | |
| individually and in his official capacity; AARON | ) | |
| CHRISTNER, in his individual capacity. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT**
**OF MOTION TO DISMISS BY DEFENDANT GIDEON CODY**

Defendant Gideon Cody, by and through his counsel of record Edward L. Keeley and Jennifer M. Hill of McDonald Tinker PA, submits this memorandum in support of his motion to dismiss Zorn's claims pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiff's Complaint (Doc. 1) alleges that Cody (in his individual capacity) violated Zorn's rights under the First and Fourth Amendments of the U.S. Constitution. However, Zorn's theories of recovery under 42 U.S.C. §1983 fail to state any viable claim against this Defendant as a matter of law. Moreover, Cody is entitled to qualified immunity. Thus, Cody requests that the Court dismiss Zorn's claims with prejudice.

1

# **TABLE OF CONTENTS**

I.      Nature of the Case .........................................................................................3

II.     Plaintiff's Factual Allegations. ....................................................................3

    A.   General Background. .............................................................................3

    B.   Kari Newell's Driver's Records ...........................................................4

    C.   The Investigation .................................................................................7

    D.   Execution of the MCR Search Warrant ...............................................10

III.    Issues ...........................................................................................................12

IV.     Arguments and Authorities ..........................................................................12

    A. Cody's Qualified Immunity Defense Bars Plaintiff's Fourth Amendment
       Claims ....................................................................................................13
        1. The Search Warrant In Question Was Not Invalid Because Through
           Her Own Admissions And Allegations It Is Undisputed That Plaintiff
           Violated The Kansas Criminal Code And The Driver's Privacy
           Protection Act (DPPA) Both Of Which Prohibited Plaintiff's
           Unlawful Conduct In Accessing Newell's KDOR Letter ................13
        2. At Least "Arguable" Probable Cause Existed To Issue The MCR
           Search Warrant So Cody Is Entitled To Qualified Immunity ..........19
        3. Chief Cody Is Entitled To Qualified Immunity Regarding The
           Execution Of The Search Warrant ...................................................22

    B.  Cody's Qualified Immunity Defense Bars Plaintiff's First Amendment
        Claims ....................................................................................................24
        1.  Zorn's First Amendment Rights Were Not Violated.......................24
        2.  No Clearly Established Law Supports Plaintiff's Claims ...............26

Conclusion ...........................................................................................................26

Certificate of Service ..........................................................................................27

## I.    NATURE OF THE CASE

The Plaintiff, Phyllis Zorn, alleges that Defendant Gideon Cody (former Marion Police Chief) violated Zorn's rights under the First and Fourth Amendments in August 2023. The case is brought pursuant to 42 U.S.C. §1983. Defendant Cody denies Plaintiff's claims and asserts his qualified immunity defense. Cody moves for a court order dismissing all claims against him with prejudice.

## II.    PLAINTIFF'S FACTUAL ALLEGATIONS

Zorn has asserted 118 paragraphs (28 pages) of factual allegations in her Complaint. (Doc. 1 at 1-28) Many of these assertions do not pertain to Cody or the claims against him but rather to claims against other Defendants. The allegations irrelevant to Cody will not be discussed herein.

For purposes of this motion only, Plaintiff's non-conclusory factual allegations may be assumed to be true. *Ashcroft v. Iqbal*, 556 U.S. at 679-680. However, Zorn's conclusory assertions of purported fact or law may not be considered by the Court in deciding this motion. *Id.* Moreover, relevant facts may be established herein by documents referred to in Plaintiff's Complaint if the documents are central to Plaintiff's claim or the materials are subject to judicial notice. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010). The Court may consider such evidence without converting this motion to dismiss into a summary judgment motion. *Id.*

### A.    <u>General Background</u>

1.    **Plaintiff Zorn is a reporter for the Marion County Record (MCR), a weekly newspaper published in Marion, Kansas. (Doc. 1 at 1)**

3.    **Defendant Cody during the relevant time at issue was the Marion Police Chief and acting under color of state law. (*Id.* at 2)**

15.    Cody was hired by Marion's Mayor and City Council on May 1, 2023. (*Id.* at 4)

18.    Eric Meyer (Meyer) is the owner and publisher of the MCR newspaper. (*Id.* at 5)

19.    Kari Newell (Newell) owned a coffee shop and restaurant in Marion. (*Id.*)

20.    On August 1, 2023, Newell and Cody asked Meyer and Zorn to leave an event involving Congressman Jake LaTurner which Newell was hosting at her coffee shop. (*Id.* at 5-6)

B.    **Kari Newell's Driver's Records**

22.    On August 2, Zorn received information from a Marion resident, Pam Maag (Maag) indicating that Newell's driver's license was suspended due to a DUI conviction. (*Id.* at 6)

24.    Maag also sent Zorn a copy of a letter addressed to Newell from the Kansas Department of Revenue (KDOR) dated August 1. (*Id.*) (*See* KDOR letter in Exh. 1 (under seal); Complaint reference; *Gee*)

25.    The KDOR letter to Newell included her full name, address, driver's license number, and date of birth. The letter also contained requirements needed before Newell could restore her driving privileges. (*Id.* at 6-7) (*See also* Exh. 1)

27.    Zorn shared a printed copy of the KDOR letter with Meyer. Meyer went to the KDOR website titled "Kansas Driver's License Status Check." (*Id.* at 7)

29.    Relying on Newell's personal information (driver's license number and date of birth) from the KDOR letter, Meyer used the "Status Check" webpage to

confirm Newell's DUI conviction and suspended license. He did not access or obtain the KDOR letter from the "Status Check" webpage. (*Id.* at 7-8)

