IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| PHYLLIS J. ZORN )<br>)<br>Plaintiff )<br>)<br>v. )<br>)<br>CITY OF MARION, KS, et al., )<br>)<br>Defendants )<br>_____ ) | Case No. 24-CV-2044-DDC-GEB |

RESPONSE TO THE COUNTY DEFENDANTS'
MOTION TO DISMISS (DOC. 53)

## I. INTRODUCTION

*Twombly/Iqbal*'s plausibility standard changed the way lawyers plead cases. It is now a rare case indeed that is not greeted with the obligatory Rule 12(b)(6) Motion to Dismiss. However, it appears that some lawyers stopped reading the cases governing pleading of a claim after the above cases arose in 2007 and 2009, respectively.

Jump ahead to 2014, when the Supreme Court reminded us that federal pleading rules call for "a short and plain statement of the claim showing that the pleader is entitled to relief."[1] *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014). *Johnson* involved a claim by police officers that they had been fired for exercising their constitutional rights under the First Amendment. The District Court and the Fifth Circuit booted their case because they had not stated the magic words "Section 1983" in their complaint. The Supreme Court was not amused. In a two-page decision, they "summarily reversed" the lower courts and reminded lawyers that:

---

[1] That being said, the plaintiff must admit her complaint is not "short"—but the facts are critical in this case.

    (1)    "The Federal pleading rules . . . do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."

    (2)    "The Federal Rules of Civil Procedure 'are designed to discourage battles over mere form of statement.'"

    (3)    Rule 8(a)(2) "indicates that a basic objective of the rules is to avoid civil cases turning on technicalities."

    (4)    "The federal rules effectively abolish the restrictive theory of the pleadings doctrine, making it clear that it is unnecessary to set out a legal theory for the plaintiff's claim for relief."

    (5)    The only thing that Twombly and Iqbal concern is "the *factual* allegations a complaint must have to survive a motion to dismiss." (italics in original).

*Johnson*, 574 U.S. at 10-12.

The courts in this District are likewise cognizant of the post *Twombly/Iqbal* pleading requirements of Rule 8:

- "There is no requirement that a pleading list elements of claims asserted, make legal conclusions about claims asserted, or label the asserted claims." *Kelp v. B & B Lumber Co.*, No. 18-1103-JWB, 2018 WL 3831525, at *3 (D. Kan. Aug. 13, 2018).

- Moreover, although labels and elements may be helpful to a defendant, they are not required under Rule 8. "There is no requirement that a pleading list elements of claims asserted, make legal conclusions about claims asserted, or label the asserted claims." *Mechler v. United States*, No. 12-1183-EFM-GLR, 2012 WL 5289627, at *3 (D. Kan. Oct. 23, 2012).

- "When a complaint provides sufficient notice under Rule 8(1), the defendant should elicit additional detail through the discovery process." *Kelly v. Morton Salt, Inc.*, No. 20-1352-TC, 2021 WL 1821819, at *2 (D. Kan. Mar. 1, 2021).

With the above pleading rules in mind, let's take a look at the defendants' brief (Doc. 54).

## II. FACTUAL BACKGROUND

Defendants inexplicably take three of the five extra pages they requested to set forth the "facts" of this case. The *only* facts of this case are found in the Amended Complaint (Doc. 35). As the Tenth Circuit noted in *Mayfield v. Bethards,* 826 F.3d 1252, 1255 (10th Cir. 2016): In reviewing a motion to dismiss, we accept the facts alleged in the complaint as true and view them in the light most favorable to the plaintiff. In determining whether a complaint states a plausible claim for relief, the Court draws upon its judicial experience and common sense. *Iqbal*, 556 U.S. at 679.

Finally, the Supreme Court, after *Twombly/Iqbal*, specifically rejected the idea that there is a heightened pleading requirement for Section 1983 cases:

> In particular, no heightened pleading rule requires plaintiffs seeking damages for violations of constitutional rights to invoke § 1983 expressly in order to state a claim. See *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (a federal court may not apply a standard "more stringent than the usual pleading requirements of Rule 8(a)" in "civil rights cases alleging municipal liability"); *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (imposing a "heightened pleading standard in employment discrimination cases conflicts with Federal Rule of Civil Procedure 8(a)(2)").

