DEPEW GILLEN RATHBUN & MCINTEER LC
8301 E. 21st Street North, Suite 450
Wichita, KS 67206-2936
Telephone: (316) 262-4000
Randy@depewgillen.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

PHYLLIS J. ZORN                          )
                                         )
                    Plaintiff            )
                                         )
v.                                       )
                                         ) Case No. 24-CV-2044-DDC-GEB
CITY OF MARION, KS, et al.,              )
                                         )
                    Defendants           )
_____ )

## RESPONSE TO DEFENDANT CODY'S
## MOTION TO DISMISS (DOC. 60)

## I.  INTRODUCTION

A Section 1983 defendant has a choice to make when deciding to raise a qualified immunity defense.  Filing it as a Rule 12(b)(6) motion at the first crack out of the box accomplishes a couple of things for the defendant: (1) with our crowded dockets, the defendant knows this will buy months of breathing room while the matter is briefed and a decision is reached and (2) with several exceptions, discovery is generally stayed so the defendant does not need to worry about what discovery will reveal about his conduct.

There is a downside, however, to the path the defendant has chosen here and it is an important one.  As the Tenth Circuit recently reminded us: raising qualified immunity in a motion to dismiss–as opposed to a motion for summary

judgment–subjects the defendant to a more challenging standard of review.

As the Tenth Circuit noted in *Bledsoe v. Carreno*, 53 F.4th 589, 607-08 (10th Cir. 2022), qualified immunity is generally decided on a motion for summary judgment. If the defendant decides to assert it in a motion to dismiss, it bears the burden of a "more challenging" standard of review:

> Lastly, we note that here Appellants asserted qualified immunity at the motion-to-dismiss stage of the litigation. The procedural posture of the qualified-immunity inquiry may be critical. Because they turn on a fact-bound inquiry, "qualified immunity defenses are typically resolved at the summary judgment stage" rather than on a motion to dismiss. *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). "Asserting a qualified immunity defense via a Rule 12(b)(6) motion ... subjects the defendant to a more challenging standard of review than would apply on summary judgment." Id. (internal quotation marks omitted). On a motion to dismiss, "it is the defendant's conduct as alleged in the complaint that is scrutinized for [constitutionality]." *Behrens v. Pelletier*, 516 U.S. 299, 309, (1996); *Thompson*, 23 F.4th at 1256; see also *Truman*, 1 F.4th at 1238.

When a defendant decides to throw the dice on a motion to dismiss, it faces two hurdles: (1) the facts–and the *only* facts–the Court considers are those alleged in the complaint and they are considered in a light most favorable to the plaintiff and (2) the plaintiff gets the benefit of any inferences that can be drawn from the facts alleged.

## II.    THE FACTS TO BE CONSIDERED BY THIS COURT.

Here are the facts from the Amended Complaint along with reasonable inferences. Gideon Cody applied to be Marion's Chief of Police in April 2023. Cody had experienced a number of problems in his former law enforcement job at the Kansas City Police Department and the local paper, the *Marion County Record,* soon started hearing

about them.  These tips were from sources who were afraid to go on the record for fear

of retribution from Cody.  It appeared that Cody was about to be demoted from captain

to sergeant so he followed the old Sally Stanford directive:  "If you are being run out of

town, get in front of the crowd and make it look like a parade."  The Amended Complaint

notes (Doc. 35, p. 5):

> 18.    According to one source, Cody was "the absolute worst commander I
> ever experienced," said "his ego would not allow him to listen to what
> anyone below his rank said," and described him as a "toxic/ego-centric
> commander."
>
> 19.     Three sources told the paper that Cody ran over a dead body at a crime
> scene.  The tipsters also reported that Cody was about to be demoted by
> the Kansas City Police Department from captain to sergeant because of
> offensive conduct towards other officers.
>
> 20.    Multiple sources reported a conversation in which Cody expressed his
> disdain for working in dispatch, and said if  he had not been transferred
> out of dispatch he would have found "the skinniest and prettiest girl down
> there and f*cked her" to force a reassignment.

Cody soon became aware that the *Record* was investigating his background and it

infuriated him.  He viewed the paper as being too negative.  He encouraged Ms. Zorn to

form a rival, competing fishwrap.  When she laughed this off, she ended up on Cody's

enemies list as well.