30.    "Zorn then called the Kansas Department of Revenue and was told that the letter in question was available on the same public-facing website, a user simply must keep clicking to find the link. Ms. Zorn then went to the same website Eric Meyer had used and saw that at the bottom of the same screen showing Newell's DUI conviction and suspension there was a box to click to view 'Documents.'" (*Id.* at 8) (*See also* KDOR webpage form in Exh. 2.; Complaint reference; *Gee*)

31.    "When Ms. Zorn clicked on that box a form appeared on the webpage and asked for 'Requester's Information.' Zorn then inserted her own name into the form and entered Newell's driver's license number and address." (Doc. 1 at 8)

32.    "The Kansas Driver's License Status Check webpage then required Zorn to check a box that read: 'I will use the information requested in a manner that is specifically authorized by Kansas Law and is related to the operation of a motor vehicle or public safety. (See section VI on the front of this form).'" (*Id.*) (*See also* Exh. 2.)

33.    "After Zorn checked the box and clicked "Accept," nineteen "Documents" appeared on the screen-the first of which was the August 1, 2023, letter from the Kansas Department of Revenue to Newell concerning the ignition interlock device, *i.e.*, the same document the source had previously provided Zorn." (*Id.*)

34.     "Having confirmed that the KDOR letter was legitimate, Zorn then closed the webpage and informed Meyer that she had verified that the information (and document) provided by the confidential source was accurate. Ms. Zorn never claimed to be Ms. Newell at any time in her dealings with the website." (*Id.* at 8-9)

39.     Meyer subsequently decided not to publish the information about Newell because he believed the paper was being drawn into a bitter divorce. (*Id.* at 10)

41.     On Friday, Aug. 4, Meyer emailed Chief Cody and Sheriff Soyez and advised them that a "confidential source" had provided the MCR with a KDOR letter addressed to a "Marion County business woman" recently in the news. Meyer did not identify MCR's source. Meyer said the KDOR letter disclosed the steps needed to reinstate the business woman's drivers license, including installing an ignition interlock device. (*Id.*) (*See* Meyer email in Exh. 3; Complaint reference; *Gee*)

43.     Also on August 4, the Marion Vice Mayor, Ruth Herbel (Herbel), sent an email to the Marion City Administrator. (Doc. 1 at 11)

44.     Attached to Herbel's email was a screenshot of the same KDOR letter to Newell which Zorn had received from Maag and which Zorn had "confirmed" through the KDOR website. (*Id.*)

45.     Herbel advised the City Administrator that Herbel had received the KDOR letter from Maag. (*Id.*)

52.     On August 7, Defendant David Mayfield, the Marion Mayor, authorized Chief Cody to begin an investigation into Newell and the MCR. (*Id.* at 13)

C. <u>**The Investigation**</u>

59. Later on Monday, August 7, Marion Police Officer Zach Hudlin, at the direction of Chief Cody, "made contact with someone at KDOR in their information technology department" and was told that on Friday, August 4, "Phyllis Zorn" had accessed Kari Newell's driver's record via the Kansas Driver's License Status Check; Hudlin did not record the name of the person he spoke with, noting only the unidentified person was "female." (*Id.* at 14). KDOR told Hudlin the Newell letter "was accessed by Phyllis Zorn and three minutes later by Kari Newell." (Hudlin memo in Exh. 4; Complaint reference; *Gee*)

55. Based on this information, Chief Cody told Newell that a reporter at MCR had stolen Newell's identify and provided Herbel with a copy of Newell's driver's license record. (Doc. 1 at 55)

57. At a meeting of the Marion City Council later on August 7, Newell spoke publically accusing the MCR and Herbel of illegally obtaining Newell's driver's records. Meyer denied that anyone at the MCR had provided Herbel with Newell's KDOR letter. (*Id.* at 13-14) (*See also* City Council minutes in Exh. 5.; Complaint reference; *Gee*)

63. On Wednesday, August 9, Detective Christner of the Sheriff's Office had drafted an application for a search warrant for the MCR offices and forwarded the draft to Cody. Christner indicated, however, that he would not sign the search warrant application himself. (Doc. 1 at 15)

64.    On Thursday, August 10, Cody had taken Christner's draft and prepared search warrant applications for the MCR offices, Ruth Herbel's residence, and Pam Maag's residence. Cody shared those drafts with Christner. (*Id.*)

65.    Later on August 10, Cody discussed the search warrant drafts with Sheriff Jeff Soyez and a decision was made to also prepare a search warrant for Meyer's residence. (*Id.*)

74A.    On the morning of Friday, August 11, Chief Cody presented his nine-page sworn affidavit to Magistrate Judge Laura Viar in an application requesting issuance of the search warrant for the MCR offices. Cody's affidavit stated in part that he had probable cause to believe and did believe that the crimes of identity theft (KSA 21-6107) and unlawful acts concerning computers (KSA 21-5839) had been committed and that evidence of such criminal offenses was located in the MCR offices. (Search Warrant application in Exh. 6; Complaint reference; *Gee*)