*Johnson v. City of Shelby, Miss.,* 574 U.S. 10, 11 (2014).

## III. ARGUMENT AND AUTHORITIES

### A. DID THE PLAINTIFF FAIL TO ALLEGE OFFICIAL CAPACITY OR MUNICIPAL LIABILITY UNDER § 1983?

The defendants correctly note that there are five different ways that a plaintiff can show that a municipal policy or custom led to the constitutional violations that have

3

literally drawn international condemnation in this case:

    1.    There was a formal regulation or policy statement;

    2.    There was an informal custom amounting to a widespread practice that was permanent/well settled as to constitute a custom or usage with the force of law;

    3.    There was a decision by an employee with final policymaking authority;

    4.    There was a ratification by final policy makers; or

    5.    There was a failure to train caused by deliberate indifference.

At this point in discovery, the plaintiff is aware of at least two of the five bases for *Monell*[2] liability as to these defendants: (1) failure to train and (2) a decision by an employee with final policymaking authority. The Amended Complaint (Doc. 35) alleges that:

"321. Marion County and Sheriff Soyez did not provide training to the members of the Sheriff's Office as to the rights of the news media to be protected from government intrusion under the First Amendment, the federal Privacy Protection Act, and the Kansas Shield Law.

322. Again, this failure is evident from the complete absence of any mention of these issues during the investigation or in the search warrant affidavits.

323. This failure to train is the result of Sheriff Soyez' animus toward the *Marion County Record* and the plaintiff and reflects deliberate indifference on the part of the County and the Sheriff.

377. Marion County, the Marion County Sheriff, and the City of Marion failed to properly hire, train, supervise, discipline, and control their officers regarding:

    a.    the constitutional protections afforded the press under the First Amendment,

    b.    the constitutional requirements contained in the Fourth Amendment,

---

[2]*Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978).

  c.  the statutory protections contained in the Privacy Protection Act,

  d.  the statutory protections of the Kansas Shield Law,

  e.  the methods and manner of preparing a valid search warrant application,

  f.  the methods and manner of properly executing a search warrant, and

  g.  the methods and manner of conducting a valid "preview search" of a digital device.

  378. Marion County, the Marion County Sheriff, and the City of Marion failed to have proper policies, procedures, or practices concerning these subjects. That failure to train is the result of deliberate indifference on the part of the City, the County, and the Sheriff's Office.

  379. The failures of Marion County, the Marion County Sheriff, and the City of Marion in this regard led to, and/or contributed to, the wrongful acts committed by their officers in obtaining and conducting the illegal raids.

  380. As a result, Marion County, the Marion County Sheriff, and the City of Marion are responsible for the actions of their officers in obtaining and conducting the illegal raids."

Additionally, the Amended Complaint alleges that the Sheriff was a decision-maker in the illegal raid:

  301. But it was Sheriff Soyez who personally told Chief Cody "just take them all" when Cody called Soyez from the *Record*'s newsroom and told Soyez about the failed "preview search."

  314. Sheriff Soyez, therefore, sets official municipal policy for the Marion County, Kansas, Sheriff's Office.

  315. Accordingly, Sheriff Soyez's actions, along with the actions of the Marion County Sheriff's personnel who participated in the illegal searches under the direction of Sheriff Soyez (including Det. Christner), were undertaken pursuant to official municipal policy. the Marion County Sheriff's personnel who participated in the illegal searches under the direction of Sheriff Soyez (including Det. Christner), were undertaken pursuant to official municipal policy.

  332. Sheriff Soyez also harbored his own personal animus against the *Record* and the plaintiff.

5

333. Both Sheriff Soyez and Chief Cody also knew the *Record* and Ms. Zorn were threatening to expose them for allowing Kari Newell to drive around Marion for years without a valid license.