Making it onto Cody's enemies list soon had it consequences.  When

Congressman LaTurner came to town to campaign, his staff invited the *Record* to cover

the event which was held at Kari's Kitchen on August 1, 2023. Kari's Kitchen, a main

street coffee shop in Marion, was owned by local restauranteur, Kari Newell. Newell

posted the event on her Facebook page as an "open meet and greet".  "Open" that is

unless you happened to work for the *Record*.  Soon after the event started, Newell asked

Chief Cody to "evict" Ms. Zorn and Eric Meyer, publisher and editor of the *Record*. This presented Cody with two options: he could tell Newell that this was an event open to the public and the journalists had a right to be there. Or, he could run them off. He took great delight in showing them the door, demonstrating the disdain he held for the First Amendment.

Snowballs and August in Kansas are generally not two words one sees in the same sentence. However, at that point, things really began to snowball in Marion, Kansas. The next day, Ms. Zorn received a Facebook direct message from a tipster alerting her to the fact that Ms. Newell was driving on a suspended license because of a DUI and had been doing so for years. To make matters worse, local law enforcement knew about it and refused to do anything about it. That very same day, the tipster sent the plaintiff a copy of a letter from the Kansas Dept. of Revenue ("KDOR") to Ms. Newell. The letter had Newell's full name, address, driver's license number and date of birth.[1]

The source explained that Ms. Zorn could obtain a copy of the letter from the KDOR website. Ms. Zorn, as a reporter, was not about to take the letter as factual without verifying it on the KDOR website, which she did with the identifying information from the copy of the letter the tipster had provided. According to the KDOR: "as long as the requestor has the required information, the information is public record and available on line."

---

[1]The letter came from Ms. Newell's soon to be ex-husband, who was going through an ugly divorce and was apparently extremely frustrated that his wife was getting a car in the divorce that she could not legally operate.

On Friday, August 4, the *Record*'s editor and publisher emailed Chief Cody and Sheriff Soyez, explaining that a source had provided a copy of a letter from the KDOR to "a Marion business woman who recently had been in the news" informing her, among other things, that she would need an ignition interlock on her car to get her license reinstated. The email also indicated that local law enforcement was aware that she had been driving for some time without an active valid license. Cody ignored the email.

An hour and half after this email was sent, Marion Vice Mayor (and another plaintiff in this consolidated action) Ruth Herbel sent a copy of the same letter from the KDOR to the Marion City Administrator, Brogan James (who subsequently resigned). She told him that she had received a copy of the letter from local towns person Pam Maag[2].

On Monday, August 7th, Mayor Mayfield authorized Cody to begin an investigation of the *Record* and Ms. Herbel. Cody contacted Newell and told her that someone had stolen her mail. Newell did not believe him, so he doubled down on this whopper: He told Newell that a reporter at the *Record* had stolen her identity and provided a copy of her driver's license record to Vice Mayor Herbel. Cody knew this was a lie and knew that it was Maag who had provided a letter to Herbel and that Maag had also put the letter on Facebook on August 2nd.

On that same day, August 7, Newell appeared at the Marion City Council meeting and repeated the whopper from Cody about the *Record* having illegally obtained her

_____

[2]Maag later acknowledged that she was Ms. Zorn's tipster.

driving record.  Editor Meyer–who happened to be covering the meeting–stood up and stated that this was utter nonsense.

Following this meeting, Cody stepped up the investigation, coordinating with the Mayor and the Sheriff.  That same day, one of Cody's officers, Zach Hudlin, contacted the KDOR and learned that the plaintiff, Phyllis Zorn, used her real name to access Newell's driving record. The information to allow her to access Newell's drivers records had come from the KDOR letter that had been provided to the *Record*.

The following day, August 8, Cody met with Sheriff Soyez, who agreed to join with Cody and the Mayor in their plan to take down the *Record*.  Detective Christner from the Sheriff's office was assigned to represent the Sheriff's office.

On August 9, Cody suggested that they obtain a "preservation warrant" to serve on the internet provider.  Christner told Cody that they lacked the jurisdiction to do so and the provider would notify the *Record* if they did so.  Christner indicated that if "you have PC for a search warrant" just skip the preservation and get a search warrant.