74B.    To establish probable cause for the search, Cody's affidavit listed the following information in the search warrant application:

    a)    The August 4 email from Meyer in which Meyer stated he received a copy of someone's private KDOR records (Exh. 6 at 5);

    b)    The August 4 email from Herbel to the City Administrator which contained a screenshot of Newell's KDOR letter (*Id.* at 5);

    c)    Newell told Cody that Newell had not given anyone permission to open or access her mail (*Id.* at 6);

d)      KDOR advised police that the individuals who downloaded the Newell letter from the KDOR website were "Phyllis Zorn" and "Kari Newell". Newell's name was used three minutes after Zorn's was used. (*Id.* at 6);

e)      Cody contacted Newell again who said she did not download or authorize anyone to download her letter from the KDOR website (*Id.* at 7);

f)      On August 9, Newell provided Cody with a written statement in which she described a phone call with Meyer on August 7 around 7:01 pm. Newell stated that Meyer admitted Zorn had downloaded Newell's KDOR letter and that was why Meyer would not publish it in the newspaper. Newell further stated that Meyer threatened, "if you pursue anything I will print the story and will continue to use anything I can to come at you. I will own your restaurant." (*Id.* at 7); S*ee also* Newell's written statement in Exh. 7; referenced in Search Warrant application; *Gee*);

g)      In a newspaper article published on August 9, Meyer wrote that the MCR received Newell's KDOR letter from a "source" and verified that it was accurate and obtained from a "public website." (Exh. 6 at 7-8);

h)      Under the federal DPPA, personal information obtained by KDOR cannot be released unless the request for that

9

information falls within one of the exceptions within that Act (Exh. 6 at 8).

74C.   **Judge Viar signed Cody's application for the search warrant which shows that it was subscribed and sworn to before her. (Exh. 6 at 9).**

74D.   **On August 11 at 9:00 a.m., Judge Viar signed Cody's requested search warrant. The Court found that there was probable cause to believe that crimes had been committed in violation of K.S.A. 21-6107 and 21-5839 and that evidence of the offenses could be found at the MCR offices. The search warrant further commanded that the listed items of evidence (including computers and cellular devices, as well as documents pertaining to Newell) could be seized. (Search Warrant in Exh. 8; Complaint reference; *Gee*).**

D.     **Execution of the MCR Search Warrant**

74.    **On Friday, August 11, Chief Cody led a team of law enforcement officers in executing search warrants on the MCR offices and the residences of Meyer and Herbel. (Doc. 1 at 18)**

76.    **The first search occurred at the MCR offices led by Chief Cody who was assisted by Officer Hudlin and Detective Christner. (*Id.*)**

79.    **Detective Christner conducted or attempted to conduct a "preview search" of Zorn's work computer utilizing special software. (*Id.* at 19)**

92.    **According to the log created by the "preview search" software, Detective Christner began his preview search at 11:11:57 a.m. and completed it at 12:32:05 p.m. (*Id.* at 21)**

93.     After Chief Cody talked to Sheriff Soyez by phone, Cody decided not to conduct a "preview search" on the other work computers in the MCR offices but rather to seize them all, including Zorn's. (*Id.* at 22)

97.     Cody also directed Officer Hudlin to seize Zorn's personal cell phone although no "preview search" had been conducted on it. (*Id.* at 23)

99.     Cody attempted to give Zorn a *Miranda* warning, but she said she believed she had done nothing wrong. (*Id.*)

100.     Cody asked Zorn if she had used her cell phone to access the KDOR website and Zorn said "no." (*Id.* at 23-24)

106.     As the searches were being executed at the various locations, Newell sent a text message to Cody. Cody later called Newell back and said: "We can't write anything." Newell replied: "I understand." Cody then discussed the status of the searches with Newell. (*Id.* at 25)

107.     After the searches were completed, Cody debriefed the Sheriff at the Sheriff's Office while sharing pizza. (*Id.* at 25)

108.     On August 13, the KBI issued a statement that it was taking over the investigation. Two days later, on August 15, Cody and Detective Christner exchanged drafts of probable cause affidavits supporting arrest warrants for Zorn, Meyer, and Herbel. (*Id.* at 25-26)

110.     On August 16, Joel Ensey (Marion County Attorney) filed a motion to release the items seized during the searches. The District Judge, Benjamin Sexton, granted Ensey's motion the same day. In a press release, the County Attorney stated that insufficient evidence existed to establish "a legally sufficient nexus"

between the crimes being investigated and the places searched and the items seized. (*Id.* at 26) In the same press release, however, the County Attorney stated his belief that Chief Cody's affidavit "established probable cause to believe that an employee of the newspaper may have committed the crime" prohibited by K.S.A. 21-5839 relating to computers. (Ensey press release in Exh. 9; Complaint reference; *Gee*).

113.   Later on August 16, a forensic examiner retained by the MCR took possession of all the seized items at the Sheriff's Office. This transfer of property was personally supervised by the Sheriff. (Doc. 1 at 26-27)

115.   On August 29, the contents of the "preview search" of Zorn's work computer was released to the MCR after a second court order. (*Id.* at 27)

## III.   ISSUES

A.   **Are Zorn's Fourth Amendment Claims Barred By Cody's Qualified Immunity Defense?**

B.   **Are Zorn's First Amendment Claims Barred By Cody's Qualified Immunity Defense?**

## IV.   ARGUMENTS AND AUTHORITIES

Defendant Cody is entitled to qualified immunity which bars all of Zorn's Fourth and First Amendment claims. To avoid Cody's defense, Zorn has the burden to show that a) Cody's conduct violated her constitutional rights and b) that the law was "clearly established" at the time of the incident. *Pahls v. Thomas*, 718 F.3d 1210, 1227 (10th Cir. 2013). "Clearly established" means that every reasonable police officer would understand that his conduct was unlawful. *Ashcroft v. al-Kidd*, 131 S. Ct. 731, 741 (2011). Moreover, the existing law must have placed the constitutionality of the officer's conduct "beyond debate." *Id.* Indeed, the constitutional rule must be "settled law."