338. Sheriff Soyez's actions in assisting Chief Cody with the investigation, in planning the raids with Chief Cody, in supplying Sheriff's deputies for the illegal raids, and in agreeing with Chief Cody to disregard the preview search requirement before seizing the computers and other devices, were motivated by his desire to seek retribution against the *Record* and its reporters.

372. Sheriff Soyez was "acting within the scope or under color of [his] office or employment" when he directed the raids on the newsroom of the *Marion County Record*."

There is no heightened pleading standard under § 1983 as the County defendants seem to suggest. The County is plainly on notice that the plaintiff alleges that the Sheriff failed to adequately train its staff and that the Sheriff himself ("a decision by an employee with final policymaking authority") was calling the shots on such critical decisions as to actually taking possession of the computers/cell phones of the reporters.

A fair reading of the Amended Complaint reveals the following: The mayor, chief of police and Sheriff had an animus toward the *Record* and its reporters (including the plaintiff)–believing they were too negative toward the community. A whistle blower notified the paper that one of the town's influential business leaders had been driving with a suspended license for years because of a DUI and local law enforcement knew about it and did nothing. In spite of the fact that defendants *knew* this information had come from correspondence that was presented to the paper, the Sheriff's office and police department cooked a scheme to raid the offices of the *Record*. Sheriff Soyez directed the raid team to take computers and cell phones from the reporters.

The defendants suggest that the pleadings above are conclusory. To the contrary, the pleadings above set out *facts* as to the actions of the Sheriff. The Sheriff's animus

6

was communicated to the plaintiff.  It was the *Sheriff* who directed that the computers/cell phones should be confiscated.  This was the conduct of the final policy maker in the office.

Two final points.  First,  the decisions as to whether a Sheriff or the BOCC should be parties for purposes of *Monell* liability seem to be conflicting.  The plaintiff named both out of an abundance of caution.  The plaintiff concurs with the decisions that, for practical purposes, the plaintiff need only name the Sheriff *or* the BOCC.  The plaintiff concurs with the defendants that the official capacity claims should proceed against the Sheriff.

Second, pleading policy and custom is generally done in a vacuum.  The plaintiff respectfully prays that should the Court find the allegations of policy and custom are lacking, the plaintiff actually be allowed to do discovery on the issue.  As this Court has noted in the past, dismissals on *Monell* claims can be without prejudice to allow the plaintiff to plead additional policy and custom facts: "the "federal policy of deciding cases on the basis of the substantive rights involved rather than on technicalities" must inform the court's dismissal." 5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2023);  *Galindo v. Taylor*, No. 22-2414-DDC-RES, 2024 WL 1116072, at *7 (D. Kan. 2024).

      B    DID THE PLAINTIFF FAIL TO ADEQUATELY ALLEGE THE EXISTENCE OF A CONSPIRACY UNDER § 1983?

The County defendants next claim that the plaintiff failed to "adequately allege" the existence of a conspiracy under § 1983.  First things first: A § 1983 conspiracy deprives "a plaintiff of a constitutional or federally protected right under color of state

law." *Bledsoe v. Carreno*, 53 F.4th 589, 609 (10th Cir. 2022) (internal quotation marks and citation omitted). This kind of conspiracy claim requires plaintiffs to "allege specific facts showing agreement and concerted action amongst the defendants[.]" *Frasier v. Evans*, 992 F.3d 1003, 1024 (10th Cir. 2021) (internal quotation marks and citation omitted). The Tenth Circuit elaborated on the requisite elements to allege a conspiracy in *Snell v. Tunnell*, 920 F.2d 673, 702 (10th Cir. 1990):

> The participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective or possess the same motives for desiring the intended conspiratorial result. To demonstrate the existence of a conspiratorial agreement it simply must be shown that there was a single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences.