By the next day, Christner had drafted an 8 page application for a search warrant but was unwilling to sign it himself.  The application was full of either intentional, knowing or recklessly false statements detailed in paragraphs 102 - 114. [Doc. 35, pp. 23-27].

By the morning of August 10, 2023, Cody had taken Christner's draft and prepared a search warrant application for a search of the *Record*, Pam Maag and Vice Mayor Herbel. Cody repeated the same falsehoods in the affidavit that he knew, or should have known, were false.  As described in paragraphs 121-129 of the Amended Complaint, Cody added additional false statements. [Doc. 35, pp. 28-29]. Later that

same day, Soyez and Cody added a fourth target to the raid, Meyer's home.

On the morning of Friday, August 11, Cody led a team of armed law enforcement officers to the offices of the *Record*, Meyer's home and the home of Pam Maag. The warrant obligated the officers to conduct a preview search so that only items used in the so-called "identity theft" would be seized. The software to perform the preview search was time consuming so Cody and the Sheriff decided not to worry about the warrant and simply seized the plaintiff's computer and her cell phone. The order to seize her personal phone came from Cody and no preview search was performed on the phone.

As the raid was ongoing, Cody was contacted by Ms. Newell. He gave her a complete rundown of the raid and admitted that their attempt to "download" information from the computers "didn't work, so f**k it," he just took the computers.

The following Tuesday, Cody and Christner exchanged probable cause warrants for the arrests of Zorn, Herbel and Meyer. But before that could happen the pretense behind the raid began to collapse like a $20 Walmart suitcase. The next day, August 16, the County Attorney panicked and filed a motion to release the evidence seized in the raid. He issued a press release admitting that there was "insufficient evidence" to connect any crime Cody was investigating to the places searched and the items seized.

Cody soon realized he was in deep trouble. He began emailing the contents of his file to his personal email address and asked Newell to destroy all email so that they could not be used against them. On October 2, he resigned and fled the jurisdiction.

## III. Argument and Authorities

### A. Standard

The *only* facts of this case are found in the Amended Complaint (Doc. 35). As the Tenth Circuit noted in a 1983 qualified immunity case, *Mayfield v. Bethards,* 826 F.3d 1252, 1255 (10th Cir. 2016): In reviewing a motion to dismiss, we accept the facts alleged in the complaint as true and view them in the light most favorable to the plaintiff. In determining whether a complaint states a plausible claim for relief, the Court draws upon its judicial experience and common sense. *Iqbal*, 556 U.S. at 679.

Finally, the Supreme Court, after *Twombly/Iqbal*, specifically rejected the idea that there is a heightened pleading requirement for Section 1983 cases:

> In particular, no heightened pleading rule requires plaintiffs seeking damages for violations of constitutional rights to invoke § 1983 expressly in order to state a claim. See *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (a federal court may not apply a standard "more stringent than the usual pleading requirements of Rule 8(a)" in "civil rights cases alleging municipal liability"); *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (imposing a "heightened pleading standard in employment discrimination cases conflicts with Federal Rule of Civil Procedure 8(a)(2)").

*Johnson v. City of Shelby, Miss.,* 574 U.S. 10, 11 (2014).

### B. Are the Plaintiff's Fourth Amendment Claims Barred by Qualified Immunity?

The defendant claims that the search warrant in question was not invalid because Ms. Zorn allegedly admits she violated Kansas law and the Driver's Privacy Protection

Act, 18 U.S.C. § 2721, *et. seq*., ("DPPA"). This is, of course, nonsense on stilts. She has never made such an admission because it would be untrue. Incredibly, Cody is arguing–presumably with a straight face–that he was investigating the violation of a federal criminal statute over which Marion, KS had absolutely no jurisdiction and *that this statute has preempted*.

The DPPA was enacted in 1994 in response to the common practice by many states of selling information in motor vehicle records to businesses, marketers and individuals. Congress found that many state motor vehicles department were in fact generating significant revenue by such sales. *See*, 183 A.L.R. Fed. 37, §2. The DPPA makes it a *federal* crime to obtain or disclose personal information wrongfully obtained from a motor vehicle record. 18 U.S.C. §§ 2722, 2723.