*Hunter v. Bryant*, 502 U.S. 224, 228 (1991). Only a high degree of specificity will satisfy this standard. *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015).

Based on Zorn's own allegations, she has failed to show that Cody violated her constitutional rights or that the law was clearly established as she contends in August 2023. *Pahls, al-Kidd.* Thus, Cody is entitled to qualified immunity which bars Zorn's claims as a matter of law. *Id.* Furthermore, Plaintiff does not state any viable claim under the federal Privacy Protection Act. (*See* Doc. 1 at 16) *Davis v. Gracey,* 111 F.3d 1472, 1481-1482 (10th Cir. 1997).

## A.    CODY'S QUALIFIED IMMUNITY DEFENSE BARS PLAINTIFF'S FOURTH AMENDMENT CLAIMS

Zorn alleges that Cody violated her Fourth Amendment rights by a) preparing and executing an "invalid search warrant" and b) by unlawfully seizing her work computer and cell phone. (Doc. 1 at 29) However, Zorn's own factual allegations do not establish any Fourth Amendment violation or that the law was clearly established in the way Plaintiff claims. Therefore, this Court should grant Cody's motion to dismiss based on his qualified immunity defense. *Pauls, Mullenix.*

### 1.    THE SEARCH WARRANT IN QUESTION WAS NOT INVALID BECAUSE THROUGH HER OWN ADMISSIONS AND ALLEGATIONS IT IS UNDISPUTED THAT PLAINTIFF VIOLATED THE KANSAS CRIMINAL CODE AND THE DRIVER'S PRIVACY PROTECTION ACT (DPPA) BOTH OF WHICH PROHIBITED PLAINTIFF'S UNLAWFUL CONDUCT IN ACCESSING NEWELL'S KDOR LETTER

Plaintiff Zorn alleges in her Complaint that her actions in accessing and obtaining the KDOR letter to Kari Newell from the KDOR website was not unlawful. (Doc. 1 at 6-9) Plaintiff further asserts that the DPPA was not applicable to Zorn's actions in obtaining Newell's letter. (Doc. 1 at 14-17) Both of these conclusory legal assertions are false as a matter of law.

Cody's Application for Seach Warrant plainly states in the first narrative portion probable cause for the violation of two specific Kansas criminal statutes designed to protect Kansas citizens from unwarranted invasions of privacy and misuse of their personal information. (Search Warrant Application in Ex. 6, p. 1). These statutes codify that Zorn's actions were criminal because they plainly state Zorn could not *legally* use the Marion County Record computers to knowingly and without authorization access Newell's documentation. Further, Zorn could not legally use Newell's name, address and driver's license number to obtain documents for the purpose of causing Newell economic harm. Zorn's criminal activity under state law is further established by analysis of the applicable federal law written to protect access to private information.

Zorn patently violated the DPPA, which is the key to understanding the basis for the initial criminal investigation of Plaintiff. The investigation ultimately resulted in the search warrant at issue being prepared, approved by a state judge, and executed at the MCR offices. Based on her own allegations, Plaintiff is guilty of criminally violating the DPPA in at least two separate ways. That formed the basis for probable cause to believe she had also committed related state criminal offenses for which she was investigated by Defendant Cody and other law enforcement agencies.

The federal DPPA, 18 U.S.C.§2721, *et seq.*, prohibits individuals from knowingly obtaining or disclosing "personal information" from a state's motor vehicle records. *Dahlstrom v. Sun-Times Media, LLC,* 777 F.3d 937, 940 (7th Cir. 2015) ("personal information" of individuals includes name, address, driver's license number and date of birth). Furthermore, the media has no First Amendment right to obtain "personal information" from state motor vehicle records in violation of the DPPA. *Id.* Thus, Zorn's lawsuit at bar is based entirely on a false legal theory. *Id.* By her own admission, Plaintiff knowingly obtained "personal information" regarding Kari Newell from KDOR for an impermissible reason in obvious violation of the DPPA. (Doc. 1 at 7-

9)  Moreover, Zorn's status as a journalist did not provide her any First Amendment privilege to

do so contrary to Plaintiff's pleadings. *Dahlstrom* states in part:

> The DPPA was enacted to protect personal privacy and promote public safety:
>
> The underlying purpose of the DPPA also supports reading "personal information" to extend to the personal details at issue here. The DPPA was enacted as a public safety measure designed to prevent stalkers and criminals from utilizing motor vehicle records to acquire information about their victims. Prior to the law's enactment, anyone could contact the department of motor vehicles in most states and, simply by providing a license plate number and paying a nominal fee, obtain the corresponding driver's address and other pertinent biographical information—no questions asked.  At congressional hearings on the proposed legislation, numerous witnesses testified about the risks posed by unfettered public access to motor vehicle records. The most highly publicized impetus for the Act's passage was the 1989 murder of television actress Rebecca Schaeffer by an obsessed fan who obtained her unlisted home address from the California Department of Motor Vehicles. The DPPA's legislative history reveals that "the intent of [the Act] is simple-to protect the personal privacy and safety of all American licensed drivers."

*Dahlstrom*, 777 F.3d at 944 (citations to legislative history, case law, and footnote omitted). *See*

*also Maracich v. Spears*, 570 U.S. 48, 60-61 (2013); *Senne v. Village of Palatina, Ill.*, 695 F.3d

597, 607 (7th Cir. 2012) (the legislative history shows DPPA was to protect personal privacy and

prevent criminals from obtaining easily available "personal information" to commit crimes).