It should be noted that direct evidence of conspiracy is not required. Because direct evidence of an agreement to join a conspiracy is rare, the Court can infer assent "from acts furthering the conspiracy's purpose." The Court decides on a case-by-case basis whether plaintiff has alleged sufficient facts to support a conspiracy claim. *Douglass v. Garden City Cmty. Coll.*, 543 F. Supp. 3d 1043, 1060 (D. Kan. 2021)

What does the Amended Complaint allege as to whether there was a "single plan, the essential nature and general scope of which was known to the Sheriff and Detective Christner? It alleges that on August 8, 2023, Soyez and Cody met. They were both concerned that the plaintiff and the Record were going expose the fact that both the Police department and Sheriff's department had knowingly let a leading Marion businesswoman, Kari Newell, drive around the town with no driver's license (having lost it because of a DUI). At that meeting, Soyez agreed to join with the police chief and the

Mayor in taking down the *Record*. (¶¶ 93-96).

Sheriff's Office Detective Christner, (assigned by Soyez to assist), was in charge of drafting the search warrant on the *Record*. The draft was forwarded to Cody because Christner had the good sense not to sign it. The draft warrant was replete with intentional, knowing or recklessly false statements. (¶¶ 97-116).

The next morning, August 10, Cody took Christner's draft and prepared a search warrant application for the *Record* (among others). The drafts were shared with Christner. Later that same day, Soyez and Cody decided to add another target to the raid: Eric Meyer's home. Christner then prepared the actual search warrants from Cody's drafts. (¶¶ 117-130).

On Friday, August 11, the Sheriff's office and Police Department raided the Marion Record. Christner was in charge of doing the "preview search" on the plaintiff's computer (¶¶ 144-150). During the search, Cody contacted Soyez concerning the speed of the search. Soyez directed Cody just to "take them all." (¶ 164) Accordingly, cell phones and computers of the reporters were confiscated.

After the raids were complete, Cody drove to the Sheriff's Office to debrief Soyez. (¶ 180). On August 15, Christner and Cody exchanged drafts of probable cause warrants for the arrest of the plaintiff. (¶ 184).

Soyez "actively participated in planning the raids" and "personally participated in the decision to have all of the Record's newsroom computers seized. (¶193)

Plaintiff cannot imagine how the evidence pointing to a conspiracy could be any more stark. There was one plan, executed in conjunction by the police department and the Sheriff's Office.

9

### C. ARE SHERIFF SOYEZ AND DETECTIVE CHRISTNER ENTITLED TO QUALIFIED IMMUNITY UNDER § 1983?

*The County Has Made Its Bed...*

The County defendants elected to make a qualified immunity claim by way of a motion to dismiss as opposed to asserting the claim in a motion for summary judgment. The Tenth Circuit has recently noted the added burden this places on the defendants:

> Lastly, we note that here Appellants asserted qualified immunity at the motion-to-dismiss stage of the litigation. The procedural posture of the qualified-immunity inquiry may be critical. Because they turn on a fact-bound inquiry, "qualified immunity defenses are typically resolved at the summary judgment stage" rather than on a motion to dismiss. *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). "Asserting a qualified immunity defense via a Rule 12(b)(6) motion … subjects the defendant to a more challenging standard of review than would apply on summary judgment." Id. (internal quotation marks omitted). On a motion to dismiss, "it is the defendant's conduct as alleged in the complaint that is scrutinized for [constitutionality]." *Behrens v. Pelletier*, 516 U.S. 299, 309, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996).

*Bledsoe v. Carreno,* 53 F.4th 589, 607–08 (10th Cir. 2022)

#### 1. The First Amendment Violation

This much is as clear as Rocky Mountain springwater: In 2023, it was clearly established that there is a constitutional right to gather and report the news. Defendants first claim not to understand the difference between a direct violation of the First Amendment and a retaliation claim.

The First Amendment protects "the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. Amend. I. Thus, a complete ban on speaking at a public forum is a direct violation of the First Amendment. *See, MacQuigg v. Albuquerque Pub. Sch. Bd. of Educ.*, No. CV 12-1137

MCA/SCY, 2015 WL 13650030, at *8 (D.N.M. Feb. 6, 2015) ("Excluding a plaintiff from a public forum … is a direct First Amendment violation ….").