Cody claims that a Seventh Circuit case arising out of the DPPA somehow bails him out of the mess he is in. In *Dahlstrom v. Sun-Times Media, LLC,* 777 F.3d 937, 939 (7th Cir. 2015), the defendant newspaper obtained five officer's birth dates, height, weight, hair color, and eye color from the Illinois Secretary of State's motor vehicle records, and published that information in a newspaper article which criticized a homicide investigation lineup in which the officers participated. The newspaper published photographs of each of the five officers along with their full names, month and year of birth, height, weight, hair and eye color. Needless to say the officers were not amused and sued the paper under the DPPA. The paper filed a motion to dismiss, claiming that the information was not "personal information" under the DPPA and that the statute violated the First Amendment's guarantees of speech and press. The personal information the paper obtained was indeed personal and the Seventh Circuit

batted the argument away like a pesky fly at a Sunday afternoon picnic.  The argument as to the constitutionality of the DPPA is not relevant to these proceedings as the plaintiff has not contended that the DPPA is unconstitutional; suffice it to say, that argument has foundered on the rocks every time it has been raised.

The *only* issue relevant here was flatly ignored by the defendant: Did Ms. Zorn knowingly "obtain or disclose personal information" from a motor vehicle record?  The answer is plain: (1) the plaintiff did not obtain "personal information" from the KDOR because she already had the information which allowed her to log into the website and (2) the status of the driver's record is *not* personal information protected by the DPPA. This is because the KDOR web page allows anyone to check the status of a Kansas driver's license so long as that person knows the driver's license number, first and last name, and date of birth of the driver they are checking on.

The DPPA defines protected "personal information" as "information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information, *but does not include information on vehicular accidents, driving violations, and driver's status.*" 18 U.S.C. § 2725(3) (emphasis added).  Therefore, an individual's "driver's status" is explicitly *not* "protected information" under the Driver's Privacy Protection Act.

As the Amended Complaint points out, Ms. Zorn used the information from the KDOR letter to verify the status of Newell's driver's license, *i.e.*, the fact her license was suspended due to a DUI conviction and that to restore her driving privileges, Newell would have to obtain an ignition interlock device.  Because the Act explicitly states that

protected personal information "does not include information on vehicular accidents, driving violations, and driver's status," the information which the plaintiff obtained from the Kansas Driver's License Status Check tool (*i.e.*, the status of Newell's driver's license) is not covered by the Driver's Privacy Protection Act.

The official spokesperson for the Kansas Department of Revenue, Zach Denney, has repeatedly confirmed that so long as the requestor has the identifying information it is perfectly legal to use the Kansas Driver's License Status Check to verify the status of anyone's driver's license.

- "That's legal. The website is public facing, and anyone can use it." (AP)

- "As long as the requestor has the required information, this information is public record and available online." (KC Star)

- "The motor vehicle driver's checker is public-facing and free-use. If you have my [identifying] information, you can pull it [my driver's record] out." (NBC News)

Additionally, the DPPA contains a list of permitted exceptions. One permitted exception allows for personal information to be disclosed for "any … use specifically authorized under the law of the State that holds the record, if such use is related to the operation of a motor vehicle or public safety." 18 U.S.C. § 2721(b)(14).

Kansas law specifically provides that all driver's license records "shall be subject to the provisions of the Open Records Act, except" (a) "records which relate to the physical or mental condition of any person," (b) "records which have been expunged," or (c) "photographs [on] drivers' licenses." K.S.A. 74-2012(a)(1) & (b). Thus, the information which the plaintiff accessed, *i.e.*, that Newell's driver's license was

suspended due to a DUI conviction, was specifically authorized under Kansas law, which states such information is subject to the Kansas Open Records Act.

Another permitted exception allows for personal information to be disclosed "for use in connection with matters of motor vehicle or driver safety." 18 U.S.C. 2721(b)(2). The plaintiff's use of the Kansas Driver's License Status Check tool to confirm the authenticity of the source's letter and the fact that Newell had been driving with a suspended license was "for use in connection with matters of motor vehicle or driver safety" because the *Record* was investigating allegations that local law enforcement routinely permitted an unlicensed driver who lost her license because of a DUI to drive in and around Marion, posing an obvious risk to other drivers. 18 U.S.C. 2721(b)(2).