It is legally dispositive in this case that Plaintiff obtained "personal information" regarding

Kari Newell from the KDOR website by accessing and obtaining the KDOR letter to Newell. The

DPPA defines "personal information" as:

> Information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status. 18 U.S.C. §2725(3).

The KDOR letter at issue expressly included Newell's full name, date of birth, driver's

license number, and address, as well as additional personal information regarding steps she must

take related to her driver's license. (Exh. 1) The entire letter constituted "personal information"

protected by the DPPA. *Dahlstrom* The KDOR letter went far beyond general "driver's status" information which is not DPPA protected. *See* 18 U.S.C. §2725(3). *Id.*

In *Dahlstrom*, a newspaper was investigating local police for possible misconduct. 777 F.3d at 940-941. The newspaper obtained "personal information" (including birth dates) for five officers from state motor vehicle records and published that information within a newspaper article. *Id.* The five officers sued and the Seventh Circuit (on interlocutory appeal) held that indeed the officers possessed a viable DPPA claim. *Id.* at 942-945. The *Dahlstrom* court further stated that the newspaper had violated the DPPA when it "knowingly obtained the officer's personal details from the Illinois Secretary of State and proceeded to publish them." *Id.* at 945. Moreover, the newspaper's First Amendment defense was rejected. *Id.* at 954.

Based on her own allegations, Zorn did not obtain Newell's "personal information" (i.e., the KDOR letter) for any of the 14 permissible uses listed in the DPPA. 18 U.S.C. §2725(b). Plaintiff alleges that she obtained Newell's letter for the permissible reason that it was related "to the operation of a motor vehicle or public safety." *See* §2725(b)(14). That contention is patently false on its face, however. Zorn admits in her Complaint, that she obtained the KDOR letter to confirm the authenticity of the same letter conveyed to Zorn by Pam Maag. (Doc. 1 at 7-8) Plaintiff's admitted purpose does not satisfy any of the 14 legitimate reasons provided in §2725(b) and thus was unlawful as a matter of law. *Hedquist v. Walsh*, 786 Fed. Appx. 130, 135 (10th Cir. 2019) (personal or political reasons to obtain "personal information" would be an impermissible purpose); *United States v. Hastie,* 854 F.3d 1298, 1300-1301 (11th Cir. 2017)(same); *Pavona v. Law Officers of Anthony Mancini, LTD,* 118 F. Supp. 3d 1004, 1007-1008 (N.D. Ill.) (the accident report obtained was not used for a legitimate purpose relating to the operation of a motor vehicle).

Zorn admits that her boss (the newspaper's editor), Eric Meyer, went to the "Status Check" page of the KDOR website prior to Zorn. (Doc 1 at 7-8) Meyer confirmed on the "Status Check" page that Kari Newell had a DUI conviction and that her driver's license was suspended. (Doc 1 at 8) KDOR's "Status Check" page is consistent with the DPPA which does not include general information regarding a person's driver's license status or driving violations within the definition of the protected "personal information." 18 U.S.C. 2725(3). Zorn knew Meyer had that general information. Thus, she had absolutely no reason to go back to the "Status Check" page except to impermissibly "confirm" that the confidential KDOR letter to Newell was authentic. (Doc 1 at 8-9) Plaintiff even expressly admits this impermissible purpose. (*Id.*)

Zorn's actions became unlawful under the DPPA as soon as she checked the box on KDOR's "Status Check" page requesting Newell's "documents." (Doc. 1 at 8-9) By checking that box she was expressly affirming (as she admits) that her request for Newell's KDOR documents was both a) "specifically authorized by Kansas law" and b) "related to the operation of a motor vehicle or public safety." (Doc 1 at 8; Exh. 2) That language was required by the DPPA to protect Newell's "personal information" and privacy from exactly the kind of illegal request for confidential documents which Zorn was making. *See* 18 U.S.C. §2721(b); §2722(a) and (b). Zorn knew or should have known that making the false representations to KDOR (i.e., checking the box) to obtain Newell's protected documents was a gross violation of the DPPA and Newell's rights under federal and state law. *Maracich*, 570 U.S. at 74 (each distinct use of personal information must be permitted by the DPPA).

The DPPA clearly provides that it "shall be unlawful for any person knowingly to obtain or disclose personal information from a motor vehicle record, for any use not permitted under §2721(b) of this title." 18 U.S.C. §2722(a).  As already noted, Zorn admits she did not obtain

Newell's KDOR letter for any of the 14 permissible DPPA uses. (Doc 1 at 8-9) Clearly based on Zorn's own admissions, she "knowingly" obtained Kari Newell's personal information from KDOR for a use not permitted by the DPPA. §2722(a). For purposes of the DPPA, the term "knowingly" merely means "voluntary action," not knowledge of illegality. *Senne*, 695 F.3d at 603; *Pichler v. UNITE*, 542 F.3d 380, 396-397 (3rd Cir. 2008) (same). In addition, ignorance of the DPPA restrictions on "personal information" is not a defense. *Hastie*, 854 F.3d at 1305. Even if the KDOR letter was never used further by Zorn or published by her newspaper, merely accessing it through the KDOR website constituted a clear DPPA violation. *McDonough v. Anoka County,* 799 F.3d 931, 944-945 (8th Cir. 2015) (the DPPA term "obtain" unambiguously includes access and observation).