On the other hand, where the government targets a specific individual because of that individual's exercise of their First Amendment rights, the government is engaged in First Amendment retaliation. For example, in *Irizarry v. Yehia*, 38 F.4th 1282 (10th Cir. 2022), the Court of Appeals found that a YouTube journalist who sued a police officer who interfered in his effort to film a police traffic stop "alleged a First Amendment retaliation claim under clearly established law." *Id*. at 1288.

As such, it is plainly proper in this Circuit to assert the "parallel claims" of a "direct violation of his right to free speech, and … for retaliation motivated by his protected speech." *Brandt v. City of Westminster*, 300 F. Supp. 3d 1259, 1282 (D. Colo. 2018). While such claims may be "closely related," they are separate claims and stand on their own. *Id*.

Moreover, the elements of the claims are distinguishable. To make out a First Amendment retaliation claim, a plaintiff must show (a) he engaged in protected speech, (b) a person of ordinary firmness would have been chilled by the defendant's actions, and (c) the defendant's action was substantially motivated as a response to the plaintiff's protected activity. *Irizarry*, 38 F.4th at 1288. In "a direct First Amendment violation … there is no need to complicate the analysis injecting the additional element of 'chilling.'" *MacQuigg*, 2015 WL 13650030, at *8.

As the Supreme Court has observed, "the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw."

11

*First Nat'l Bank v. Bellotti*, 435 U.S. 765, 783 (1978) see also *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("It is ... well established that the Constitution protects the right to receive information and ideas."). An important corollary to this interest in protecting the stock of public information is that "[t]here is an undoubted right to gather news 'from any source by means within the law.' " *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978). Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting "the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). "We do not question the significance of free speech, press, or assembly to the country's welfare. Nor is it suggested that news gathering does not qualify for First Amendment protection; without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972).

Prior to the August 11, 2023, unprecedented raids on the newsroom of the *Marion County Record*, it was clearly established that "[w]here the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude.'" *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978).

According to the Amended Complaint, the raid was *in retaliation for the newspaper doing its job*. (Paragraphs 336-340). Tenth Circuit law on retaliatory claims arising under the First Amendment are well established. A First Amendment retaliation claim requires facts alleging (1) constitutionally protected activity, (2) an injury that would chill a person of ordinary firmness from continuing to engage in constitutionally protected activity, and (3) that the defendant's actions were

substantially motivated as a response to the constitutionally protected activity. *Salemi v. Colo. Pub. Employees' Ret. Ass'n*, 747 F. App'x 675, 698 (10th Cir. 2018).

Plaintiff acknowledges that she has the burden to come forward with authorities demonstrating that the violative nature of the conduct at issue is clearly established. *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018). However, as this Court has noted:

> [T]o hold a defendant liable under § 1983, it is not necessary that " 'the very action in question has previously been held unlawful.' " Id. at 1866–67 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Thus, for qualified immunity to apply, the Supreme Court does not require a "reported case directly on point." Id. at 1867 (citation and internal quotation marks omitted). Instead, the Court's case law requires district courts to evaluate whether "the unlawfulness of the officer's conduct '[is] apparent' " " 'in the light of pre-existing law.' " Id. (quoting *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034).

*White v. City of Topeka,* 489 F. Supp. 3d 1209, 1223 (D. Kan. 2020).

### 2. The Fourth Amendment Violations

This case is a veritable shopping list of Fourth Amendment violations. The Amended Complaint clearly shows the following violations (paragraphs 213 - 294):

- ✓ Misleading and just plain false statements in the affidavit for a warrant.
- ✓ The search warrants were not supported by oath or affirmation.
- ✓ The search exceeded the scope of the search warrant.
- ✓ The raid interfered with the freedom of the press.