Finally, the defendant seeks to have it both ways. He claims the DPPA preempts all state laws governing access to driver's license information. He takes this position because he knows that state law does not support his argument. The problem is that his arguments as to the DPPA won't fly either.

*Standing*

The second issue raised by the defendant on plaintiff's Fourth Amendment claim is that Ms. Zorn did not have a reasonable expectation of privacy as to her work product on her computer, which was admittedly owned by the *Record*. Determination of this issue is necessarily based upon a number of facts relating to the employer's policy as to company owned computers and is not properly before this Court on a Motion to Dismiss. Regardless, the defendant seized Ms. Zorn's personal cell phone which was used in the course of her work as a reporter. She clearly has standing to contest this lawless act.

*Arguable Probable Cause*

Defendant claims that Cody's conduct cannot be challenged because the warrant was issued by a neutral magistrate. The Supreme Court has noted though that deference to the magistrate is not boundless. It is clear that the deference accorded to a magistrate's finding of probable cause does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based. *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *United States v. Leon*, 468 U.S. 897, 914, (1984)

In the qualified immunity context, courts ask whether there was "arguable probable cause" for the challenged conduct in a search and seizure situation. *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014). "Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Jones v. City and County of Denver*, 854 F.2d 1206, 1210 (10th Cir. 1988).

The was no belief here, reasonable or otherwise, that probable cause existed. The affidavit was built by misrepresentation stacked upon misrepresentation. Cody knew, and flat out lied to the magistrate that Ms. Zorn had obtained the information in question from utilizing the KDOR website. He knew that a copy of the letter from the KDOR had been provided to Ms. Zorn and that she did not obtain it from the KDOR. The Amended Complaint lists prevarication after prevarication in the affidavit. One cannot falsely swear out an affidavit for a search warrant and then hide behind that warrant issued by a neutral magistrate.

Finally, Cody claims he had probable cause to seek the warrant because he was investigating state law violations relating to the illegal access of Newell's driving record. Ironically, four pages earlier in his brief he claimed that the DPPA preempted any state laws related to accessing motor vehicle records.

*Execution of the Search Warrant*

The Fourth Amendment requires that the government describe the items to be seized with as much specificity as the government's knowledge and circumstances allow, and warrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized." *United States v. Leary,* 846 F.2d 592, 600 (10th Cir.1988)  Thus, the "particularity requirement" prevents general searches and strictly limits the discretion of the officer executing the warrant. See *Voss v. Bergsgaard*, 774 F.2d 402, 404 (10th Cir. 1985) ("The particularity requirement ensures that a search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause."); see also *United States v. Janus Indus.*, 48 F.3d 1548, 1553 (10th Cir.1995) ("As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." (quoting *Stanford v. Texas*, 379 U.S. 476, 485, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965).

The search warrant required a "preview search" of all located digital communications devices and digital storage media to exclude from seizure those which had not been involved in the identity theft, by use of manual or automated preview tools. When the preview search was taking longer than Cody wanted, he consulted with the Sheriff and concluded they were just going to take the computers–and for good measure took the personal cell phones of the reporters as well. The County Attorney quickly

ordered return of this equipment, but not until the Constitution had been trampled on. Defendant's argument is without merit.

*False Statements by Cody*

The plaintiff will not belabor the matter by restating the false statements by Cody utilized to get the magistrate to sign off on the warrant. These false statements are discussed above at pages 5-6 and refer to the specific allegations in the Amended Complaint that set forth the false information used to obtain the warrant. Clearly established law restricts officers from intentionally misleading the judge with respect to the facts in obtaining a warrant. *Franks v. Delaware***,** 438 U.S. 154, 164–65 (1978); *Poolaw v. Marcantel*, 565 F.3d 721, 745 (10th Cir. 2009), as amended (July 24, 2009).


### C.   ARE THE PLAINTIFF'S FIRST AMENDMENT CLAIMS BARRED BY QUALIFIED IMMUNITY?

Defendant Cody either misunderstands or intentionally misstates Ms. Zorn's First Amendment claims. In 2023, it was clearly established that there is a constitutional right to gather and report the news.