In addition, the DPPA expressly makes it "unlawful for any person to make false representation to obtain any personal information from an individual's motor vehicle record." 18 U.S.C. §2722(b).  Zorn admits that when the KDOR website asked for "Requestor's Information," she inserted her own name but entered Newell's driver's license number and address. (Doc. 1 at 8) Then Zorn checked the box that read: "I will use the information requested in a manner that is specifically authorized by Kansas law and is related to the operation of a motor vehicle, or public safety." (Id.; Exh. 2)

After Zorn checked the box and clicked "accept," 19 "documents" pertaining to Newell appeared on the screen including the KDOR letter at issue. (Doc. 1 at 8) Zorn's misrepresentation to KDOR that her request was specifically authorized by Kansas law and was for a valid purpose constituted a clear "false representation" to obtain Newell's personal information (i.e., the KDOR letter) for an improper purpose.  That is a separate and distinct violation of the DPPA. 18 U.S.C. §2722(b).

18

Zorn's two separate violations of the DPPA (§2722(a) and (b)) constitute both a federal crime and the basis for civil liability to the victim, Newell. *See* 18 USC §2723(a) and §2724. Had Zorn not committed those obvious DPPA violations which victimized Newell, the search warrant executed on Zorn's newspaper and the seizure of her work computer and cell phone would likely have never occurred.

Zorn contends that Kansas law authorized her actions despite the DPPA violations. (Doc. 1 at 9) However, that contention is patently false. The primary KDOR records statute, K.S.A. 74-2012, did not authorize Zorn's misrepresentations (i.e., checking the website box) to obtain access to the KDOR letter. Moreover, the Kansas Open Records Act (KORA) expressly protects the confidentiality of records "the disclosure of which is specifically prohibited or restricted by federal law." 45 K.S.A. §221(a)(1). *See also* §221(a)(30) (records which invade personal privacy are not open to the public).

However, it is immaterial whether Kansas law authorized Zorn's actions. The DPPA pre-empts state law based on the supremacy clause of the U.S. Constitution. *Maracich*, 570 U.S. at 71-72; *State of Oklahoma ex rel. Okl. Dept. of Public Safety v. U.S.*, 161 F.3d 1266, 1272 (10th Cir. 1998). Zorn's blatant violations of the DPPA led directly to Defendant Cody's investigation of her related state criminal offenses. (Doc. 1 at 15-18)

## 2. AT LEAST "ARGUABLE" PROBABLE CAUSE EXISTED TO ISSUE THE MCR SEARCH WARRANT SO CODY IS ENTITLED TO QUALIFIED IMMUNITY

In the context of a qualified immunity defense, a court determines whether "arguable" probable cause existed for the search warrant to issue. *Stonecipher v. Valles,* 759 F.3d 1134, 1141 (10th Cir. 2014). "Arguable probable cause is another way of saying that officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Id.* at 1141; *See also Cortez v. McCauley*, 478 F.3d 1108, 1120 (10th Cir. 2007). Certainly Chief Cody had at least

"arguable" probable cause to believe based on the information he set forth in his search warrant application that evidence could be found at the MCR offices regarding crimes relating to Newell's KDOR letter. *Stonecipher; Hoskins v. Withers,* 92 F.4th 1279, 1289-1290 (10th Cir. 2023); *Mocek v. City of Albuquerque,* 813 F.3d 912, 924-927 (10th Cir. 2015).

A neutral magistrate judge's issuance of a warrant is "the clearest indication that the officers acted in an objectively reasonable manner." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012). In the case at bar, Zorn does not allege that Judge Viar was biased, incompetent or anything other than neutral. Thus, her approval of Cody's search warrant application and the MCR search warrant itself is "the clearest indication" that Cody acted in an objectively reasonable manner in seeking the search warrant. *Id.*

Chief Cody had actual probable cause (or at least arguable probable cause) as set forth in his search warrant application. (*See* Exh. 6 at 5-8) KDOR had advised Officer Hudlin on August 7 that a person identified as "Phyllis Zorn" had downloaded Newell's KDOR letter from the KDOR website. When contacted, Newell denied that she had downloaded the letter and further said she had not authorized anyone to download the letter from the website. On the same day as the download (August 4), Meyer sent an email to Chief Cody and Sheriff Soyez indicating MCR had received a copy of "a local business woman's" private KDOR records. On August 9, Newell provided Cody with a written statement in which she described a phone call with Meyer on August 7. According to Newell, Meyer admitted that Zorn had downloaded Newell's KDOR letter. Newell's written statement also asserted that Meyer threatened Newell if she pursued the matter.

Therefore, Chief Cody had a solid basis to reasonably believe that 1) Phyllis Zorn of the MCR had downloaded Newell's federally-protected, private KDOR letter from the KDOR website on August 4; 2) Newell had not authorized Zorn to access and obtain Newell's confidential KDOR

letter; 3) The MCR owner and editor (Meyer) had admitted to Newell on August 9 that Zorn had downloaded Newell's KDOR letter protected by the DPPA, and 4) Meyer showed his consciousness of guilt by threatening Newell if she pursued the illegality. Thus, as a matter of law, Cody had probable cause (or at least arguable probable cause) to reasonably believe that Newell was the victim of computer related crimes involving the download of Newell's KDOR letter. In addition, Cody had a reasonable belief that relevant evidence would be found by searching the electronic devices at the MCR offices.

Chief Cody was investigating the state law crime which prohibits certain unlawful acts concerning computers (K.S.A. 21-5839). (*See* Exh. 6) Under K.S.A. 21-5839(a)(5), it is unlawful for any person to "**knowingly and without authorization, access or attempt to access any computer, computer system, social networking website, computer network or computer software, program, documentation, data or property contained in any computer, computer system or computer network.**" Based on Zorn's own allegations, Cody had probable cause (or at least arguable probable cause) to believe that Zorn: a) knowingly and without authorization, b) accessed KDOR's computer system, c) to obtain Newell's confidential documentation or data. This crime is a class A nonperson misdemeanor under Kansas law. K.S.A. 21-5839(b)(3).