These actions above were clearly established as Fourth Amendment violations before the raid of August 11, 2023. It was clearly established that "employ[ing] a reasonable process in seeking the warrant" does not relieve officers of their constitutional duty to "exercise their own professional judgment" as to the

13

existence of probable cause. *Poolaw v. Marcantel*, 565 F.3d 721, 734 (10th Cir. 2009), as amended (July 24, 2009). Clearly established law restricts officers from intentionally misleading the judge with respect to the facts in obtaining a warrant. *Id* at 745; *Franks v. Delaware*, 438 U.S. 154, 164–65, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

### D. DOES THE PLAINTIFF STATE A CLAIM UNDER THE PRIVACY PROTECTION ACT ?

The County Defendants argue that Ms. Zorn cannot state a claim for recovery under the Privacy Protection Act, 42 U.S.C. §2000aa. They make essentially three arguments: (1) Ms. Zorn has no standing; (2) she is not protected because she is a "criminal suspect"; and (3) the County defendants were not searching for "work product materials." The arguments will be examined in the order presented.

The standing requirement under the PPA is not as restrictive as the defendant would lead the Court to believe. Standing under the PPA has been held to be broad enough to protect *users* of a bulletin board service that was seized by law enforcement. *Guest v. Leis*, 255 F.3d 325, 341 (6th Cir. 2001). The Sixth Circuit noted that the statute creates a cause of action for any "aggrieved person": "A person aggrieved by a search for or seizure of materials in violation of this chapter shall have a civil cause of action for damages for such search or seizure...." 42 U.S.C. § 2000aa 6(a). The plaintiff's cell phone was seized by the defendants. Her work computer was seized by the defendants with all her "work product." The defendants *admit* that the owners of seized items have standing under the PPA, apparently overlooking that the plaintiff's cell phone was seized. This argument fails.

Defendants additionally claim that Ms. Zorn was not protected by the PPA because she was a "criminal suspect". This is nonsense. The defendants knew that Ms.

14

Zorn had received the information concerning Newell's criminal conduct from a letter given to her by a third party. In no way was she a criminal suspect. No arrest warrant was ever issued for Ms. Zorn because the KDOR was loud and clear in its public statement as to the lack of any crime in accessing the public website.

It has been 10 months since the raid. After the Bay of Pigs invasion, President Kennedy noted that "success has many fathers, but failure is an orphan." This raid was an orphan almost immediately. The raid in Marion drew international scorn. The county attorney almost immediately washed his hands of this mess. It was with whopper built on whopper that the defendants were able to even get a search warrant. The plaintiff will not be charged with a crime because no crime was committed.

Defendants' last argument as to the PPA is a head scratcher. They argue that nothing in the Amended Complaint alleges that the defendants were "searching for work product materials." It apparently missed paragraphs 99-143. They clearly were looking for material relating to their fanciful belief that somehow a crime had been committed.

Finally, it should be noted that liability under the PPA is very broad and includes anyone who directed, controlled or participated in the search or seizure. *Mink v. Suthers,* 482 F.3d 1244, 1258 (10th Cir. 2007). The County defendants either directed or participated in the raid–or did both.

## IV.  CONCLUSION

The constitutional violations by the defendants are clearly established. The cause of action under the PPA sets forth a valid cause of action. The defendants' motion should be consigned to the ashcan of history.

Respectfully submitted,

DEPEW GILLEN RATHBUN & MCINTEER LC

/s/Randall K. Rathbun
Randall K. Rathbun #09765
8301 E. 21st Street N., Suite 450
Wichita, KS 67206-2936
(316) 262-4000
Randy@depewgillen.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of June, 2024, the above and foregoing **Response to the County Defendants' Motion to Dismiss (Doc. 53)** was filed via CM/ECF and notice sent to:

Jeffrey M. Kuhlman
Watkins Calcara Chtd.
1321 Main Street, Suite 300
PO Drawer 1110
Great Bend, KS 67530
*Attorneys for Defendants Soyez, Christner, Marion Board*

Edward Keeley
Jennifer Hill
McDonald Tinker PA
300 West Douglas, Suite 500
PO Box 207
Wichita, KS 67202
*Attorneys for Defendants Cody, City of Marion, et al*

/s/Randall K. Rathbun
Randall K. Rathbun #09765

16