The First Amendment protects "the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. Amend. I. Thus, a complete ban on speaking at a public forum is a direct violation of the First Amendment. *See, MacQuigg v. Albuquerque Pub. Sch. Bd. of Educ.*, No. CV 12-1137 MCA/SCY, 2015 WL 13650030, at *8 (D.N.M. Feb. 6, 2015) ("Excluding a plaintiff from a public forum … is a direct First Amendment violation ….").

On the other hand, where the government targets a specific individual because of that individual's exercise of their First Amendment rights, the government is engaged in First Amendment retaliation. For example, in *Irizarry v. Yehia*, 38 F.4th 1282 (10th Cir. 2022), the Court of Appeals found that a YouTube journalist who sued a police officer who interfered in his effort to film a police traffic stop "alleged a First Amendment retaliation claim under clearly established law." *Id*. at 1288.

As such, it is plainly proper in this Circuit to assert the "parallel claims" of a "direct violation of his right to free speech, and ... for retaliation motivated by his protected speech." *Brandt v. City of Westminster*, 300 F. Supp. 3d 1259, 1282 (D. Colo. 2018). While such claims may be "closely related," they are separate claims and stand on their own. *Id*.

Moreover, the elements of the claims are distinguishable. To make a First Amendment retaliation claim, a plaintiff must show (a) he engaged in protected speech, (b) a person of ordinary firmness would have been chilled by the defendant's action, and (c) the defendant's action was substantially motivated as a response to the plaintiff's protected activity. *Irizarry*, 38 F.4th at 1288. In "a direct First Amendment violation ... there is no need to complicate the analysis injecting the additional element of 'chilling.'" *MacQuigg*, 2015 WL 13650030, at *8.

As the Supreme Court has observed, "the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 783 (1978) see also *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("It is ... well established that the Constitution protects the right to

receive information and ideas."). An important corollary to this interest in protecting the stock of public information is that "[t]here is an undoubted right to gather news 'from any source by means within the law.' " *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978). Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting "the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). "We do not question the significance of free speech, press, or assembly to the country's welfare. Nor is it suggested that news gathering does not qualify for First Amendment protection; without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972).

Prior to the August 11, 2023, unprecedented raids on the newsroom of the *Marion County Record*, it was clearly established that "[w]here the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude.'" *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978).

According to the Amended Complaint, the raid was *in retaliation for the newspaper doing its job*. (Paragraphs 336-340). Tenth Circuit law on retaliatory claims arising under the First Amendment is well established. A First Amendment retaliation claim requires facts alleging (1) constitutionally protected activity, (2) an injury that would chill a person of ordinary firmness from continuing to engage in constitutionally protected activity, and (3) that the defendant's actions were substantially motivated as a response to the constitutionally protected activity. *Salemi v. Colo. Pub. Employees' Ret. Ass'n*, 747 F. App'x 675, 698 (10th Cir. 2018).

Plaintiff acknowledges that she has the burden to come forward with authorities demonstrating that the violative nature of the conduct at issue is clearly established. *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018).  However, as this Court has noted:

> [T]o hold a defendant liable under § 1983, it is not necessary that " 'the very action in question has previously been held unlawful.' " Id. at 1866–67 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Thus, for qualified immunity to apply, the Supreme Court does not require a "reported case directly on point." Id. at 1867 (citation and internal quotation marks omitted). Instead, the Court's case law requires district courts to evaluate whether "the unlawfulness of the officer's conduct '[is] apparent' " " 'in the light of pre-existing law.' " Id. (quoting *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034).

*White v. City of Topeka,* 489 F. Supp. 3d 1209, 1223 (D. Kan. 2020).