Chief Cody was also investigating an "identity theft" offense. (*See* Ex. 6) Under K.S.A. 21-6107(a), identity theft is "**obtaining, possessing, transferring, using, selling or purchasing any personal identifying information, or document containing the same, belonging to or issued to another person, with the intent to: 1) defraud that person, or anyone else, in order to receive any benefit; or 2) misrepresent that person in order to subject that person to economic or bodily harm.**" Cody had probable cause (or at least arguable probable cause) to reasonably believe that Zorn: a) obtained the KDOR letter containing Newell's personal

identifying information, b) with the intent to defraud KDOR (by misrepresenting her purpose) for MCR's benefit (i.e. to sell newspapers). Alternatively, Zorn acted with the illegal intent to misrepresent Newell (i.e. steal her identity) to cause Newell economic harm (i.e., damage to her reputation and business). Identity theft is a severity level 8, nonperson felony, in Kansas.

Because Cody had a least arguable probable cause for the MCR search warrant to be issued, he is entitled to qualified immunity. *Stonecipher; Hoskins; Mocek.*

### 3. CHIEF CODY IS ENTITLED TO QUALIFIED IMMUNITY REGARDING THE EXECUTION OF THE SEARCH WARRANT

Zorn also alleges that Cody violated her Fourth Amendment rights by exceeding the scope of the search warrant and seizing her work computer and phone. (Doc. 1 at 29) Zorn more particularly alleges that Detective Christner conducted a "sham" preview search (using special software) on her work computer which took more than 80 minutes using keywords such as "vehicle" and "Kansas." (*Id.* at 19-21) Then Cody directed that Zorn's work computer be seized, as well as her cell phone on which a preview search had not been conducted. (*Id.* at 21-23) Plaintiff argues that the seizure of those items violated her Fourth Amendment rights because (according to Zorn) the MCR search warrant required a preview search before any items were seized. (*Id.*)

First, Plaintiff alleges that Christner (not Cody) conducted the purported "sham" preview search of her work computer. Zorn does not allege that Cody ordered, directed or authorized any "sham" search of the computer. Thus, even if a "sham" preview search occurred, Chief Cody would not be responsible for it and would be entitled to qualified immunity on Zorn's claim of a "sham" search.

Second, Zorn does not explain how or why a "sham" search would take more than one hour and twenty minutes. It would seem that a truly fake search would take much less time than that and would also fake a "hit." Of course, we now know that Zorn indeed did download Newell's

22

KDOR letter from Zorn's work computer as she herself admits in her Complaint. Moreover, Meyer admitted that fact to Newell before the search warrant issued. Thus, Plaintiff's conclusory assertion of a "sham" preview search is not plausible and Cody is entitled to qualified immunity for that reason as well.

Third, it is apparent from the length of the preview search (more than 80 minutes) that Detective Christner's software was not operating properly or was horrendously slow. If a preview search would have been conducted on Zorn's cell phone and the other electronic devices in the MCR offices, it could have taken another six hours or more for the MCR search to be completed which would have meant even more inconvenience to the newspaper operations. Thus, it was objectively reasonable for Chief Cody to direct that Zorn's cell phone and work computer be seized for any additional preview searches to be conducted off premises.

Fourth, the search warrant (which incorporated the language of Cody's application) did not *require* an on-premises preview search. (*See* Exh. 6 and 8) The language used certainly indicated that preview searches should be done, if reasonably possible, at the MCR offices. But the search warrant did not contemplate that preview searches of the electronic devices on-premises would take several hours or more.

This factual scenario is governed by *United States v. Hargus*, 128 F.3d 1358 (10th Cir 1997). In that case, law enforcement officers seized two file cabinets with all their contents rather than reviewing all the files therein for relevant documents to be seized pursuant to the search warrant. *Id.* at 1363. The *Hargus* Court upheld the seizures by stating:

> Although we are given pause by the wholesale seizure of file cabinets and miscellaneous papers and property not specified in the search warrant, the officers did not grossly exceed the scope of the warrant. Their conduct was motivated by the impracticability of on-site sorting and the time constraints of executing a daytime search warrant. *Id.* at 1363

Subsequent courts have reaffirmed this Fourth Amendment principle of law. *High Plains Livestock, LLC v. Allan,* 2019 WL 2524323 at 4-5 (D. N. Mex.); *United States v. Gimmett,* 2004 WL 3171788 at 4 (D. Kan.).

Because the scope of the search warrant was not grossly exceeded in the case at bar, Chief Cody is entitled to qualified immunity regarding the execution of the search warrant. *Hargus, High Plains, Gimmett.* Cody also fully incorporates herein the argument that Zorn has no standing to base her claim on the seizure of the MCR-owned work computer. *See* Memorandum in Support of Motion to Dismiss by Defendants Mayfield, Hudlin, and Marion.

**B.    CODY'S QUALIFIED IMMUNITY DEFENSE BARS PLAINTIFF'S FIRST AMENDMENT CLAIMS**

Zorn claims that Chief Cody violated her First Amendment rights by a) restricting her ability as a journalist to gather information, and b) by retaliating against her with the search and seizure of her work computer and cell phone. (Doc. 1 at 28-29) Neither of those claims state a viable cause of action under §1983. *Villarreal v. City of Laredo, Texas,* ___ F.4th ___ (5th Cir. 2024); 2024 WL 244359 at 12-14 (en banc) (First Amendment rights of on-line journalist were not violated when she was arrested for publishing confidential personal information in violation of statute).