## D.   WAS DEFENDANT CODY INVOLVED IN A CONSPIRACY TO VIOLATE THE PLAINTIFF'S CONSTITUTIONAL RIGHTS?

Finally, Cody claims that the plaintiff failed to "adequately allege" the existence of a conspiracy under § 1983.   First things first: A § 1983 conspiracy deprives "a plaintiff of a constitutional or federally protected right under color of state law." *Bledsoe v. Carreno*, 53 F.4th 589, 609 (10th Cir. 2022) (internal quotation marks and citation omitted). This kind of conspiracy claim requires plaintiffs to "allege specific facts showing agreement and concerted action amongst the defendants[.]" *Frasier v. Evans*, 992 F.3d 1003, 1024 (10th Cir. 2021) (internal quotation marks and citation omitted). The Tenth Circuit elaborated on the requisite elements to allege a conspiracy in *Snell v. Tunnell*, 920 F.2d 673, 702 (10th Cir. 1990):

18

> The participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective or possess the same motives for desiring the intended conspiratorial result. To demonstrate the existence of a conspiratorial agreement it simply must be shown that there was a single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences.

It should be noted that direct evidence of conspiracy is not required. Because direct evidence of an agreement to join a conspiracy is rare, the Court can infer assent "from acts furthering the conspiracy's purpose." The Court decides on a case-by-case basis whether plaintiff has alleged sufficient facts to support a conspiracy claim. *Douglass v. Garden City Cmty. Coll.*, 543 F. Supp. 3d 1043, 1060 (D. Kan. 2021)

What does the Amended Complaint allege as to whether there was a "single plan, the essential nature and general scope of which was known to the Defendant Cody? It alleges that on August 8, 2023, Soyez and Cody met. They were both concerned that the plaintiff and the *Record* were going expose the fact that both the Police department and Sheriff's department had knowingly let a leading Marion businesswoman, Kari Newell, drive around the town with no driver's license (having lost it because of a DUI). At that meeting, Cody agreed to join with the Sheriff and the Mayor in taking down the *Record*. (¶¶ 93-96).

Sheriff's Office Detective Christner, (assigned by Sheriff Soyez to assist), was in charge of drafting the search warrant on the *Record*. The draft was forwarded to Cody because Christner had the good sense not to sign it. (¶¶ 97-116).

The next morning, August 10, Cody took Christner's draft and prepared a search warrant application for the *Record* (among others). The drafts were shared with

Christner.  Later that same day, Soyez and Cody decided to add another target to the raid: Eric Meyer's home. Christner then prepared the actual search warrants from Cody's drafts. (¶¶ 117-130).

On Friday, August 11, the Sheriff's Office and Police Department raided the *Marion Record*.  During the search, Cody contacted Soyez concerning the speed of the search.  Soyez directed Cody just to "take them all." (¶ 164)  Accordingly, cell phones and computers of the reporters were confiscated.

After the raids were complete, Cody drove to the Sheriff's Office to debrief Soyez. (¶ 180).  On August 15, Christner and Cody exchanged drafts of probable cause warrants for the arrest of the plaintiff. (¶ 184).

Plaintiff cannot imagine how the evidence pointing to a conspiracy could be any more stark.  There was one plan, executed in conjunction by the police department, the Mayor and the Sheriff's Office.

## CONCLUSION

The defendants should not have been surprised by the headlines they received from across the country for the raid on a newspaper office just trying to do its job to keep people informed.  Cody prevaricated to get a search warrant, destroyed evidence when things started to go south, and fled the jurisdiction as things got too hot. The people of Marion–the City and the County– are going to be cleaning up his mess for a long time.

Respectfully submitted,

DEPEW GILLEN RATHBUN & MCINTEER LC

/s/Randall K. Rathbun
Randall K. Rathbun #09765
8301 E. 21st Street N., Suite 450
Wichita, KS 67206-2936
(316) 262-4000
Randy@depewgillen.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of June, 2024, the above and

foregoing **Response to Defendant Cody's Motion to Dismiss (Doc. 60)** was filed

via CM/ECF and notice sent to:

Jeffrey M. Kuhlman
Watkins Calcara Chtd.
1321 Main Street, Suite 300
PO Drawer 1110
Great Bend, KS 67530
*Attorneys for Defendants Soyez, Christner, Marion Board*

Edward Keeley
Jennifer Hill
McDonald Tinker PA
300 West Douglas, Suite 500
PO Box 207
Wichita, KS 67202
*Attorneys for Defendants Cody, City of Marion, et al*

/s/Randall K. Rathbun
Randall K. Rathbun #09765