**1.    ZORN'S FIRST AMENDMENT RIGHTS WERE NOT VIOLATED**

To state a viable First Amendment claim, Zorn must prove: a) she was engaged in constitutionally protected activity; b) Chief Cody's actions caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and c) Cody's adverse action was substantially motivated as a response to Zorn's exercise of constitutionally protected conduct. *Smith v. Plati*; 258 F. 3d 1167, 1176-1178 (10th Cir. 2001) (on-line journalist restricted from some University information did not state viable First Amendment claim).

First, it is settled law that there is no general First Amendment right of access to all sources of information under government control. *Smith,* 258 F.3d at 1178. Moreover, "the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg v. Hayes*, 408 U.S. 665, 681-682 (1972). Further, a newspaper "has no special immunity from the application of general laws" and "no special privilege to invade the rights and liberties of others." *Id* at 683. Thus, in the case at bar, Zorn's First Amendment rights as a journalist are constrained to news gathering "within the means of the law." *Villarreal*, 2014 WL 244359 at 13. *See also Dahlstrom*, 777 F.3d at 954 (First Amendment defense to DPPA violation was rejected). Therefore, Zorn states no viable First Amendment claim based on her mere status as a journalist. *Branzburg, Villarreal, Smith, Dahlstrom.*

In addition, Plaintiff does not allege any facts to establish that she was engaged in protected First Amendment activity as required by the three-pronged *Smith* test. Instead, by her own allegations, she was engaged in violating the federal DPPA and Kansas criminal law by accessing Newell's KDOR letter from KDOR. (Doc. 1 at 8-9) Thus, no viable First Amendment claim exists. *Smith, Villarreal.*

Zorn also fails to allege any facts to establish that an ordinary person in her position would have been "chilled" by a search warrant directed at finding evidence of computer crimes in the MCR offices. Zorn was not arrested or charged criminally, and she was prevented from using her work computer and cell phone for only five days. Her cell phone itself was never searched. Again, no viable First Amendment claim is stated. *Smith, Villarreal.*

Finally, Plaintiff fails to allege any facts to establish that Chief Cody's motivation for obtaining the MCR search warrant was other than to gather evidence of computer crimes committed by Zorn and other MCR employees based on probable cause. It was another reporter

(Gruver) not Zorn who was allegedly investigating purported misconduct by Cody at his prior job. (Doc. 1 at 20, 25) Zorn even alleges that Cody confidentially encouraged her to start her own newspaper to compete with the MCR and he would invest with her. (Doc. 1 at 4) Zorn makes no factual allegation establishing any retaliatory animus by Cody toward Zorn. Once again, no viable First Amendment claim has been stated under the applicable *Smith* test, and Zorn's claims must be dismissed with prejudice. *Smith, Villarreal.*

### 2.    NO CLEARLY ESTABLISHED LAW SUPPORTS PLAINTIFF'S CLAIMS

As an alternative basis for dismissal of Plaintiff's First Amendment claims, Chief Cody is entitled to qualified immunity because Zorn cannot identify any Supreme Court or Tenth Circuit case which clearly establishes a constitutional violation under even arguably similar alleged facts. *Wise v. Caffery* 72 F.4th 1199, 1209 (10th Cir. 2023). Indeed, the clearly established law is contrary to Zorn's contentions. *See Smith, Villarreal, Dahlstrom.* When it is debatable whether a constitutional violation has occurred in the circumstances at issue, the law cannot (by definition) be clearly established. *Reichle v. Howards*, 566 U.S. 658, 669-670 (2012). In the case at bar, the law is certainly not "settled" in Zorn's favor. *Id.* Therefore, Cody is entitled to qualified immunity barring Plaintiff's First Amendment claims. *Id.*

## V.    CONCLUSION

For the reasons stated herein, Defendant Gideon Cody requests the Court enter judgment against Plaintiff as to the claims in the Plaintiff's Complaint, dismiss the Defendant from this action with prejudice and for any further relief the Court deems just and proper.

Respectfully submitted:

/s/Edward L. Keeley
Edward L. Keeley, #09771
Jennifer M. Hill, #21213
MCDONALD TINKER PA

300 West Douglas Avenue, Suite 500
Wichita, Kansas 67202
T: (316) 263-5851; F: (316) 263-4677
E: ekeeley@mcdonaldtinker.com
E: jhill@mcdonaldtinker.com
*Attorneys for Defendant Gideon Cody*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 22nd day of March 2024, a true and correct copy of the above and foregoing **Defendants' Memorandum in Support Motion to Dismiss** was electronically filed with the United States District Court via the CM/ECF system, which will provide electronic notice to all attorneys of record including, the pro se Plaintiff:

Jeffrey L. Kuhlmann
WATKINS CALCARA, CHTD.
1321 Main Street – Suite 300
P.O. Drawer 1110
Great Bend, Kansas 67530
Tel: (620) 792-8231
Fax: (620) 792-2775
Email: jkuhlman@wcrf.com
*Attorneys for Defendants The Board of*
*County Commission of Marion County, KS,*
*Sheriff Jeff Soyez, Aaron Christner*

Randall K. Rathbun
DEPEW GILLEN RATHBUN &
MCINTEER LC
8301 E. 21st Street N., Suite 450
Wichita, Kansas 67206-2936
T: (316) 262-4000
Email: randy@depewgillen.com
*Attorney for Plaintiff*

/s/Edward L. Keeley
Edward L. Keeley, #09771

27