## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

PHYLLIS J. ZORN,

                              Plaintiff,                   Case No. 24-2044-DDC-GEB

v.

CITY OF MARION, KANSAS, et al.,

                              Defendants.

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Phyllis J. Zorn is a reporter for the *Marion County Record*, a small-town Kansas newspaper. She sued a group of defendants for their involvement in an allegedly unlawful police raid of the *Record*'s office. Defendants include the City of Marion, Kansas; David Mayfield, Marion's former mayor; Gideon Cody, Marion's former chief of police; Zachariah Hudlin, Marion's acting chief of police; the Board of County Commission of Marion County, Kansas;[1] Jeff Soyez, Sheriff of Marion County; and Aaron Christner, detective for the Marion County Sheriff's office.[2]

---

[1]    The Amended Complaint names "Board of County Commission of Marion County, KS" as a defendant. Doc. 35 at 1. The court assumes that title is an error because the governing entity of Marion County is the Board of County *Commissioners*. *Board of County Commissioners*, Marion County, Kansas, https://www.marioncoks.net/board-county-commissioners (last visited Feb. 7, 2025); *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) (explaining that courts may take judicial notice of matters of public record). But the court dismisses claims against this defendant, so it needn't dwell on the subject.

[2]    Plaintiff sues Mayfield, Cody, Hudlin, and Soyez in their individual and official capacities. Plaintiff's claim against Christner is an individual capacity claim only.

The Board of County Commissioners, Christner, and Soyez (collectively, "county defendants") filed a Motion to Dismiss (Doc. 53). The City of Marion, Hudlin, and Mayfield (collectively, "city defendants") also filed a Motion to Dismiss (Doc. 57). And Cody filed a third Motion to Dismiss (Doc. 60). Plaintiff responded to each motion. Doc. 77; Doc. 78; Doc. 80. Defendants all filed Reply briefs. Doc. 81; Doc. 85; Doc. 86. This Order grants in part and denies in part each Motion to Dismiss (Doc. 53; Doc. 57; Doc. 60). The court explains its rulings, below, starting with a summary of the facts plaintiff alleges.

## I.       Background

The following facts come from plaintiff's Amended Complaint (Doc. 35). The court accepts plaintiff's "well-pleaded facts as true, view[s] them in the light most favorable to Plaintiff[], and draw[s] all reasonable inferences from the facts in favor of Plaintiff[]." *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021) (citation omitted).

Because this lawsuit involves a host of characters, the following table summarizes the players and their roles for the reader's reference:

| Name | Role |
|---|---|
| **Plaintiff and Other Associated Individuals** ||
| Phyllis Zorn | Reporter for the *Record* |
| Eric Meyer | Publisher and editor for the *Record* |
| Deb Gruver | Reporter for the *Record* |
| Ruth Herbel | Vice Mayor of Marion City Council |
| **Defendants and Other Associated Individuals** ||
| Board of County Commissioners of Marion County | |
| Jeff Soyez | Sheriff of the Marion County Sheriff's Office |
| Aaron Christner | Detective for the Marion County Sheriff's Office |
| City of Marion, Kansas | |
| David Mayfield | Mayor of Marion, Kansas |
| Gideon Cody | Chief of Police of the Marion Police Department |
| Zach Hudlin | Officer for the Marion Police Department |
| Kari Newell | Coffeeshop owner with suspended driver's license |

### Hiring Cody

Marion, Kansas ("the City")—a small town in central Kansas—is governed by a mayor and four city council members.  Doc. 35 at 2 (Am. Compl. ¶ 2).  During the time period relevant to this lawsuit, defendant David Mayfield served as the City's mayor.  *Id.*  Defendant Jeff Soyez serves as the sheriff of Marion County, Kansas ("the County"), an entity governed by the County's Board of County Commissioners.  *Id.* (Am. Compl. ¶ 5).  The City needed a new police chief in 2023, and at the urging of Soyez, Mayfield hired defendant Gideon Cody.  *Id.* at 3–4, 6 (Am. Compl. ¶¶ 10–11, 23).  Cody previously had worked for the Kansas City, Missouri Police Department.  *Id.* at 3 (Am. Compl. ¶ 10).

The *Marion County Record* is a newspaper published in the City.  *Id.* at 4 (Am. Compl. ¶ 16).  It's the newspaper of record for both the City and the County.  *Id.*  At the times relevant to this lawsuit, Plaintiff was a reporter for the *Record*.  *Id.* at 1–2 (Am. Compl. ¶ 1).  When the *Record* reported that Cody was a candidate for the police chief position, the paper received numerous, unflattering tips about Cody's background.  *Id.* at 4–5 (Am. Compl. ¶¶ 17–20).  Cody learned that the *Record* was looking into his background, which "infuriated" him.  *Id.* at 5 (Am. Compl. ¶ 21).

### Congressman Comes to Town

In July 2023, United States Representative Jake LaTurner announced a visit to the City. *Id.* at 6 (Am. Compl. ¶ 25).  The event—"Coffee With Your Congressman"—was hosted at Kari's Kitchen, a coffeeshop owned by a local resident named Kari Newell.  *Id.* (Am. Compl. ¶¶ 25, 27).  Kari's Kitchen posted a public invitation to the event on its Facebook page.  *Id.* at 7 (Am. Compl. ¶ 27).  Rep. LaTurner's communications director reached out to Eric Meyer, the editor and publisher of the *Record*, and invited him to attend the event.  *Id.* at 6 (Am. Compl.

¶ 26). But when Meyer and plaintiff arrived at the event, Chief Cody—at Newell's behest—told them to leave. *Id.* at 7 (Am. Compl. ¶ 28).

### *Tip on Newell and License Status Check*

The day after the coffeeshop event—August 2, 2023—plaintiff received a message on Facebook from Marion resident Pam Maag. *Id.* (Am. Compl. ¶ 30). Maag, who requested anonymity, told plaintiff that Newell's driver's license was suspended due to a DUI conviction and that local law enforcement knew this fact but allowed Newell to drive anyway. *Id.* (Am. Compl. ¶¶ 30–31). Maag also sent plaintiff a copy of a letter from the Kansas Department of Revenue (KDOR). *Id.* at 8 (Am. Compl. ¶ 32). The letter—which included Newell's full name, address, driver's license number, and date of birth—laid out the steps Newell would need to take to reinstate her license. *Id.* (Am. Compl. ¶ 33). Plaintiff shared this information with Meyer. *Id.* (Am. Compl. ¶ 35).

The next day, trying to verify the information from Maag, Meyer visited a webpage titled "Kansas Driver's License Status Check" on the KDOR website. *Id.* (Am. Compl. ¶ 35). That website "allows anyone to check the status of a Kansas driver's license so long as that person knows the driver's license number, first and last name, and date of birth of the driver they are checking on." *Id.* at 9 (Am. Compl. ¶ 36). The website is public-facing and doesn't require any sort of login or password. *Id.* It also doesn't give any warning about accessing information on the site. *Id.* The only "disclaimer" warns users that the information "is a summary only and will not display any sanctions from another state." *Id.*

Meyer inputted the information from the letter that Maag had provided plaintiff. *Id.* (Am. Compl. ¶ 37). He confirmed that Newell's driver's license was suspended due to a DUI conviction. *Id.* Then, plaintiff called the KDOR. *Id.* (Am. Compl. ¶ 38). Someone from the KDOR informed her that the letter that Maag had provided was accessible on the same website.

4

*Id.* So, plaintiff went to the "Kansas Driver's License Status Check" webpage, inputted Newell's information, and found a link to view "Documents." *Id.* Plaintiff clicked on that link, and a form on the webpage asked for the "Requester's Information." *Id.* (Am. Compl. ¶ 39). So plaintiff typed in her name and Newell's driver's license number and address. *Id.* at 9–10 (Am. Compl. ¶ 39). The website required plaintiff to check a box that provided, "I will use the information requested in a manner that is specifically authorized by Kansas law and is related to the operation of a motor vehicle or public safety. (See section VI on the front of this form)." *Id.* at 10 (Am. Compl. ¶ 40). Zorn checked that box and clicked "Accept." *Id.* (Am. Compl. ¶ 41). Then, 19 documents appeared, the first of which was the same letter Maag had sent plaintiff. *Id.* Having confirmed the letter's authenticity, Zorn closed the website and relayed her findings to Meyer. *Id.* (Am. Compl. ¶ 42).[3]

### *Informing Law Enforcement*

Meyer decided not to pursue a story reporting on Newell's driver's license. *Id.* at 16 (Am. Compl. ¶ 68). Still, Meyer sent Sheriff Soyez and Chief Cody an email. *Id.* (Am. Compl. ¶¶ 69–70). He informed them about the tipster and a "Marion businesswoman"—whom Meyer didn't identify—with a suspended driver's license. *Id.* Meyer's email also explained that the *Record* had checked with the KDOR and learned that anyone with the driver's identification card number, name, and date of birth could access the letter. *Id.* at 17 (Am. Compl. ¶ 71). And the

---

[3]    The Amended Complaint contains a host of assertions and conclusions about Kansas and federal law. *E.g.*, Doc. 35 at 70 (Am. Compl. ¶ 354) ("Eric Meyer and Phyllis Zorn's use of the Kansas Driver's License Status Check tool on the public-facing website of the Kansas Department of Revenue was 100% legal and did not violate any Kansas law."); *id.* at 10–11 (Am. Compl. ¶¶ 43–46) (describing Kansas law governing driver's license records); *id.* at 11–16 (Am. Compl. ¶¶ 47–67) (describing the federal Driver's Privacy Protection Act). But it's well established that the court needn't accept this kind of legal conclusion as true. *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012); *see also Tucker v. Univ. of N.M. Bd. of Regents*, 618 F. Supp. 3d 1201, 1208 (D.N.M. 2022) ("The court is not required to accept conclusions of law or the asserted application of law to the alleged facts.").

email stated that the tipster had informed the *Record* that local law enforcement officials were "fully aware" that the businesswoman—Newell—didn't have a valid license.  *Id.*  Neither Cody nor Soyez responded to Meyer's email.  *Id.* (Am. Compl. ¶ 72).

### Investigation Ordered

Ruth Herbel, Marion's Vice Mayor, also received a copy of the letter from Maag describing Newell's driver's license status.  *Id.* (Am. Compl. ¶¶ 73–75).  She sent it on to the city administrator.  *Id.*  The city administrator notified Mayfield about the email from Herbel.  *Id.* at 18 (Am. Compl. ¶ 76).  He declared that the city would not look into it.  *Id.*  But Mayfield—who had feuded with Herbel and the *Record* before—had other ideas.  *Id.* at 18–19 (Am. Compl. ¶¶ 77–79).

The city administrator forwarded Herbel's email—which contained the KDOR letter about Newell's driver's license status—to Mayfield and the rest of the city council.  *Id.* at 19 (Am. Compl. ¶ 81).  Then, Mayfield and another member of the Marion City Council, Zach Collett, falsely told Newell that Herbel had learned of her DUI conviction and intended to use it to oppose Newell's application for a liquor license for her restaurant.  *Id.* (Am. Compl. ¶ 82).  Mayfield told Newell that the only way to remove Herbel from the city council was if Herbel was convicted of a crime.  *Id.*  Later that same day, Mayfield "overruled" the city administrator and "authorized Chief Cody to begin an investigation into Herbel and the *Marion County Record*."  *Id.* (Am. Compl. ¶ 83).

### Cody's Investigation

Cody contacted Newell and informed her that someone at the *Record* had stolen her identity and provided Herbel with a copy of her driver's license record, though Cody knew this wasn't true.  *Id.* at 20 (Am. Compl. ¶¶ 86–87).  When Newell appeared at a Marion City Council meeting later that day, she repeated Cody's accusations against the *Record*.  *Id.* (Am. Compl.

¶ 88).  Meyer refuted Newell's accusations and said that no one at the *Record* had given Herbel a copy of the letter.  *Id.* at 21 (Am. Compl. ¶ 89).

Cody directed defendant Zach Hudlin, a Marion police officer, to make contact with someone at the KDOR.  *Id.* (Am. Compl. ¶ 91).  A KDOR representative told Hudlin that Zorn had accessed Newell's driving record through KDOR's license status check tool.  *Id.*

The next day—August 8, 2023—Cody met with Soyez.  *Id.* at 22 (Am. Compl. ¶ 93). Soyez allegedly shared Cody's animus against the *Record*, Meyer, and the *Record*'s staff.  *Id.* (Am. Compl. ¶ 94).  In particular, Soyez had expressed "regularly" that he didn't approve of Meyer's negative reporting and that the *Record* should espouse more positive stories about Marion and its government.  *Id.*  Soyez, like Cody, was concerned that the *Record* would expose his office for allowing Newell to drive without a valid driver's license.  *Id.* (Am. Compl. ¶ 95). During this meeting, Soyez and Cody agreed on an "illicit plan to take down the *Marion County Record*."  *Id.* (Am. Compl. ¶ 96).

Cody requested help from defendant Aaron Christner, a detective with the Marion County Sheriff's Office.  *Id.* (Am. Compl. ¶ 97).  Cody wanted to get a "preservation warrant" to serve on the *Record*'s internet service provider.  *Id.*  But after learning that the internet service provider was based in Wisconsin—where Marion law enforcement lacked jurisdiction— Christner advised Cody to seek a search warrant.  *Id.* at 23 (Am. Compl. ¶ 98).

### *Procuring the Warrants*

Christner drafted an application for a search warrant for the *Record*'s office.  *Id.* (Am. Compl. ¶ 99).  Christner sent the draft application to Cody, but Christner wouldn't sign it.  *Id.* Christner wrote the application even though he admitted that he "did not do the investigation." *Id.* (Am. Compl. ¶ 100).  The application thus "was replete" with inaccurate information.  *Id.*

(Am. Compl. ¶ 101).  The Amended Complaint alleges that Christner included the following

false information in his draft of the affidavit seeking a warrant:

- a statement that Zorn would have had to select from a list of options on the KDOR website to access Newell's driving record information, *id.* (Am. Compl. ¶ 102);

- a screenshot that purports to list these options, *id.* (The KDOR website doesn't require users to select from any such options.  *Id.* at 23–24 (Am. Compl. ¶¶ 103–04));

- a statement that Zorn would have had to impersonate or lie to access Newell's driving records, *id.* at 24 (Am. Compl. ¶ 108); and

- a statement in the warrant that someone at the *Record* had given the letter about Newell's driving status to Herbel, *id.* at 25 (Am. Compl. ¶ 111) (But Christner knew that Zorn didn't access the KDOR website until after Herbel already had received the letter from Pam Maag.  *Id.* (Am. Compl. ¶ 112)).

Plaintiff also alleges that Christner omitted material facts from the warrant application, including

that the *Record* had acquired Newell's personal information from tipster Maag and that such

personal information allows anyone to access the status of Newell's license on the KDOR's

website.[4]  *Id.* at 25–26 (Am. Compl. ¶ 114(a)–(c)).  Christner knew these facts "or would have

known them had he performed even the most basic investigation."  *Id.* at 27 (Am. Compl. ¶ 115).

Cody then copied the draft Christner had sent him and used it to prepare search warrant

applications for the homes of Herbel and Maag.  *Id.* (Am. Compl. ¶ 117).  He discussed the draft

applications with Soyez.  *Id.* at 28 (Am. Compl. ¶ 118).  The two men decided to pursue a fourth

warrant authorizing the search of the Meyer home.  *Id.*  Each application contained the same

falsehoods as the application for the *Record*'s office.  *Id.* (Am. Compl. ¶¶ 119–20).  Cody also

included more allegedly false statements in his warrant applications.  *Id.* (Am. Compl. ¶ 121).

For instance, he falsely wrote that the KDOR website requires its users to agree to a warning

---

[4]    The Amended Complaint lists a bundle of other "facts" that Christner and Cody omitted from the search warrant application.  Doc. 35 at 26–27 (Am. Compl. ¶ 114(d)–(o)).  But all of these omitted "facts" really are statements of law.  The court needn't accept such statements as true.  *Khalik*, 671 F.3d at 1190.

about compliance with the Driver's Privacy Protection Act of 1994, even though it does not so require. *Id.* at 28–29 (Am. Compl. ¶¶ 121–24).

Cody sent these applications back to Christner. *Id.* (Am. Compl. ¶ 130). Then, Christner prepared the actual search warrant drafts for the magistrate judge to sign and sent those back to Cody. *Id.* Cody sent the search warrant applications to the Marion County District Attorney, who directed his staff to present them to a judge. *Id.* at 31–32 (Am. Compl. ¶ 139–41). Magistrate Judge Laura E. Viar approved the search warrants for the *Record*'s office, Meyer's home, and Herbel's home. *Id.* at 30 (Am. Compl. ¶ 131). Had the search warrant applications not contained falsehoods and material omissions, plaintiff alleges, probable cause would not have supported the warrants, and the warrants never would have issued. *Id.* (Am. Compl. ¶ 132).

When Magistrate Judge Viar signed the search warrants, she crossed out a blank for a notary signature. *Id.* at 31 (Am. Compl. ¶ 136). Instead, she signed a portion of the application that said that Cody had "subscribed and sworn" the application before her. *Id.* at 31 (Am. Compl. ¶ 136). But according to plaintiff, Cody didn't appear before Magistrate Judge Viar. *Id.* (Am. Compl. ¶ 137).

### *The Raid*

The same day the warrants issued—August 11, 2023—Cody and a group of other officers raided the *Record*'s office, Meyer's home, and Herbel's home. *Id.* at 32 (Am. Compl. ¶ 144). Defendants Cody, Hudlin, and Christner were present for the raid of the *Record*'s office. *Id.* (Am. Compl. ¶ 146).

The warrant required officers to perform a "preview search" to exclude from seizure any items not related to the alleged identity theft. *Id.* at 33 (Am. Compl. ¶ 149); Doc. 54-1 at 10 (requiring officers to "[c]onduct a preview search of all located digital communications devices and digital storage media to exclude from seizure those which have not been involved in the

9

identity theft").[5]  To comply with this requirement, Christner used an external hard drive with an

application called osTriage to perform a preview search on plaintiff's workplace computer.  Doc.

35 at 33 (Am. Compl. ¶ 150).  Christner used "vague" search terms like "vehicle" and "Kansas"

that returned many results but none "were even suggestive" of criminality.  *Id.* at 33–34 (Am.

Compl. ¶¶ 151–52).  And even though this preview search revealed no evidence of crime on

plaintiff's computer, Cody directed officers to seize the computer.  *Id.* at 34 (Am. Compl. ¶ 154).

The preview search of plaintiff's computer took longer than an hour to complete.  *See id.*

at 36 (Am. Compl ¶ 162).  After Christner completed the preview search, Hudlin said, "We'd be

here all freakin' day if we were going to do that to all those computers."  *Id.* (Am. Compl.

¶ 163).  Cody then called Soyez on the phone and brought him "up to speed on the search[.]"  *Id.*

(Am. Compl. ¶ 164).  Cody declared "we'll just take them all."  *Id.*  Cody then ordered the

seizure of plaintiff's phone, Meyer's computer, another reporter's computer, and the network file

server.  *Id.* at 37 (Am. Compl. ¶ 167).  Officers hadn't performed—or even attempted to

perform—a preview search of those devices.  *Id.* at 36, 37 (Am. Compl. ¶¶ 165, 167–69).  These

seizures "effectively shut[] down the newspaper."  *Id.* at 37 (Am. Compl. ¶ 168).

### Aftermath

The week after the raids, the Marion County District Attorney issued a press release.  *Id.*

at 41 (Am. Compl. ¶ 187).  In it, he acknowledged that the warrants failed to "establish a legally

---

[5]  The court properly may consider the search warrants attached to defendants' motions because they're "'central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'" *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1150 n.11 (10th Cir. 2023) (quoting *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010)).  Along with their motions, Cody and the city defendants filed an array of other exhibits, including a statement from Hudlin, a handwritten note from Newell, and the Marion County District Attorney's press release.  *E.g.*, Doc. 61-3; Doc. 61-6; Doc. 61-8.  But these other exhibits don't satisfy any exception to the general rule that "a court should consider no evidence beyond the pleadings" when deciding a motion to dismiss.  *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1297 (10th Cir. 2018) (internal quotation marks and citation omitted).

sufficient nexus" between any alleged crime and the searches and seizures.  *Id.*  The Marion

County District Attorney then filed a motion to release the evidence, which a Kansas state

district court judge granted.  *Id.*  The *Record* retained a forensic examiner, who went to the

Marion County Sheriff's Office to retrieve the seized property.  *Id.* (Am. Compl. ¶ 190).  Soyez

supervised the transfer of property to the forensic examiner.  *Id.*  Plaintiff was also present for

the retrieval of the seized items.  *See id.* (Am. Compl. ¶ 191).  Soyez "made a point" of

distancing himself from the raids, telling plaintiff, "You didn't see me over there[.]"  *Id.* at 41–42

(Am. Compl. ¶¶ 191–92).

### *Plaintiff's Suit*

The Amended Complaint organizes plaintiff's claims into four counts.  They are:

- *Count I*:  First Amendment direct violation against all defendants;

- *Count II*:  First Amendment retaliation against the City, Mayfield, Cody, the Board of County Commissioners of Marion County, and Soyez;

- *Count III*:  Privacy Protection Act against the City, the County, and Soyez, in his official capacity;

- *Count IV*:  Failure to train, supervise, and have proper policies against the City, the County, and Soyez, in his official capacity.

*Id.* at 45–46, 64–76 (Am. Compl. ¶¶ 208–15, 324–80).  As discussed further below, plaintiff

evidently intended to bring more than just these four claims, but she neglected to organize and

number them separately in her operative pleading.

Now, the court turns to defendants' motions, starting by reciting the governing legal

standard.

## II.      Legal Standard

Under Rule 12(b)(6), a party may move the court to dismiss an action for failing "to state

a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  For a complaint to survive

a Rule 12(b)(6) motion to dismiss, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir. 2009) ("The question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." (citation omitted)). The Tenth Circuit has explained that "[t]here is a 'low bar for surviving a motion to dismiss[.]'" *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1276 (10th Cir. 2023) (quoting *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1034 (10th Cir. 2020)). "'[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely[.]'" *Brown v. City of Tulsa*, 124 F.4th 1251, 1264 (10th Cir. 2025) (quoting *Quintana*, 973 F.3d at 1034).

When considering a Rule 12(b)(6) motion to dismiss, the court must assume that factual allegations in the complaint are true, but it is "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). And, while this pleading standard doesn't require "'detailed factual allegations,'" it demands more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, as the Supreme Court explained, "'will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

III.        Analysis

A.        Section 1983 and Qualified Immunity Overview

The law on 42 U.S.C. § 1983 and qualified immunity are relevant throughout this Order.

So, the court starts with a brief overview of these topics.

### 1. Section 1983

A plaintiff may bring a civil cause of action under 42 U.S.C. § 1983, "which requires (1)

deprivation of a federally protected right by (2) an actor acting under color of state law." *Fowler*

*v. Stitt*, 104 F.4th 770, 797 (10th Cir. 2024) (internal quotation marks and citation omitted). A

plaintiff may assert a § 1983 claim against either a municipality or an individual. *See Brown*,

124 F.4th at 1264 (permitting § 1983 suit for policies and practices of municipal police

department), *id.* at 1266 (permitting § 1983 suit against police chief in his individual capacity).

As a defense against a § 1983 claim, an individual defendant may assert qualified immunity. *Id.*

at 1266. But "[q]ualified immunity is not available as a defense to municipal liability." *Pyle v.*

*Woods*, 874 F.3d 1257, 1264 (10th Cir. 2017) (citing *Owen v. City of Independence*, 445 U.S.

622, 637–38 (1980)). The court outlines the broad contours of the qualified immunity defense,

next.

### 2. Qualified Immunity

"When a defendant asserts qualified immunity at the motion to dismiss phase, the

plaintiff 'must allege facts sufficient to show (assuming they are true) that the [1] defendant[]

plausibly violated their constitutional rights, and that [2] those rights were clearly established at

the time.'" *Brown*, 124 F.4th at 1265 (alterations in original) (quoting *Robbins v. Oklahoma*, 519

F.3d 1242, 1249 (10th Cir. 2008)). That's so because the "doctrine of qualified immunity

protects government officials 'from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would

have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant has "asserted the defense of qualified immunity, the burden is on Plaintiffs to establish their right to proceed." *Matthews v. Bergdorf*, 889 F.3d 1136, 1143 (10th Cir. 2018); *Bledsoe v. Carreno*, 53 F.4th 589, 617 n.25 (10th Cir. 2022) ("Appellants are correct that once they asserted qualified immunity in the district court, which they did here, it was [plaintiff's] burden to show both that he had alleged a constitutional violation and that that violation was clearly established."). If plaintiff fails to carry that burden, "'the defendant prevails on the defense'" and the plaintiff's claims "are dismissed." *Losee v. Preece*, No. 18-CV-195-TC, 2022 WL 957194, at *5 (D. Utah Mar. 30, 2022) (quoting *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016)).

A constitutional right is clearly established when, "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful. In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal quotation marks and citations omitted). A plaintiff can't defeat qualified immunity "simply by alleging violation of extremely abstract rights," *White v. Pauly*, 580 U.S. 73, 79 (2017), and a court shouldn't "define clearly established law at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

"Ordinarily, to make such a showing of clearly established law in our circuit, the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Frasier v. Evans*, 992 F.3d 1003, 1014 (10th Cir. 2021) (quotation cleaned up). But such authority is unnecessary and "a government official may still have notice that their conduct

violates a constitutional right" when "it is so apparent as to apply with obvious clarity." *Brown*,
124 F.4th at 1265. "In this regard, the Supreme Court has reminded us recently that under
certain 'extreme circumstances' general constitutional principles established in the caselaw may
give reasonable government officials fair warning that their conduct is constitutionally or
statutorily unlawful." *Frasier*, 992 F.3d at 1015 (quoting *Taylor v. Riojas*, 592 U.S. 7, 8 (2020)
(per curiam)); *see also Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004) ("The degree of
specificity required from prior case law depends in part on the character of the challenged
conduct. The more obviously egregious the conduct in light of prevailing constitutional
principles, the less specificity is required from prior case law to clearly establish the violation.").

### B.    Fourth Amendment Claim

None of the enumerated "counts" in the Amended Complaint seeks recovery based on a
violation of plaintiff's Fourth Amendment rights. Doc. 35 at 45, 64, 68, 74. Still, in her direct
claim based on the First Amendment, plaintiff references the Fourth Amendment many times and
suggests that defendants violated the Fourth Amendment. *Id.* at 46, 49, 50, 53, 56 (Am. Compl.
¶¶ 213–14, 232, 237, 253, 274 (Count I)).

A complaint needn't "set out a legal theory for the plaintiff's claim for relief." 5 A.
Benjamin Spencer, Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*
§ 1219 (4th ed. 2024) (cited approvingly in *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014)).
Our court has amplified this principle, explaining that there "'is no requirement that a pleading
list elements of claims asserted, make legal conclusions about claims asserted, or label the
asserted claims.'" *Kelp v. B & B Lumber Co.*, No. 18-1103-JWB, 2018 WL 3831525, at *6 (D.
Kan. Aug. 13, 2018) (quoting *Mechler v. United States*, No. 12-1183-EFM-GLR, 2012 WL
5289627, at *3 (D. Kan. Oct. 23, 2012)). That said, the organizational choices a plaintiff makes
can complicate the court's work. *See George v. Uponor Corp.*, 988 F. Supp. 2d 1056, 1072 n.10

(D. Minn. 2013) ("Plaintiffs' tactic of grouping several disparate claims together under one count . . . has added unneeded complexity to this litigation."). Unfortunately, that's so here.

Defendants argue that plaintiff has failed to state a Fourth Amendment claim. Doc. 54 at 11–14; Doc. 58 at 13–15; Doc. 61 at 13–26. And plaintiff, though she never asserts a Fourth Amendment claim expressly, responds vigorously to defendants' Fourth Amendment arguments. Plaintiff asserts that she has alleged a plausible Fourth Amendment claim. *E.g.*, Doc. 77 at 13–14; Doc. 80 at 8–15. So, following the lead of the parties' presentation, the court assesses whether the Amended Complaint sets forth facts that plausibly furnish a basis for a § 1983 Fourth Amendment claim.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and instructs that "no Warrants shall issue, but upon probable cause[.]" U.S. Const. amend. IV. Plaintiff's Amended Complaint and Responses are not entirely clear, but the court discerns two possible Fourth Amendment theories of recovery based on (1) the procurement of the warrant and (2) its execution. The court addresses the viability of each theory, next.

### 1. Warrant Procurement

The Amended Complaint states a plausible Fourth Amendment claim against Cody and Christner based on the allegedly unlawful procurement of the warrant.

To state a Fourth Amendment violation based on misrepresented or omitted facts in the search warrant affidavit, a plaintiff must show that (1) the omitted or misrepresented facts were material and (2) the affiant acted reckless or knowingly. *Robitaille v. Spitzer*, 175 F. Supp. 3d 1299, 1305 (D. Colo. 2016). Start with the first requirement—materiality.

16

### a.    Materiality of Falsehoods

To determine whether the alleged omissions and falsehoods in the warrant affidavit were material, the court must determine "whether probable cause existed in light of all the evidence, including the omitted information" but excluding the falsehoods. *Pierce*, 359 F.3d at 1293 (citations omitted). That is, the court must assess whether the warrant affidavit—stripped of the allegedly false information and including the omitted information—presents a reasonable basis for probable cause. *Id.* (citation omitted); *see also Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996) ("Where false statements have been included in an arrest warrant affidavit, the existence of probable cause is determined by setting aside the false information and reviewing the remaining contents of the affidavit." (citation omitted)).

Cody argues emphatically that the search warrant he procured was valid because he had probable cause to believe that plaintiff and Meyer had violated both state and federal law. Doc. 61 at 13–19, 20–22. The court addresses these arguments, in turn, next.

### i.    State law crimes

Cody first contends that arguable probable cause existed to believe that plaintiff and Meyer had violated Kan. Stat. Ann. §§ 21-5839(a)(5) (unlawful computer access) and 21-6107(a) (identify theft). Doc. 61 at 20–22. Begin with unlawful computer access, unlawful under Kan. Stat. Ann. § 21-5839(a). It provides: "It is unlawful for any person . . . (5) to knowingly and without authorization, access or attempt to access any computer, computer system, social networking website, computer network or computer software, program, documentation, data or property contained in any computer, computer system, or computer network." *Id.*

With the allegedly false statements stripped from the search warrant application, it contains almost no information suggesting that criminal activity was afoot. *See* Doc. 54-1 at 5–

8. In particular, the stripped search warrant affidavit furnishes no explanation why Zorn or Meyer's access of the KDOR license status check tool was "without authorization[.]" Kan. Stat. Ann. § 21-5839(a)(5). The thrust of Cody's position presumes—but without any justification—that the act of downloading publicly available documents is illegal. *See* Doc. 61 at 22. But Cody never provides any justification for the conclusion that plaintiff (or anyone affiliated with the *Record*) acted "knowingly and without authorization" when they downloaded documents from a publicly accessible internet terminal. Kan. Stat. Ann. § 21-5839(a)(5). Without some rationale for believing that plaintiff or Meyer lacked authority to access the KDOR license status check tool—and Cody never articulates one—probable cause couldn't support the searches.

Cody's argument trying to support probable cause for identify theft is even weaker. Kan. Stat. Ann. § 21-6107(a) criminalizes identify theft. This statute defines "identify theft" as

> obtaining, possessing, transferring, using, selling or purchasing any personal identifying information, or document containing the same, belonging to or issued to another person, with the intent to: (1) Defraud that person, or anyone else, in order to receive any benefit; or (2) misrepresent that person in order to subject that person to economic or bodily harm.

*Id.* Cody maintains that he arguably had probable cause to believe that plaintiff had retrieved "the KDOR letter containing Newell's personal identifying information . . . with the intent to defraud KDOR (by mispresenting her purpose)[.]" Doc. 61 at 22. But a party cannot "defraud" another without intending to deceive. *State v. Valdiviezo-Martinez*, 486 P.3d 1256, 1267–68 (Kan. 2021). And the Kansas Supreme Court has explained that "authorized activity is not deception[.]" *Id.* at 1268. Again, Cody has failed to identify any reasonable basis to believe that Zorn or Meyer's access of the KDOR license status tool wasn't authorized. Cody argues that plaintiff "misrepresent[ed] her purpose" to KDOR but offers no facts or other explanation to justify that conclusion. Doc. 61 at 22.

In short, Cody hasn't identified any basis for probable cause to believe that Zorn, Meyer, or anyone at the *Record* had committed a state crime. The court next assesses Cody's argument that he had probable cause based on a violation of the federal Driver's Privacy Protection Act (DPPA).

### ii.        Federal Law Crime: the DPPA

Without the allegedly false statements, the search warrant affidavit didn't support probable cause of violating the federal law called the Driver's Privacy Protection Act (DPPA).

The DPPA prohibits a "State department of motor vehicles" from disclosing personal information "about any individual obtained by the department in connection with a motor vehicle record[.]" 18 U.S.C. § 2721(a). It also makes it "unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record[.]" *Id.* § 2722(a). The DPPA separately provides it's "unlawful for any person to make [a] false representation to obtain any personal information from an individual's motor vehicle record." *Id.* § 2722(b). The DPPA enumerates 14 carveouts. *Maracich v. Spears*, 570 U.S. 48, 58 (2013); 18 U.S.C. § 2722(a) (exempting carveouts listed in § 2721(b)); *id.* § 2721(b) (listing 14 exceptions).

Plaintiff argues that she didn't "obtain" Newell's personal information from the KDOR because she already possessed that information. Doc. 80 at 10. Cody retorts that plaintiff must have a specific justification each time she accessed the protected information. Doc. 86 at 2–3. The court agrees with plaintiff. When a party already possesses information and merely verifies that information through a state's department of motor vehicles, the party doesn't "obtain" the information within the meaning of the DPPA.

The DPPA doesn't define the word "obtain." Absent a statutory definition, the Supreme Court has instructed that courts should interpret words "'as taking their ordinary, contemporary,

common meaning.'" *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)) (characterizing this principle as a "fundamental canon of statutory construction"). "Obtain" means to "bring into one's own possession; to procure[.]" *Obtain*, Black's Law Dictionary (12th ed. 2024). Based on this definition, when a person already possesses information, the act of verifying the information doesn't qualify as "obtaining" it.

So far as the court could discern, the only court to address plaintiff's argument here is *New Richmond News v. City of New Richmond*, 881 N.W.2d 339, 356–57 (Wis. Ct. App. 2016). There, the Wisconsin Court of Appeals concluded that "information that is *obtained* from another source and subsequently *verified* using DMV records is not subject to the DPPA, as long as, upon verification, the information is not substantively altered to conform to the DMV records." *Id.* at 356 (emphasis added). In other words, if a party already possesses information and merely verifies it, that act of verification doesn't amount to "obtaining" the information. *Cf. Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 949 (7th Cir. 2015) ("The DPPA proscribes only the publication of personal information that has been obtained from motor vehicle records. The origin of the information is thus crucial to the illegality of its publication—the statute is agnostic to the dissemination of the very same information acquired from a lawful source.").

Two of Cody's counterarguments merit a response. *First*, Cody cites the Supreme Court's opinion in *Maracich* for the proposition that "[e]ach distinct occasion" of accessing DPPA-protected information must fall within an excepted provision of the DPPA. Doc. 86 at 3. To be sure, the Supreme Court in *Maracich* explained that "[e]ach distinct disclosure or use of personal information acquired from a state DMV must be permitted by the DPPA." 570 U.S. at 74. But the Supreme Court made that statement in the context of the DPPA's civil liability

provision, *id.*, which imposes liability when a person "knowingly obtains, discloses or *uses* personal information[.]"  18 U.S.C. § 2724 (emphasis added).  Meanwhile, the DPPA's criminal provision makes it unlawful for a person "knowingly to obtain or disclose personal information[.]"  *Id.* § 2722(a).  There's no reference to "use" in the criminal provision.  And here, there's no plausible basis in the warrant affidavit for finding that plaintiff or Meyer *disclosed* any personal information.  So, probable cause existed here only if plaintiff unlawfully "obtained" the personal information.  And, as already explained above, the warrant affidavit didn't support probable cause that plaintiff had "obtained" personal information from the KDOR website.  That's so because, if the warrant application included the allegedly omitted fact that the *Record* and plaintiff already had Newell's personal information, then no "obtaining" ever occurred.

*Second*, Cody cites *McDonough v. Anoka County*, a case which arguably supports his position at first blush.  Doc. 61 at 18 (citing *McDonough v. Anoka County*, 799 F.3d 931, 944–45 (8th Cir. 2015)).  In *McDonough*, the Eighth Circuit interpreted the word "obtain" in the DPPA to "unambiguously include[] access and observation of" protected information.  799 F.3d at 944.  But the Eighth Circuit there was deciding a question different from the one presented here: whether information *already* possessed is "obtained" upon verification.  Instead, *McDonough* was rejecting the argument that "obtain" requires "physical possession of the information[.]"  *Id.* The court explained there that, in enacting the DPPA, "Congress could not have intended to require physical procurement of intangible information."  *Id.*  Here, the court agrees with that commonsense proposition.  That is, when a user doesn't already have information and then views that information without a permissible purpose, the person has "obtained" the information.  *See*

*id.* But, that doesn't help Cody here because plaintiff already possessed the material she accessed through the KDOR website.

In sum, if the information Zorn accessed from the KDOR "was obtained from other sources and was merely verified using DMV records, it would not be subject to the DPPA." *New Richmond News*, 881 N.W.2d at 357. Because Cody knew that Zorn already had the information she accessed from the KDOR website, *see* Doc. 35 at 25 (Am. Compl. ¶ 114(a)), and because he omitted that information from the search warrant, the cumulative effect of the falsehoods and omissions in the warrant was material.

Apart from the weaknesses of these counterarguments, another separate, and perhaps more fundamental reason demonstrates why the warrant didn't support probable cause. Recall that the DPPA has 14 exceptions. 18 U.S.C. § 2721(b). An element of the DPPA's criminal provision is that none of these exceptions applies. *Id.* § 2722(a) ("It shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, *for any use not permitted under section 2721(b) of this title*." (emphasis added)). So, to have probable cause for a DPPA violation, Cody needed probable cause to believe that none of those exceptions applied. *See Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1224 (10th Cir. 2020) (explaining that probable cause requires officer to "develop probable cause for each element of the offense"); *cf. Thomas v. George, Hartz, Lundeen, Fulmer, Johnstone, King, & Stevens, P.A.*, 525 F.3d 1107, 1110–14 (11th Cir. 2008) (holding—in the context of DPPA's civil provision—that plaintiff bears burden to plead that no exception applies); *Kost v. Hunt*, 983 F. Supp. 2d 1121, 1133 (D. Minn. 2013) (same). Stripped of the allegedly false statements and including the alleged omissions, *see Pierce*, 359 F.3d at 1293, the warrant affidavit doesn't provide *any* justification for escaping these exceptions. *See generally* Doc. 54-1. Plaintiff's

pleading identifies several possible carveouts. Doc. 35 at 14–15 (Am. Compl. ¶¶ 60–65). The court needn't decide definitively whether plaintiff's alleged conduct satisfied one of these standards. Instead, the court can conclude that the affidavit—without its alleged falsehoods—provides no reason to believe that plaintiff's conduct wasn't authorized. As such, the warrant affidavit failed to support probable cause for a violation of the DPPA.

Plaintiff thus has satisfied her burden to establish that the alleged falsehoods that Cody and Christner included in the warrant—together with the omissions—were material.[6]

### b.    Affiant Acted Recklessly or Knowingly

Christner trains his arguments on the second element of a Fourth Amendment violation based on falsehoods in or omissions from in a warrant—*i.e.*, the affiant acted recklessly or knowingly. Doc. 54 at 11–12. He also argues that he didn't cause plaintiff's constitutional injuries. *Id.* The court rejects both these arguments, and now explains why.

Viewed in the light most favorable to plaintiff, the Amended Complaint plausibly alleges that Christner knowingly or recklessly included false and material information in the warrant application. Doc. 35 at 23–27 (Am. Compl. ¶¶ 99–115). For example, Christner included a falsified screenshot in the warrant affidavit. *Id.* at 23 (Am. Compl. ¶¶ 102–03).[7] This screenshot

---

[6]    The Amended Complaint alleges that the warrants issued without an oath or affirmation. Doc. 35 at 32 (Am. Compl. ¶ 143). Cody offers several arguments against this theory of recovery. Doc. 61 at 29–30. Plaintiff's Response doesn't answer any of Cody's arguments or discuss the oath-or-affirmation theory. The court thus can treat this theory as abandoned. *E.g.*, *Cortishae-Eier v. Ford Motor Co.*, No. 23-3081-EFM-TJJ, 2023 WL 5625311, at *3 (D. Kan. Aug. 31, 2023) ("A plaintiff abandons her claim when she fails to substantively respond to defendant's arguments." (quotation cleaned up)); *Tronsgard v. FBL Fin. Grp., Inc.*, 312 F. Supp. 3d 982, 1009 (D. Kan. 2018) (treating claim as abandoned when plaintiffs didn't substantively respond to arguments on motion to dismiss). The court thus dismisses any claim based on a violation of the Fourth Amendment's oath-or-affirmation requirement.

[7]    Christner also argues that "none of the justifications set forth on the KDOR site apply to Plaintiff accessing Newell's records." Doc. 54 at 13. That argument ignores, however, plaintiff's allegation that Christner himself falsely included that list of justifications in the warrant application. Christner can't rely reasonably on a fabrication for which he is responsible.

allegedly doesn't appear anywhere on the KDOR website. *Id.* Also, as alleged, Christner falsely stated in the warrant affidavit that a user attempting to access documents on the KDOR website must provide a reason for doing so. *Id.* at 24 (Am. Compl. ¶ 107). And he alleged in the warrant that plaintiff had to "either impersonat[e] or l[ie] about the reasons" she was seeking the records. *Id.* (Am. Compl. ¶ 108). Plaintiff's allegations plausibly support a finding that Christner knowingly or recklessly included false and material information in the warrant application.

Christner argues that the Amended Complaint alleges that he merely "put Cody's investigation on paper without double-checking Cody's investigation." Doc. 54 at 12. To be sure, officers reasonably may rely on "'observations, statements, and conclusions of their fellow officers[.]'" *Eckert v. Dougherty*, 658 F. App'x 401, 407 (10th Cir. 2016) (quoting *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1260 (10th Cir. 1998)). And the Amended Complaint suggests simply that Christner drafted the warrant at Cody's direction. *See* Doc. 35 at 23 (Am. Compl. ¶¶ 98–99). Still, given the inaccurate nature of some information that Christner included in the warrant—a screenshot that doesn't appear on the KDOR website, for example—a jury could find or infer that Christner knew—or recklessly disregarded the possibility—that he included false information in the warrant affidavit.

This conclusion also undercuts Christner's causation arguments. The subsequent chain of events allegedly leading to the putative Fourth Amendment violations relied on Christner's drafting the warrant, including his fabrications and omissions. *Cf. Wulf v. City of Wichita*, 883 F.2d 842, 864 (10th Cir. 1989) (holding defendant "caused" constitutional violation where decisionmaker "listened to" and "to some extent, relied on" defendant's recommendation). And the Amended Complaint plausibly alleges that Christner acted with requisite culpability. That is, he knowingly or recklessly misrepresented and omitted material facts from the search warrant

affidavit.  Given these facts, he knew or should have known that his actions would "set in motion a series of events" that "would cause others" to violate plaintiff's constitutional rights.  *Mink v. Knox*, 613 F.3d 995, 1001 (10th Cir. 2010) (internal quotation marks and citation omitted).  Christner can't avoid liability just because he refused to sign the affidavit.

In sum, the Amended Complaint alleges—and with specificity—that Christner knowingly or recklessly drafted the search warrant affidavit to include false statements and omit material information.  And then Cody allegedly added more false statements in his warrant applications.  Doc. 35 at 28–29 (Am. Compl. ¶¶ 120–24).  Given the "low bar" for surviving a motion to dismiss, *Clinton*, 63 F.4th at 1276, and given the court's obligation to view plaintiff's allegations in the light most favorable to them, plaintiff plausibly has alleged that Cody and Christner are liable for violating her Fourth Amendment rights by participating in the drafting and procurement of the allegedly deficient search warrants.[8]

### c.   Acting Chief of Police Hudlin

Defendant Hudlin argues that that the Amended Complaint is too conclusory to state a Fourth Amendment claim against him.  Doc. 58 at 14–15.  The court agrees with him, at least in part.  The Amended Complaint doesn't allege plausibly that Hudlin was involved in procuring the warrant.  The court thus dismisses any Fourth Amendment claim against Hudlin based on unlawful procurement of the warrant.[9]

---

[8]     Our court reached a different conclusion about Christner's liability in *Herbel*.  2024 WL 4416849, at *16.  Critically, the complaint there didn't allege that Christner recklessly or knowingly had included false statements in the warrant affidavit.  *Id.* (explaining that "there are no allegations that Christner . . . knew of any misstatements by Cody"); *see also* Complaint, *Herbel*, No. 24-cv-2224-HLT-GEB, ECF No. 1, at 31–32 (Compl. ¶¶ 189–91).  Here, in contrast, the Amended Complaint explicitly alleges that Christner knowingly or recklessly included false information in the warrant affidavit.  Doc. 35 at 23–27 (Am. Compl. ¶¶ 101–16).

[9]     Soyez also argues that he didn't participate in procuring the warrant.  Doc. 54 at 12.  Plaintiff doesn't contest this argument.  *See generally* Doc. 77.  So, the court agrees with Soyez.  Plaintiff hasn't alleged plausibly that Soyez was involved directly with the warrant's procurement.  If plaintiff can prove

### d.    Qualified Immunity

Former Chief of Police Cody and Detective Christner (Marion County Sheriff's Office) each invoke qualified immunity. Doc. 61 at 20–22; Doc. 54 at 16.

"Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner[.]" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012).  Still, "the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry[.]" *Id.* at 547.  "When the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing." *Franks v. Delaware*, 438 U.S. 154, 164–65 (1978) (emphasis in original) (quotation cleaned up).  To that end, a warrant can't "protect officers who misrepresent or omit material facts to the magistrate judge." *Stonecipher v. Valles*, 759 F.3d 1134, 1142–45 (10th Cir. 2014) (affirming decision granting qualified immunity to officer who incorrectly claimed—in a warrant affidavit—plaintiff previously was convicted of a crime of violence even though plaintiff had received a suspended sentence, which under Missouri law didn't qualify as a conviction).

"In the context of a qualified immunity defense on an unlawful search or arrest claim, [the court] ascertain[s] whether a defendant violated clearly established law 'by asking whether there was arguable probable cause' for the challenged conduct." *Id.* at 1141 (quotation cleaned up) (quoting *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012)).  That is, a "defendant is entitled to qualified immunity if a reasonable officer could have believed that probable cause

---

her conspiracy theory, she may succeed in holding Soyez liable for the warrant procurement on that theory.  *See below* § III.D.  But plaintiff hasn't alleged plausibly that Soyez himself is liable directly for a Fourth Amendment violation based on the warrant procurement.  The court thus dismisses any Fourth Amendment claim against Soyez based on unlawful procurement of the warrant.

existed[.]" *Cortez v. McCauley*, 478 F.3d 1108, 1120 (10th Cir. 2007) (en banc); *see also Turner v. Lotspeich*, 77 F.3d 493, 1996 WL 23195, at *2 (10th Cir. 1996) ("'The law is clearly established that an officer would violate a plaintiff's Fourth and Fourteenth Amendment rights by knowingly or recklessly making a false statement in an affidavit in support of an arrest or search warrant, if the false statement were material to the finding of probable cause.'" (quotation cleaned up) (quoting *Bruning v. Pixler*, 949 F.2d 352, 357 (10th Cir. 1991)).

Here, Cody argues that he deserves qualified immunity for procuring the warrant because "arguable" probable cause supported the search. Doc. 61 at 20–22. The court already has concluded that probable cause didn't support the warrant issued here. *See above* § III.B.1.a. Now, the court also concludes based on plaintiff's pleaded facts that probable cause wasn't even arguable here. Here's why.

Under those pleaded facts, Cody didn't have any reason to believe that plaintiff accessed the KDOR website without authorization. So, he lacked even arguable probable cause to believe a state law crime or a DPPA violation had occurred. Cody also knew that plaintiff already possessed the information that she verified by checking the KDOR website. Doc. 35 at 25 (Am. Compl. ¶ 114(a)). Because plaintiff already possessed that information, she couldn't have "obtained" it from the KDOR. And it was objectively unreasonable for Cody to assume otherwise. Cody knew that Meyer had contacted the KDOR, and he also knew that the KDOR had informed Meyer that anyone with Newell's driver's license card number, name, and date of birth could access Newell's letter. *Id.* at 17 (Am. Compl. ¶ 71). Viewed in the light most favorable to plaintiff, these facts collectively can support but one conclusion: It was objectively unreasonable for Cody to seek a search warrant for the *Record*'s office. That is, no "reasonable

officer could have concluded that probable cause existed[.]" *Cortez*, 478 F.3d at 1120. Cody isn't entitled to qualified immunity.

Christner also asks for qualified immunity. Doc. 54 at 16. He contends that "there is no binding precedent in which an assisting officer, who did not conduct the underlying investigation and failed to double-check the investigation of another agency, is liable under the Fourth Amendment for the issuance of that warrant." *Id.* Again, Christner undersells the Amended Complaint's allegations. It alleges that Christner himself recklessly or knowingly included false information and omitted material information from the warrant application. Doc. 35 at 23–27 (Am. Compl. ¶¶ 101–16). Assuming, it's true that Christner knowingly or recklessly misrepresented facts on the warrant affidavit, as the court must, Christner violated clearly established law. *See Turner*, 1996 WL 23195, at *2 ("'The law is clearly established that an officer would violate a plaintiff's Fourth and Fourteenth Amendment rights by knowingly or recklessly making a false statement in an affidavit in support of an arrest or search warrant, if the false statement were material to the finding of probable cause.'" (quotation cleaned up) (quoting *Bruning*, 949 F.2d at 357).

Christner's refusal to sign the warrant affidavit complicates the qualified-immunity inquiry, however. Still, the court concludes that Christner isn't entitled to qualified immunity at this stage for four reasons.

*First*, the Amended Complaint alleges Christner knowingly or recklessly included false information in the affidavit he drafted. Doc. 35 at 23–27 (Am. Compl. ¶¶ 101–16). So even if Christner was relying on Cody's directions, his actions weren't objectively reasonable if he knew—or recklessly disregarded the possibility—that the statements he included in the warrant weren't true. *See Robitaille*, 175 F. Supp. 3d at 1305–06 (rejecting officer-defendant's position

that he reasonably could rely on fellow officers' observations when defendant had reason to question veracity of those observations); *see also Montoya v. City and County of Denver*, No. 16-cv-01457-JLK, 2021 WL 1244264, at *17 (D. Colo. Mar. 4, 2021) (rejecting officer defendant's argument that "he was just the messenger" where evidence he included in warrant affidavit was "obviously false"), *aff'd*, No. 21-1107, 2022 WL 1837828 (10th Cir. June 3, 2022).

*Second*, because Christner prepared the bulk of the affidavit and allegedly knew that much of its information was false, he should have known that probable cause didn't support the search warrants. *See Michalik v. Hermann*, 422 F.3d 252, 261 (5th Cir. 2005) ("[L]iability under *Malley* may lie . . . against . . . an officer who actually prepares the warrant application . . . . Such an officer is in a position to see the whole picture, to understand his responsibility, and thus fully to assess probable cause questions."). In other words, as alleged, Christner knew—or should have known—that the warrant affidavit he drafted failed to support even arguable probable cause. Still, he went forward.

*Third*, viewing the allegations in the light most favorable to plaintiff, a reasonable jury could interpret Christner's refusal to sign the affidavit as evidence Christner intentionally distanced himself from wrongful conduct—a consciousness of guilt. *See Sanford v. Russell*, 531 F. Supp. 3d 1221, 1227 (E.D. Mich. 2021) (explaining that evidence manifesting a defendant's "consciousness of his unlawful conduct" is admissible in a § 1983 case).

*Fourth*, the court must accept plaintiff's allegations as true and view them in the light most favorable to plaintiff. *Brooks*, 985 F.3d at 1281. Perhaps evidence will emerge that Christner merely copied Cody's allegations and had no reason to doubt their veracity. But that's not what plaintiff has alleged. Should plaintiff fail to muster evidence for her allegations about Christner's culpability, it seems likely he'll prevail at summary judgment. But at the current

stage, the court must view Christner's conduct "as alleged in the complaint[.]" *Thompson v. Ragland*, 23 F.4th 1252, 1256 (10th Cir. 2022) ("The procedural posture of the qualified-immunity inquiry may be critical. . . . Asserting a qualified immunity defense via a Rule 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review than would apply on summary judgment." (second ellipsis in original) (internal quotation marks and citation omitted)).

So, Christner doesn't deserve qualified immunity at this stage of the action. Plaintiff's claim of a Fourth Amendment violation premised on warrant procurement survives against defendants Cody and Christner.

Next, the court addresses plaintiff's claims based on execution of the search warrant.

### 2. Warrant Execution

The Amended Complaint also suggests that defendants violated the Fourth Amendment by unlawfully executing the search warrant. *See* Doc. 35 at 33–40 (Am. Compl. ¶¶ 149–81). This part of the pleading contends that defendants seized items without conducting the warrant-required preview search. *See id.* Defendants offer a series of arguments against this theory of claim. The court addresses defendants' first challenge—standing—next.

### a. Standing

Former Chief Cody and Officer Hudlin argue that plaintiff doesn't have standing to state a Fourth Amendment claim for the seizure of her workplace computer. Doc. 61 at 19–20 (citing *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978)); Doc. 58 at 15. According to Cody, because the *Record*—not plaintiff—owns the computer that officers searched and seized, plaintiff didn't suffer a constitutional injury. *Id.* Plaintiff's response is less than stellar.

She argues that assessing standing is a fact-intensive inquiry that the court can't resolve on a motion to dismiss.[10]  Doc. 80 at 12.  Plaintiff misapprehends the 12(b)(6) standard.  Though discovery might produce additional facts relevant to the inquiry, the court's task at this procedural juncture is to determine whether the facts alleged in the Amended Complaint— "viewed in the light most favorable to plaintiff"—state a plausible claim for relief.  *Abdi v. Wray*, 942 F.3d 1019, 1025 (10th Cir. 2019).  And because defendants have raised a colorable basis to defeat at least one of plaintiff's theories of recovery, the court doesn't have the luxury of postponing this standing argument for another day.  The court concludes that plaintiff hasn't alleged any facts permitting a plausible inference that she had a reasonable expectation of privacy in her workplace computer.

"Fourth Amendment rights are personal and cannot be asserted vicariously."  *Lowther v. Child. Youth & Fam. Dep't*, 101 F.4th 742, 754 n.6 (10th Cir. 2024).  "Although this principle is often called 'standing,' the idea that personal Fourth Amendment rights must be at stake 'is more properly subsumed under substantive Fourth Amendment doctrine.'"  *United States v. Davis*, 750 F.3d 1186, 1190 (10th Cir. 2014) (quoting *Rakas*, 439 U.S. at 139).  The inquiry, then, is whether plaintiff had either "a possessory interest or reasonable expectation of privacy" that the search or seizure could have violated.  *Id.* at 1190; *see also United States v. Ackerman*, 831 F.3d 1292, 1307 (10th Cir. 2016) (explaining that search violates Fourth Amendment when it "infringes on a reasonable expectation of privacy *or* when it involves a physical intrusion (a trespass) on a constitutionally protected space" (emphasis in original)).  Here, the parties agree.  Plaintiff lacked a possessory interest in her workplace computer, *see* Doc. 80 at 12, so the only remaining issue is whether she had a reasonable expectation of privacy in it.  To satisfy the reasonable-

---

[10]     Plaintiff also argues that she has standing to challenge the search and seizure of her cell phone. Doc. 80 at 12.  Cody doesn't challenge this proposition.  Doc. 86 at 5.

expectation-of-privacy standard, a party must have both a subjective and objectively reasonable expectation of privacy. *See United States v. Barrows*, 481 F.3d 1246, 1248–49 (10th Cir. 2007).

Whether an employee has a reasonable expectation of privacy in the workplace is a fact-intensive inquiry, which the court resolves "on a case-by-case basis." *United States v. Angevine*, 281 F.3d 1130, 1134 (10th Cir. 2002) (citing *O'Connor v. Ortega*, 480 U.S. 709, 718 (1987) (plurality opinion)). "'Within the workplace context, the Supreme Court has recognized that employees may have a reasonable expectation of privacy against intrusions by police.'" *Id.* (quotation cleaned up) (quoting *O'Connor*, 480 U.S. at 716). Indeed, our Circuit has instructed that generally "an employee enjoys a reasonable expectation of privacy in his work space[.]" *United States v. Anderson*, 154 F.3d 1225, 1230 (10th Cir. 1998). Still, to determine whether a plaintiff has standing sufficient to challenge a workplace search, the court must "examine all of the circumstances of the working environment and the relevant search." *Id.* Factors relevant to this determination include the employer's practices and procedures, whether the employee has a possessory interest in the seized item, "whether the item was in the immediate control of the employee" when officers seized it, and whether the employee proactively protected the privacy of the item uncovered by the workplace search. *Angevine*, 281 F.3d at 1134.

Twice, our Circuit has concluded that an employee lacked a reasonable expectation of privacy in a workplace computer. *Angevine*, 281 F.3d at 1135; *Barrows*, 481 F.3d at 1249. The conclusions in those two cases turned on specific facts elucidated in suppression hearings. In *Angevine*, police seized and searched the defendant's university-issued computer and found child pornography. 281 F.3d at 1132. The Circuit reasoned that the defendant didn't own the laptop and had received express warnings that the university and third parties actively monitored network activity on the computer. *Id.* at 1134–35. Thus, any expectation of privacy that the

defendant harbored wasn't objectively reasonable. *Id.* at 1135. In *Barrows*, the defendant used his personal computer at work. 481 F.3d at 1247. An officer, who was troubleshooting network issues, used the defendant's computer and found child pornography. *Id.* The panel explained that the defendant didn't have a reasonable expectation of privacy because he hadn't taken any proactive steps to protect the privacy of his computer. *Id.* at 1248–49. In particular, he hadn't password-protected the computer, turned it off, or taken "any other steps to prevent third-party use." *Id.* at 1248.

Here, plaintiff hasn't alleged plausibly that she had a reasonable expectation of privacy in her workplace computer. The Amended Complaint's allegations about plaintiff's workplace computer are nearly nonexistent. The Amended Complaint refers to the computer as "Zorn's computer." *E.g.*, Doc. 35 at 33, 34, 36, 42 (Am. Compl. ¶¶ 150, 153, 154, 162, 163, 194). These references plausibly imply that plaintiff didn't share her computer with other staff at the *Record*. *See id.* at 37 (Am. Compl. ¶ 167) (referring to "Meyer's computer" and "Deb Gruver's computer").[11] That inference alone, however, won't do. Plaintiff concedes that she didn't own the computer. Doc. 80 at 12. And like the defendant in *Barrows*, plaintiff—at least as far as the Amended Complaint alleges—didn't password protect her computer or take any proactive steps to secure her computer from prying eyes. Even viewing the Amended Complaint in the light most favorable to plaintiff, the court can't conclude that she had either a subjective or objectively reasonable expectation of privacy in her workplace computer. *See United States v. Wong*, 334 F.3d 831, 839 (9th Cir. 2003) ("[T]he laptop searched belonged to Wong's former employer . . . . Therefore, Wong does not have standing to object to the search of that laptop because he failed to establish that he had a reasonable expectation of privacy in it."); *Bingham v. Baycare Health*

---

[11]    Recall that plaintiff's briefing admits that the *Record* owned her workplace computer. Doc. 80 at 12.

*Sys.*, No. 14-cv-73-T-23JSS, 2016 WL 3917513, at *3 n.2 (M.D. Fla. July 20, 2016) (compiling cases and explaining that "the majority of courts have found that employees do not have a reasonable expectation of privacy in their work computers or in e-mails exchanged using a work account, especially when the employer retains a policy or otherwise notifies employees that their equipment or accounts are subject to monitoring"); *cf. Rissetto v. County of Clinton*, No. 15-CV-0720 (GTS/CFH), 2016 WL 4530473, at *15 (N.D.N.Y. Aug. 29, 2016) (concluding—"albeit barely"—that plaintiff had "alleged facts plausibly suggesting that [he] had a reasonable expectation of privacy in his work-issued computer" when he pleaded that (1) only he controlled his laptop and it was password-protected; (2) his employer never had accessed or monitored his computer; (3) no other personnel of his employer had access to the computer; and (4) the laptop was located in plaintiff's office). Plaintiff thus doesn't have standing to state a Fourth Amendment claim based on the search or seizure of her workplace computer.[12] The court dismisses any Fourth Amendment claim based on that search or seizure.

Plaintiff's purported Fourth Amendment claim based on the seizure of her phone survives.[13]

---

[12] Any uncertainty about this conclusion cuts against plaintiff, who bears the burden to "frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). Also, because defendants asserted qualified immunity, plaintiff bears the burden to establish a basis for an underlying constitutional violation. *Bledsoe*, 53 F.4th at 617 n.25. Plaintiff hasn't carried her burden of alleging a constitutional violation based on the search and seizure of her workplace computer.

[13] This conclusion—that plaintiff lacks standing to assert a Fourth Amendment claim based on the search and seizure of her work computer—doesn't mean that plaintiff lacks Article III standing to assert other claims and injuries based on the search and seizure of her work computer. After all, the "concept of standing in Fourth Amendment cases can be a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief . . . but it should not be confused with Article III standing, which is jurisdictional and must be assessed before reaching the merits." *Byrd v. United States*, 584 U.S. 395, 410–11 (2018). So, the court's conclusion that plaintiff has failed to allege Fourth Amendment standing doesn't undermine plaintiff's other alleged theories based on seizure of her workplace computer. As alleged, plaintiff suffered a concrete injury that was causally connected to defendants' conduct and that likely is redressable by a favorable outcome in this proceeding.

### b.   Ignoring Preview Search

Defendants offer a variety of other arguments—beyond standing—to counteract plaintiff's theory that defendants violated the Fourth Amendment by unlawfully executing the search warrant.

Cody argues that because it took so long for Christner to perform the preview search, "it was objectively reasonable" for Cody to order the seizure of the devices without performing the warrant-required preview search.  Doc. 61 at 24.  Cody cites *United States v. Hargus*, 128 F.3d 1358 (10th Cir. 1997), to support this argument.  *Id.*  In *Hargus*, a search warrant authorized officers to "seize ten broad categories of records" but due to "the impracticability of on-site sorting and the time constraints of executing a daytime search warrant[,]" the officers seized file cabinets, miscellaneous papers, and "property not specified in the search warrant[.]"  128 F.3d at 1363.  Our Circuit was "given pause" by these seizures but nonetheless affirmed the district court's decision denying defendant's motion to suppress, and it concluded that the officers' seizures didn't "grossly exceed" the scope of the warrant.  *Id.*

*Hargus* doesn't control here, however.  In *Hargus*, oil records—which the warrant authorized officers to seize—"were present in every drawer of the file cabinets[.]"  *Id.*  Not so here.  Defendants had no reason to believe that *any* of the devices they seized contained evidence of crimes.  What's more, the warrants here plainly instructed the officers how to separate the wheat from the chaff.  Doc. 54-1 at 10 (instructing officers executing the warrant to "[c]onduct a preview search of all located digital communications devices and digital storage media *to exclude from seizure* those [devices] which have not been involved in the identity theft"

---

So, she has Article III standing.  *See Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 134 (2011) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

(emphasis added)).  The warrants' explicit instructions and the absence of any evidence of crime on the seized devices factually distinguish *Hargus* from this case's allegations.

In any event, the court isn't persuaded that an hour-long preview search is unmanageable. Defendants could have procured another hard drive to preview search multiple devices at once. They also could have reduced the preview search time by limiting the number of terms to search. Minor inconveniences to law enforcement officers can't justify disregard for Fourth Amendment safeguards.  In sum, plaintiff has stated a cognizable claim against Cody for exceeding the scope of the warrant by ignoring the warrant-required preview search.

For his part, Christner argues that he isn't liable for executing the warrant.  Doc. 54 at 14. His arguments focus on the preview search of plaintiff's workplace computer.  *See id.*  The court needn't assess these arguments because plaintiff had no reasonable expectation of privacy in the contents of her workplace computer.  *See above* § III.B.2.a.  And plaintiff hasn't alleged plausibly that Christner executing the warrant caused the seizure of her phone.  *See* Doc. 35 at 37 (Am. Compl. ¶ 169) (explaining that "Cody directed that Ofc. Hudlin seize Ms. Zorn's cell even though no preview search of any sort was conducted on the phone").  As alleged, Christner participating in the raid didn't "set in motion a series of events" that caused "others to deprive the plaintiff of her constitutional rights."  *Mink*, 613 F.3d at 1001 (quotation cleaned up).  Putting it another way, plaintiff hasn't alleged the requisite "affirmative link" between Christner's presence at the scene and seizure of her cell phone.  *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009).  Hudlin seized the phone at Cody's behest.  So, Christner isn't liable on that basis, and the court dismisses any Fourth Amendment claim against him based on executing the search warrant.

Hudlin contributes his argument that plaintiff hasn't stated a Fourth Amendment claim against him. Doc. 58 at 14–15. As already explained, Hudlin isn't responsible for procuring the warrant. *See* § III.B.1.a, *above*. But Hudlin participated in the raid. And plaintiff plausibly has alleged that Hudlin is responsible for exceeding the scope of the warrant at Cody's direction. In particular, the Amended Complaint alleges that Cody directed Hudlin to seize plaintiff's cell phone without performing the warrant-mandated preview search. Doc. 35 at 37 (Am. Compl. ¶ 169). It's reasonable to infer that Hudlin—as an officer executing the search warrant—was aware that the search warrant mandated a preview search. So, taking the facts of the Amended Complaint as true, Hudlin is liable for seizing plaintiff's property without abiding the warrant's restrictions.

Finally, Marion County Sheriff Soyez likewise argues that he isn't liable for exceeding the scope of the warrants because he "did not personally participate in the execution and had no control or authority over Cody's investigation or search." Doc. 54 at 12. The court rejects this proposition. Although it's something of a close call, the Amended Complaint furnishes allegations that make Soyez's liability for exceeding the scope of the warrant plausible. Specifically, plaintiff alleges that Cody called Soyez, brought him "up to speed on the search" and then declared, "Alright we'll just take them all." Doc. 35 at 36 (Am. Compl. ¶ 164). Taking these allegations as true, as it must, the finder of fact reasonably could infer that Soyez knew of the preview search requirement, understood that the first preview search had taken a long time to run, and he then directed, suggested, or authorized Cody to seize the remaining devices without conducting a preview search. Based on that inference, Soyez "'knew or reasonably should have known'" that directing or supporting Cody's seizure of the devices would violate plaintiff's rights. *Mink*, 613 F.3d at 1001 (quoting *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990)).

And the seizure of plaintiff's phone occurred *after* Cody called Soyez. *See* Doc. 35 at 37 (Am. Compl. ¶ 169) (recounting that Cody directed the seizure of plaintiff's cell phone after calling Soyez). In sum, plaintiff's operative pleading thus states a plausible claim against Soyez for violating the Fourth Amendment by authorizing or directing Cody to ignore the warrant-required preview search.

The court addresses defendants' assertions of qualified immunity, next.

### c.    Qualified Immunity

Defendants assert qualified immunity as a defense against plaintiff's claims for the exceeding-the-warrant's-scope Fourth Amendment violation. Some defendants have waived a qualified immunity defense, and regardless, the law is clearly established that it's unlawful to exceed the scope of a search warrant. The court explains these conclusions, next.

### i.    Waiver

Former Chief Cody argues that he's entitled to qualified immunity for any violation of the Fourth Amendment predicated on the warrant's execution. Doc. 61 at 23–25. His briefing just addresses the first prong of qualified immunity—whether "defendant plausibly violated [plaintiff's] constitutional rights[.]" *Brown*, 124 F.4th at 1265 (quotation cleaned up). So Cody has waived any argument that exceeding the scope of a warrant doesn't violate clearly established law. *See Toevs v. Reid*, 685 F.3d 903, 911 (10th Cir. 2012) ("Arguments not clearly made in a party's opening brief are deemed waived."); *see also Tillmon v. Douglas County*, 817 F. App'x 586, 589–90 (10th Cir. 2020) (explaining that single-paragraph, "cursory" presentation of qualified immunity defense wasn't adequate to preserve it for appellate review).

Marion's Acting Chief of Police Hudlin, too, has waived any argument that he didn't violate clearly established law when he exceeded the scope of the search warrant at Cody's direction. Hudlin's briefing on this issue comprises a single sentence and three citations.

Specifically, Hudlin asserts: "Hudlin is also entitled to qualified immunity because the law was not clearly established as Zorn contends." Doc. 58 at 15. That perfunctory explanation fails to present a qualified immunity defense. *See Fullen v. City of Salina*, No. 21-4010-JAR-TJJ, 2021 WL 4476780, at *12 (D. Kan. Sept. 30, 2021) (declining to consider qualified immunity where defendants didn't "address whether the Fourth Amendment rights at issue were clearly established"); *see also Toevs*, 685 F.3d at 911; *Tillmon*, 817 F. App'x at 589–90.

Last, even without this procedural deficiency, the court still would conclude that defendants aren't entitled to qualified immunity for their allegedly unlawful execution of the search warrant. As the court explains next, these defendants violated clearly established law.

### ii.        Clearly Established Violations

When the search was executed in 2023, it was clearly established law that exceeding the scope of a search warrant is unlawful. *Bowling v. Rector*, 584 F.3d 956, 971 (10th Cir. 2009) ("As it would have been clear to a reasonable officer in July of 2006 that exceeding the scope of a search warrant was unlawful, the constitutional right at issue was clearly established at the time of [defendant's] conduct."); *see also Patel v. Hall*, 849 F.3d 970, 984 (10th Cir. 2017) ("When 'a warrant clearly and precisely specifies items to be seized, and the officers executing the warrant seize additional items, those officers act unreasonably for Fourth Amendment purposes unless their conduct may be justified under an exception to the warrant requirement.'" (quoting *Bowling*, 584 F.3d at 971)). It's also clearly established law that "[w]here the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude.'" *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (quoting *Stanford v. Texas*, 379 U.S. 476, 485 (1965)). As alleged, defendants flouted these clearly established constitutional mandates when they searched and seized plaintiff's phone

in violation of the warrant. They thus aren't entitled to qualified immunity at this stage of these proceedings.

### 3. Former Mayor Mayfield

Mayor Mayfield argues that he, too, is entitled to qualified immunity. Doc. 58 at 13–14. He maintains that plaintiff hasn't alleged that he personally participated in the investigation, procuring the warrant, or executing the warrant. *Id.* He also argues that his conduct—even as plaintiff alleges it—didn't violate clearly established law. *Id.* at 14. The court agrees, so it dismisses plaintiff's claims against Mayfield.

Plaintiff's Response emphasizes two aspects of Mayfield's alleged involvement: (1) he "lied to Newell about Herbel's planned use of the letter" and (2) "he authorized a criminal investigation into Herbel" and the *Record* even though he lacked reasonable suspicion of a crime. Doc. 78 at 5. Neither of these allegations overcome Mayfield's assertion of qualified immunity.

*First*, Mayfield's discussion with Newell isn't causally linked to plaintiff's constitutional injuries. Plaintiff asserts—albeit in conclusory fashion—that Mayfield's "behavior with Newell" caused others to violate plaintiff's constitutional rights. *Id.* at 6. The court isn't persuaded by this theory of the claim. Even without Newell's participation, the falsehoods in the search warrant application—such as the assertion that plaintiff either lied or impersonated Newell— would have generated probable cause for the warrants to issue. In any event, plaintiff hasn't shouldered her burden to show that Mayfield violated clearly established law by recruiting Newell to serve as a complaining witness. That is, plaintiff hasn't directed the court to any Tenth Circuit or Supreme Court decision establishing that a governmental official violates the

law by recruiting a person—even absent probable cause—to act as a complaining witness.
Mayfield is thus entitled to qualified immunity for his discussion with Newell.[14]

*Second*, Mayfield's authorization of a criminal investigation doesn't subject him to
liability. Plaintiff's briefing addressing the causal connection between initiating the criminal
investigation and plaintiff's injuries is perfunctory. *See* Doc. 78 at 5–6. Even if Mayfield's
direction to his subordinates to investigate qualified as the but-for cause of plaintiff's injuries,
plaintiff hasn't alleged any facts that Mayfield "'knew or reasonably should have known'" that
his direction to investigate would deprive someone of their constitutional rights. *Mink*, 613 F.3d
at 1001 (quoting *Snell*, 920 F.2d at 700).

Regardless, Mayfield is entitled to qualified immunity for directing his subordinates to
begin an investigation. Plaintiff hasn't presented any citation or even any argument that it was
clearly established that it's unconstitutional to direct subordinates to investigate, even where the
person directing the investigation has no basis to believe that a crime was committed. *See Knopf
v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018) ("'The dispositive question is whether the

---

[14]     The court reads Circuit precedent to place both a *pleading* and a *briefing* burden on plaintiffs
seeking to survive a qualified immunity defense. That is, a plaintiff must plead facts that plausibly allege
a violation of federal law *and* show that the violation was clearly established. *See, e.g.*, *Roska ex rel.
Roska v. Sneddon*, 437 F.3d 964, 971 (10th Cir. 2006) ("To overcome a qualified immunity defense, a
plaintiff must first *establish* a violation of a constitutional or statutory right and then *show* that the right
was clearly established." (emphasis added)); *Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001) ("If
the plaintiff *establishes* a violation of a constitutional or statutory right, he must then *demonstrate* that the
right at issue was clearly established at the time of the defendant's unlawful conduct." (emphasis added));
*Bledsoe*, 53 F.4th at 617 n.25 ("Appellants are correct that once they asserted qualified immunity in the
district court, which they did here, it was Bledsoe's burden to show both that he had *alleged* a
constitutional violation and that that violation was clearly established." (emphasis added)); *Gutierrez v.
Cobos*, 841 F.3d 895, 900 (10th Cir. 2016) (explaining that "the plaintiff bears the ultimate burden of
persuasion to overcome qualified immunity" (quotation cleaned up)). Still, the court is cognizant of the
Supreme Court's instruction that whether "an asserted federal right was clearly established at a particular
time . . . presents a question of law," so a court reviewing qualified immunity should "use its full
knowledge of its own and other relevant precedents." *Elder v. Holloway*, 510 U.S. 510, 516 (1994)
(quotation cleaned up). To that end, the court finds no precedent suggesting that recruiting a person to act
as a complaining witness violates clearly established law.

violative nature of *particular* conduct is clearly established.'" (emphasis in original) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)); *cf. Frasier*, 992 F.3d at 1025 (explaining that proof defendants agreed to "engage in . . . lawful investigative activities" couldn't support a § 1983 claim).

Plaintiff argues that her allegations against Mayfield represent "extreme circumstances" that can overcome an assertion of qualified immunity even without on-point, binding authority. Doc. 78 at 6–7. That's just not the law. While the central allegation in plaintiff's pleading might satisfy that rigorous criterion, the allegations against Mayfield do not. In fact, our Circuit has granted qualified immunity in a similar situation. In *Lincoln v. Maketa*, the Tenth Circuit reasoned that a retaliatory criminal investigation into a plaintiff and his children didn't amount to a "violation of a clearly established constitutional right." 880 F.3d 533, 541 (10th Cir. 2018). And other circuits have reached the same result. *E.g.*, *Moore v. Garnand*, 83 F.4th 743, 752–53 (9th Cir. 2023) (finding no violation of clearly established law where defendants "conducted a criminal investigation against Plaintiffs without any reasonable suspicion"); *Rehberg v. Paulk*, 611 F.3d 828, 851 (11th Cir. 2010) ("[The] right to be free from a retaliatory investigation is not clearly established. The Supreme Court has never defined retaliatory investigation, standing alone, as a constitutional tort[.]"). So, the court concludes, Mayor Mayfield is entitled to qualified immunity based on his alleged conduct directing an investigation.

### 4. Fourth Amendment Conclusion

Before pivoting to defendants' arguments targeting plaintiff's First Amendment claims, the court summarizes its holdings thus far. The court dismisses the following claims:

- all claims against former Mayor Mayfield;

- any Fourth Amendment claim against Sheriff Soyez, based on the warrant's procurement;

- any Fourth Amendment claim against Acting Chief Hudlin, based on the warrant's procurement;

- any Fourth Amendment claim against Chief Cody, based on the oath-or-affirmation requirement; and

- any Fourth Amendment claim against Detective Christner, based on executing the warrant.

All other Fourth Amendment claims survive.  Now, the court tackles plaintiff's First Amendment claims and defendants' arguments against those claims.

### C.    First Amendment Claims

The First Amendment prohibits the government from "abridging the freedom of speech, or of the press[.]"  U.S. Const. amend. I.  These prohibitions apply to "both state and federal government action."  *Voter Reference Found., LLC v. Torrez*, 727 F. Supp. 3d 1014, 1182 (D.N.M. 2024) (first citing *Gitlow v. New York*, 286 U.S. 652, 666 (1925); and then citing *Near v. Minnesota*, 283 U.S. 697, 707 (1931)).  Plaintiff asserts two First Amendment claims—a "direct" claim and a retaliation claim.  Defendants move to dismiss both.

### 1.    Direct First Amendment Claim

The full text of § 1983 and the First Amendment support the court concluding that plaintiff has stated a plausible claim for a direct violation.  Plaintiff's claim that defendants violated her First Amendment rights by physically invading the *Record*'s offices and interfering with the *Record*'s ability to gather and publish news survives.[15]  Section 1983 imposes liability

---

[15]    County defendants argue that it's not clear whether the Tenth Circuit recognizes a § 1983 claim predicated on a direct First Amendment violation.  Doc. 54 at 8–10.  Instead, these defendants contend that the Tenth Circuit generally recognizes First Amendment retaliation claims and First Amendment claims based on prior restraint.  *Id.*  Plaintiff disagrees.  The court agrees about this much:  Our Circuit hasn't ruled in a case where government actors raided a newspaper office without probable cause, effectively shutting it down.  Simply put, the unusual facts of this case don't fit neatly within existing Circuit precedent.  Still, as explained, the court holds that plaintiff has stated a plausible claim that defendants violated her First Amendment rights by physically invading the *Record*'s offices and interfering with the *Record*'s ability to gather and publish the news.

on actors—acting under color of state law—who "subject[], or cause[] to be subjected" any person "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]"  42 U.S.C. § 1983.  Our Circuit has identified just two elements for a § 1983 cause of action.  A plaintiff must allege a "(1) deprivation of a federally protected right by (2) an actor acting under color of state law."  *Fowler*, 104 F.4th at 797 (quotation cleaned up).  Just the first element is at issue here.

The court concludes that plaintiff has alleged a violation of the First Amendment freedom of press.  The First Amendment prohibits the government from "abridging the freedom . . . of the press[.]"  U.S. Const. amend. I.  The Supreme Court has made clear that "the guarantees of freedom of speech and press were not designed to prevent the censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential[.]"  *Bigelow v. Virginia*, 421 U.S. 809, 829 (1975) (quotation cleaned up).  In other words, the government generally may not interfere—by any means—with the production and dissemination of ideas.  The First Amendment also protects the right to circulate newspapers.  *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 768 (1988) (explaining that "circulation of newspapers . . . is constitutionally protected"); *see also Honolulu Weekly, Inc. v. Harris*, 298 F.3d 1037, 1047 (9th Cir. 2002) ("It is beyond dispute that the right to distribute newspapers is protected under the First Amendment." (quotation cleaned up)).

Plaintiffs can state a plausible First Amendment claim when the government physically disrupts protected First Amendment activities.  Many courts have concluded as much.  *E.g.*, *Keating v. City of Miami*, 598 F.3d 753, 764 (11th Cir. 2010) (holding that plaintiffs had stated § 1983 claim for violating First Amendment where defendants "caused the subordinate police

44

officers to disperse a crowd of peaceful demonstrators, including the Protesters, who were exercising their freedom of expression"); *Brandt v. City of Westminster*, 300 F. Supp. 3d 1259, 1282–83 (D. Colo. 2018) (declining to grant summary judgment against "as-applied" First Amendment claim where police officers arrested plaintiff while he was protesting); *Irizarry v. City and County of Denver*, 661 F. Supp. 3d 1073, 1091–92 (D. Colo. 2023) (allowing First Amendment claim and First Amendment retaliation claim to survive motion to dismiss based on arrest of plaintiff while protesting); *see also Irizarry v. Yehia*, 38 F.4th 1282, 1297 (10th Cir. 2022) (explaining that officer violated First Amendment rights when he "physically interfered with protected conduct" by standing in front of plaintiff and shining light into his camera while plaintiff was filming police); *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023) (concluding that officers violated plaintiff's First Amendment rights by confiscating his sign). In short, the government violates the First Amendment when it physically interferes with plaintiffs engaging in protected First Amendment activities.

Here, plaintiff has alleged that sort of physical interference. She alleges defendants unlawfully raided the *Record*'s offices and seized the computers necessary to the newspaper's operation. Doc. 35 at 37 (Am. Compl. ¶ 168). And, she alleges, defendants' raid and seizures "effectively shut[] down" the *Record*. *Id.* Those actions thus violated plaintiff's First Amendment rights by "restricting [her] ability to gather and report information about matters of public concern." *Id.* at 58 (Am. Compl. ¶ 284). The government—without a lawful basis—may not physically restrain a newspaper from operating. The sort of physical disruption alleged here violated plaintiff's First Amendment rights. So, defendants' unlawful seizure of the *Record*'s equipment and plaintiff's cell phone can support a direct First Amendment claim.

The court now turns to defendants' various arguments targeting plaintiff's direct claim.

### a. Sheriff Soyez

Sheriff Soyez argues that plaintiff hasn't alleged that Soyez caused her to suffer First Amendment injuries. Doc. 54 at 10. Admittedly, the inquiry is complicated because the Amended Complaint seems to allege that Cody ordered plaintiff's computer seized *before* he spoke with Soyez on the phone. *See* Doc. 35 at 36 (Am. Compl. ¶¶ 162–64). So, to the extent that Zorn's First Amendment injuries are based on that computer seizure, Soyez isn't liable for them because he didn't cause them. Still, the court concludes, plaintiff's direct First Amendment claim against Soyez is plausible for two reasons.

*First*, plaintiff alleges Cody spoke with Soyez before ordering seizure of Zorn's phone. And Zorn has alleged plausibly that her phone was an important tool used for protected First Amendment activities. *See* Doc. 35 at 58 (Am. Compl. ¶ 286) (alleging that without "their cell phones and without access to their e-mail accounts, the staff [of the *Record*] had no way to contact sources of information and obtain the news").

*Second*, Soyez is causally linked to the broader shutdown of the *Record*. That is, plaintiff has alleged plausibly that Soyez authorized, directed, or planned with Cody to ignore the preview-search requirement mandated by the warrant and seize the remaining computers and network equipment in the *Record*'s offices. Plaintiff—as a reporter for the *Record*—exercised her First Amendment rights through her work for her employer. So, she suffered a First Amendment injury when officers—at the behest of or with authorization from Soyez—seized equipment necessary for the *Record* to report the news.

Those two points nudge plaintiff's allegations across the plausibility line. So, the court concludes that plaintiff has stated a plausible direct First Amendment claim against Sheriff Soyez. The court now turns to defendants' argument that plaintiff's direct claim duplicates her retaliation claim.

### b.    Duplicative of Retaliation Claim

The county defendants also argue that plaintiff's direct claim duplicates her retaliation claim. Doc. 54 at 10. But that's not right. Plaintiff bases her direct claim on defendants physically interfering with the *Record*'s media operations. In contrast, her First Amendment retaliation claim relies on defendants' *response* to plaintiff engaging in protected First Amendment activities. Regardless, other courts in our Circuit have acknowledged that First Amendment plaintiffs may assert both a direct claim and a retaliation claim based on the same government conduct. *E.g.*, *Sexton v. City of Colorado Springs*, 530 F. Supp. 3d 1044, 1065 (D. Colo. 2021) (declining to dismiss First Amendment claim as duplicative of First Amendment retaliation claim where police officer arrested plaintiff after he "flipped off" officer); *Irizarry v. City and County of Denver*, 661 F. Supp. 3d at 1091–92 (finding First Amendment legal theory distinct from retaliation claim and denying motion to dismiss on basis of duplicative claim). At this stage, plaintiff has alleged plausibly that defendants retaliated against her exercise of constitutionally protected rights and also that they physically interfered with her exercise of constitutionally protected rights. So, plaintiff's direct claim and retaliation claim may both proceed.

### c.    Qualified Immunity

The county defendants assert qualified immunity. Doc. 54 at 15. They contend that because there's uncertainty about whether the Tenth Circuit recognizes a direct First Amendment claim, "the law, by definition cannot be clearly defined." *Id.* (citing *Reichle v. Howards*, 566 U.S. 658, 668–70 (2012)). It's true. Neither the Tenth Circuit nor the Supreme Court has adjudicated a case that looks quite like this one. And the court recognizes that a qualified immunity analysis must not define rights at "'a high level of generality,'" which the Supreme

Court has "'repeatedly stressed'" cannot suffice. *Frasier*, 992 F.3d at 1021 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).

But plaintiff's allegations here fit the mold of "the rare case or extreme circumstance where the conduct in question has not previously been held unlawful, but a government official may still have notice that their conduct violates a constitutional right because it is so apparent as to apply with obvious clarity." *Brown*, 124 F.4th at 1265 (quotation cleaned up). According to plaintiff's allegations, defendants manufactured probable cause to procure search warrants, used those search warrants to raid a newspaper establishment, and plainly violated the terms of the search warrant to seize every computer at that newspaper and effectively shut it down. The court can't know now whether plaintiff will muster evidence to support her allegations. But the court can conclude that allegations like plaintiff's here are rare, and they are remarkable. Any reasonable official in defendants' shoes would know that it's unlawful to manufacture false allegations against a newspaper, use those contrived allegations to secure a search warrant, execute the resulting warrant in a fashion contrary to the judicial officer's instructions, and then seize every one of the newspaper's computers. *Cf. Bailey v. Wheeler*, 843 F.3d 473, 485 (11th Cir. 2016) (affirming decision denying qualified immunity where defendant police chief issued a be-on-the-lookout advisory in retaliation for plaintiff "speaking up about alleged civil-rights abuses" because "it is certainly obvious, as a general proposition and without reference to case law" that defendant's conduct violated the First Amendment). It was objectively unreasonable for Detective Christner knowingly or recklessly to include falsehoods and omit material information from the warrant affidavit. Likewise, it was objectively unreasonable for Sheriff Soyez to collude with Chief Cody to ignore the express terms of the search warrant. And defendants knew—or reasonably should have known—that their conduct would injure plaintiff's

First Amendment rights.  So, defendants don't qualify for qualified immunity against plaintiff's direct First Amendment claim.

Next, the court addresses defendants' arguments targeting plaintiff's First Amendment retaliation claim.

### 2.   First Amendment Retaliation Claim

The court likewise concludes that plaintiff has stated a plausible First Amendment retaliation claim.

To establish a § 1983 First Amendment retaliation claim, a "plaintiff must show that (a) he or she was engaged in constitutionally protected activity; (b) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (c) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct."  *Van Deelen v. Johnson*, 497 F.3d 1151, 1155–56 (10th Cir. 2007).  The court considers the various and sundry ways defendants try to repel this claim.

### a.   Chief of Police Cody

Chief Cody argues that plaintiff hasn't stated a First Amendment claim against him.  He first argues that there's "no general First Amendment right of access to all sources of information under government control."  Doc. 61 at 27 (citing *Smith v. Plati*, 258 F.3d 1167, 1178 (10th Cir. 2001)).  That's correct.  And to the extent plaintiff bases her First Amendment claim on an informational right of access, the court dismisses it.  *See Smith*, 258 F.3d at 1178 (rejecting argument that First Amendment protects generalized right of access to public information).  But Cody's argument based on a right of access isn't responsive to plaintiff's central allegation:  She alleges defendants violated her First Amendment rights with a wanton search and seizure in retaliation for plaintiff engaging in protected activity.

Cody next argues that plaintiff hasn't alleged the first element of a First Amendment retaliation claim. Doc. 61 at 27. The court disagrees. Recall that this element requires plaintiff to allege she "was engaged in constitutionally protected activity[.]" *Van Deelen*, 497 F.3d at 1155. The Amended Complaint alleges that plaintiff worked as a reporter for the *Record*, Doc. 35 at 1–2 (Am. Compl. ¶ 1), and that plaintiff engaged in investigative reporting, *see id.* at 10 (Am. Compl. ¶¶ 41–42). These activities satisfy the first element of a retaliation claim. Cody argues that plaintiff was breaking the law and that her conduct was thus not protected. Doc. 61 at 27. The court already has considered and rejected this argument in its probable cause analysis. There's no need to rehash it here. *See above* § III.B.1.a.

Cody also takes aim at the second element of a retaliation claim. Doc. 61 at 28. He contends that his action wouldn't chill "an ordinary person" in plaintiff's position. *Id.* Our court already rejected this *ipse dixit* argument. It "is unsupported and not persuasive[.]" *Herbel v. City of Marion*, No. 24-cv-02224-HLT-GEB, 2024 WL 4416849, at *13 (D. Kan. Oct. 4, 2024).

Our Circuit employs an objective test to determine whether conduct would chill an ordinary person. *Yehia*, 38 F.4th at 1292. Procuring search warrants, raiding a place of business, and—most importantly—seizing cell phones would chill a person of ordinary firmness from continuing to exercise protected First Amendment rights. *See United States v. Christie*, 717 F.3d 1156, 1164 (10th Cir. 2013) ("In today's world, if any place or thing is especially vulnerable to a worrisome exploratory rummaging by the government, it may be our personal computers.").

Finally, Cody argues that plaintiff has failed to allege that she engaged in protected speech and conduct that substantially motivated any retaliatory conduct. Doc. 61 at 28. Again, the court disagrees with Cody's view of the Amended Complaint. The Amended Complaint plausibly alleges that plaintiff was engaged in constitutionally protected activities and that her

role as a reporter for the *Record* motived Cody to retaliate against her.  *See* Doc. 35 at 67 (Am. Compl. ¶¶ 337, 339) (alleging Cody was "motivated by his desire to seek retribution against the *Record* and its reporters" and that his "actions were designed to intimidate the [*Record*'s] owners and reporters").  Plaintiff also alleges that Cody was "infuriated" when he learned the *Record* was investigating him and that he expressed—to plaintiff—that the *Record* was too negative.  *Id.* at 5 (Am. Compl. ¶ 21).  Cody also argues that it was *Record* reporter Deb Gruver—not plaintiff—who was investigating him.  Doc. 61 at 28.  Perhaps, but plaintiff also was working for the *Record* and engaged in constitutionally protected activity on her employer's behalf.  So the alleged animus that Cody harbored against the *Record* was also plausibly animus against plaintiff.  Taken collectively, plaintiff's allegations support a plausible inference that Cody lied on the search warrant application and unlawfully executed the resulting warrant as retaliation for the *Record* (and its reporters, including plaintiff) exercising protected constitutional rights.  At this stage of the proceedings, those allegations suffice.

### b.    Sheriff Soyez

Soyez attacks the third element of a retaliation claim.  Doc. 54 at 10.  He contends that plaintiff's allegations of animus are "conclusory" and fall short of "plausibly alleging unlawful animus."  *Id.*

Here's what the Amended Complaint alleges.  Soyez "assist[ed] Chief Cody with the investigation," "plann[ed] the raids with Chief Cody," "suppl[ied] Sheriff's deputies for the illegal raids," and "agree[d] with Chief Cody to disregard the preview search requirement before seizing the computers and other devices" because he was "motivated by his desire to seek retribution against the *Record* and its reporters."  Doc. 35 at 67 (Am. Compl. ¶ 338).  Plaintiff also alleges that Soyez "harbored his own personal animus against the *Record* and the plaintiff," *id.* at 66 (Am. Compl. ¶ 332), and that Soyez "regularly" criticized the *Record*.  *Id.* at 22 (Am.

Compl. ¶ 94). Taken together, these factual allegations could support a reasonable inference that Soyez was motivated to retaliate against the *Record* and its reporters—including plaintiff—for exercising their First Amendment rights to collect and publish news.

Soyez next argues that he didn't participate in investigating the *Record*. Doc. 54 at 10. Maybe that's so. But at this stage, the court simply can't adopt a version defendant's version of a fact when the operative pleading alleges just the opposite. And that's the situation here. The Amended Complaint explicitly asserts that Sheriff Soyez "assist[ed] Chief Cody with the investigation." Doc. 35 at 67 (Am. Compl. ¶ 338). In short, Soyez's first argument simply abandons the governing procedural standard.

Moreover, the court already has addressed this argument in the context of plaintiff's Fourth Amendment claim. *See above* § III.B.2.b. Its analysis there applies equally to this First Amendment claim. Soyez faces liability for colluding with Cody to violate the warrants' preview search requirement. The court thus declines to dismiss plaintiff's First Amendment retaliation claim against Soyez.

### c.    Qualified Immunity

Former Chief of Police Cody asserts qualified immunity against plaintiff's First Amendment retaliation claim. Doc. 61 at 28–29. He contends that plaintiff can't identify binding authority demonstrating that Cody violated clearly established law. *Id.* For reasons explained below, the court rejects this argument.

Sheriff Soyez also argues that he's entitled to qualified immunity. Doc. 54 at 16. He advances two arguments, neither of which convinces the court. *First*, Soyez argues that plaintiff's allegations of animus "are implausible and conclusory." *Id.* at 15. The court already has considered and rejected that argument. Plaintiff has alleged plausibly that plaintiff's constitutionally protected activities motivated Soyez. *Second*, Soyez contends that case law

doesn't establish that "a Sheriff wishing that a newspaper was more positive constitutes unlawful animus." *Id.* This characterization of the analysis distorts the inquiry and omits relevant allegations in the Amended Complaint. The relevant inquiry is whether Soyez's *conduct* violated clearly established law. *See Knopf*, 884 F.3d at 944 ("'The dispositive question is whether the violative nature of *particular* conduct is clearly established.'" (emphasis in original) (quoting *Mullenix*, 577 U.S. at 11)). So, plaintiff needn't cite cases where a defendant's motivation was identical to Soyez's motivation here. Rather, the controlling question is whether it's clearly established that Soyez's retaliatory conduct was unlawful. It was.

As already explained, it's clearly established that the law prohibits officials from grossly exceeding the scope of a search warrant. *Bowling*, 584 F.3d at 971. Likewise, it "has long been clearly established that the First Amendment bars retaliation for protected speech and association." *Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 848 (10th Cir. 2005); *accord Buck v. City of Albuquerque*, 549 F.3d 1269, 1292 (10th Cir. 2008). As alleged, Cody and Soyez's conduct violated clearly established law, and again as alleged, they acted with a clearly unlawful motivation. They thus don't qualify for qualified immunity, so the court declines to dismiss plaintiff's First Amendment retaliation claim against them.

Next, the court analyzes plaintiff's conspiracy allegations.

### D.    Conspiracy

All defendants argue that the Amended Complaint fails to allege a § 1983 conspiracy. Doc. 54 at 7–8; Doc. 58 at 15–16; Doc. 61 at 29. As with the Fourth Amendment "claim," the Amended Complaint doesn't enumerate a conspiracy theory expressly. *See generally* Doc. 35. Still, the court concludes that the Amended Complaint plausibly alleges a narrow conspiracy involving only defendants Cody and Soyez.

### 1. Law on § 1983 Conspiracies

A § 1983 "'conspiracy claim allows for imputed liability[.]'" *Bledsoe*, 53 F.4th at 609 (quoting *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 n.6 (10th Cir. 1990)). That is, a § 1983 conspiracy theory isn't a standalone claim on which a plaintiff may recover. It requires "'an underlying constitutional deprivation'" for which "'a plaintiff may be able to impose liability on one defendant for the actions of another performed in the course of the conspiracy.'" *Id.* (quoting *Dixon*, 898 F.2d at 1449 n.6). To prevail on a conspiracy theory under § 1983, "a plaintiff must show 'at least a combination of two or more persons acting in concert and an allegation of a meeting of the minds, an agreement among the defendants, or a general conspiratorial objective.'" *Frasier*, 992 F.3d at 1024 (quoting *Brooks v. Gaenzle*, 614 F.3d 1213, 1227–28 (10th Cir. 2010), *abrogated on other grounds by Torres v. Madrid*, 592 U.S. 306 (2021)). The general conspiratorial objective must take the form of "'a common, unconstitutional goal.'" *Bledsoe*, 53 F.4th at 609 (quoting *Janny v. Gamez*, 8 F.4th 883, 919 (10th Cir. 2021)); *see also Frasier*, 992 F.3d at 1025 ("[P]roof that defendants formed an agreement or conspired to engage in lawful activities—including lawful investigative activities—would be inadequate to support a § 1983 conspiracy claim.").

But "'[c]onclusory allegations of conspiracy are insufficient to state a valid § 1983 claim.'" *Id.* (quoting *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998)). Instead, our Circuit demands specificity to plead conspiracy. "A § 1983 plaintiff must 'make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state.'" *Bledsoe*, 53 F.4th at 609 (emphasis in original) (quoting *Robbins*, 519 F.3d at 1250); *see also Durre v. Dempsey*, 869 F.2d 543, 545 (10th Cir. 1989) (affirming

dismissal of conspiracy claim where "plaintiff failed to allege specific facts showing agreement and concerted action among defendants").

### 2. Conspiracy Analysis

Defendants all argue that plaintiff has failed to allege a cognizable conspiracy claim against them. Doc. 54 at 7–8; Doc. 58 at 15–16; Doc. 61 at 29. The court agrees, but only in part. Plaintiff has alleged sufficient facts to infer a limited conspiracy between Cody and Soyez to take down the *Record*.

Start with the allegation that's sufficient: a conspiracy between Chief Cody and Sheriff Soyez. Plaintiff alleges that Cody and Soyez had a meeting on August 8, shared a common motivation to retaliate against the *Record*, and agreed on an "illicit plan to take down the *Marion County Record*." Doc. 35 at 22 (Am. Compl. ¶¶ 93–96). That is, the Amended Complaint alleges that the conspiracy had a clear goal, that Cody and Soyez took "specific actions" to "carry out the plan," and that both of them "participated in the conspiracy." *Bledsoe*, 53 F.4th at 609–10. Take those assertions one at a time.

*First*, plaintiff alleges that Cody and Soyez formed an "illicit plan to take down the *Marion County Record*." Doc. 35 at 22 (Am. Compl. ¶ 96). Soyez argues that the Amended Complaint fails to allege that he "shared any unlawful conspiratorial objective." Doc. 54 at 7. The court disagrees. Plaintiff alleges that Soyez joined Cody's plan to "take down" the *Record*. Doc. 35 at 22 (Am. Compl. ¶ 96). Granted, this allegation isn't "impressively detailed[.]" *Montoya v. City and County of Denver*, No. 21-1107, 2022 WL 1837828, at *8 (10th Cir. 2022) (affirming denial of motion to dismiss conspiracy allegations even though the plaintiff's "allegations of conspiracy [were] not impressively detailed"). But it's enough—in conjunction

55

with the overt acts that Cody and Soyez performed—to support a plausible inference that Cody and Soyez agreed to violate the *Record*'s First or Fourth Amendment rights.[16]

*Second*, plaintiff "identified specific actions [d]efendants allegedly took to carry out the plan[.]" *Bledsoe*, 53 F.4th at 610. Cody and Soyez coordinated an investigation into a "non-existent" crime. Doc. 35 at 21 (Am. Compl. ¶ 90). Cody helped prepare a warrant application that contained falsehoods and omitted material information. *Id.* at 28–29 (Am. Compl. ¶¶ 119–29). Cody oversaw the raid of a newspaper's operations. *Id.* at 32–33 (Am. Compl. ¶¶ 144–48). And along with Soyez, he directed seizure of materials—including plaintiff's cellphone—in violation of the search warrant's restrictions. *Id.* at 36–37 (Am. Compl. ¶¶ 164–69).

*Third*, both Cody and Soyez personally participated in consummating the conspiracy. Cody helped draft search warrants that he knew contained falsehoods and omitted material facts. *Id.* at 28–29 (Am. Compl. ¶¶ 119–29). Cody searched Gruver's file about Cody even though the warrant didn't authorize it. *Id.* at 34–35 (Am. Compl. ¶¶ 156–59). And Cody ordered other officers to seize plaintiff's computer even though the preview search didn't suggest that the computer contained evidence of a crime. *Id.* at 34 (Am. Compl. ¶ 153). Cody also ordered seizure of plaintiff's phone and other computers and phones at the *Record*'s offices in violation of the warrant's preview-search requirement. *Id.* at 37 (Am. Compl. ¶¶ 167–69).

---

[16]   Plaintiff can allege a plausible conspiracy theory even though the *Record*—not plaintiff—was the target of the alleged conspiracy. That's because conspiracy liability "typically holds co-conspirators liable for all reasonably foreseeable acts taken to further the conspiracy." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 496 (2023); *Canter v. Hardy*, 188 F. Supp. 2d 773, 792 (E.D. Mich. 2002) ("[A] conspirator is liable under § 1983 for all acts taken in furtherance of the conspiracy, regardless of whether the conspirator directly participated in the act."); *see also Bledsoe*, 53 F.4th at 609 (explaining that under a conspiracy theory, "a plaintiff may be able to impose liability on one defendant for the actions of another performed in the course of the conspiracy" (internal quotation marks and citation omitted)). And taking plaintiff's alleged facts in the light most favorable to her, a reasonable factfinder could find that Cody and Soyez reasonably could have foreseen that the *Record*'s employees would suffer constitutional injuries from their conspiracy to harm the *Record*.

Soyez's participation was more limited than Cody's. Soyez spoke on the phone with Cody while Cody and other officers were conducting the search of the *Record*'s offices. *Id.* at 36 (Am. Compl. ¶ 164). As explained above, *see* § III.B.2.b., the alleged facts support a reasonable inference that Soyez directed or authorized Cody to ignore the warrant's preview-search requirement. Soyez also directed Detective Christner to help Cody with his investigation. *Id.* at 21 (Am. Compl. ¶ 90). Collectively, these allegations capably could support the plausible inference that Soyez and Cody joined a conspiracy to violate the *Record*'s constitutional rights.

The court is cognizant of our Circuit's instruction that "'[c]onclusory allegations of conspiracy are insufficient to state a valid § 1983 claim.'" *Bledsoe*, 53 F.4th at 609 (quoting *Tonkovich*, 159 F.3d at 533). But drawing the line between a conclusory and non-conclusory conspiracy allegation isn't always a precise task. Here, the allegations of an agreement between Soyez and Cody aren't merely a "formulaic recitation of the elements of a cause of action[.]" *Twombly*, 550 U.S. at 555; *see also Garth O. Green Enters., Inc. v. Harward*, No. 15-CV-00556-DN-EJF, 2017 WL 1184024, at *10 (D. Utah Mar. 29, 2017) (finding allegation that parties "had a meeting of the minds" insufficient to state a conspiracy claim). And while the allegations aren't "impressively detailed[,]" *Montoya*, 2022 WL 1837828, at *8, they allege who was involved in the meeting, when the meeting and agreement occurred, and what the agreement's aim was. *See Cash v. Wetzel*, 8 F. Supp. 3d 644, 661 (E.D. Pa. 2014) ("Only allegations of conspiracy which are particularized, such as those addressing the period of the conspiracy, the object of the conspiracy, and certain other actions of the alleged conspirators taken to achieve that purpose will be deemed sufficient." (internal quotation marks and citation omitted)); *see also Twombly*, 550 U.S. at 565 n.10 (suggesting that conspiracy claim failed where complaint alleged

"no specific time, place, or person involved"). Plaintiff here has alleged a plausible conspiracy between Cody and Soyez to violate the *Record*'s constitutional rights.

In contrast, plaintiff's allegations don't allege a plausible conspiracy extending to defendants Hudlin, Christner, or Mayfield. Our Circuit repeatedly and clearly has demanded that plaintiffs "allege specific facts showing an agreement and concerted action[.]" *Tonkovich*, 159 F.3d at 533; *Brooks*, 614 F.3d at 1228 (same); *Bledsoe*, 53 F.4th at 609 (same); *Frasier*, 992 F.3d at 1024 (same). The Amended Complaint fails to allege specific facts that tie Christner, Hudlin, or Mayfield to the alleged conspiracy. And though the Amended Complaint implicates Christner and Hudlin preparing and executing the warrants, it never alleges that they came to some sort of agreement with the other defendants—*before* raiding the *Record*'s offices—to violate anyone's constitutional rights. And even unlawful parallel activity doesn't necessarily suggest an agreement, the keystone element of a conspiracy theory. *See Salehpoor v. Shahinpoor*, 358 F.3d 782, 789 (10th Cir. 2004) ("Parallel action . . . does not necessarily indicate an agreement to act in concert."). Plus, plaintiff's Response to Hudlin's Motion to Dismiss doesn't attempt to explain how the conspiracy allegations connect to Hudlin. *See* Doc. 78 at 8–9. Similarly, plaintiff's Response to Christner's Motion to Dismiss references Christner's involvement generally, but never argues that Christner *agreed* to violate anyone's constitutional rights. *See* Doc. 77 at 7–9. Without alleging specific facts tying Hudlin and Christner to an agreement *before* others procured and executed the warrants, the Amended Complaint fails to advance a plausible basis of conspiracy against those actors. *See Twombly*, 550 U.S. at 557 (explaining that a complaint must allege a "preceding agreement, not merely parallel conduct that could just as well be independent action" to state a Sherman Act conspiracy claim).

For Mayor Mayfield, the Amended Complaint alleges that he "authorized Chief Cody to begin an investigation into Herbel and the *Marion County Record*."  Doc. 35 at 19 (Am. Compl. ¶ 83).  But that authorization—no matter how ill-advised—wasn't illegal and doesn't raise a plausible inference that Mayfield joined a conspiracy to do something illegal.  *See Frasier*, 992 F.3d at 1025 ("[P]roof that defendants formed an agreement or conspired to engage in lawful activities—including lawful investigative activities—would be inadequate to support a § 1983 conspiracy claim.").  Plaintiff's briefing says that Mayfield "presumably" met with Cody when he authorized Cody to conduct the investigation.  Doc. 78 at 9.  But the Amended Complaint doesn't allege the facts that meeting occurred.  And even if Cody and Mayfield met, neither the Amended Complaint nor plaintiff's briefing explains how such a meeting suggests that Mayfield joined a conspiracy to violate plaintiff's constitutional rights.

To summarize, the Amended Complaint successfully alleges a limited conspiracy between Soyez and Cody.  But plaintiff fails to allege a plausible conspiracy involving Mayfield, Christner, or Hudlin.  So, the court dismisses any conspiracy theory against Mayfield, Christner, and Hudlin.

The court now turns to plaintiff's claims against the municipalities she has sued.

### E.    Municipal Liability

"A municipality or other local government may be liable under" § 1983 "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011).  But municipalities "are responsible only for 'their *own* illegal acts'" and "are not vicariously liable under § 1983 for their employees' actions."  *Id.* (emphasis in original) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)); *see also George v. Beaver County*, 32 F.4th 1246, 1253 (10th Cir. 2022).

To establish municipal liability under § 1983, "'a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged.'"  *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (quoting *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)).

A plaintiff may establish such municipal policy or custom by alleging facts capable of demonstrating one of the following:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Id.* (internal quotation marks, brackets, and citation omitted).  To establish municipal liability, plaintiff alleges constitutional violations caused by the failure to adequately train or supervise employees and by the decisions of employees with final policymaking authority.  Doc. 77 at 4. The court takes up each, below, starting with failure to train.

### 1.  Failure to Train

Plaintiff's failure-to-train theory is conclusory and fails to state a cognizable claim for recovery.  So, the court dismisses it.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  To state a claim based on a failure to train, a plaintiff must allege facts that raise a plausible inference that the municipality acted with deliberate indifference.  *See Bryson*, 627 F.3d at 788 (explaining that plaintiff may state claim for failure to train "so long as that failure results from deliberate indifference to the injuries that may be caused" (quotation cleaned up)).  "Ordinarily, a plaintiff

must prove a pattern of untrained employees' constitutional violations to show deliberate indifference." *George*, 32 F.4th at 1253.  "A deliberate indifference claim may be based on a single incident when the need for training 'can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights.'" *Valdez v. Macdonald*, 66 F.4th 796, 815 (10th Cir. 2023) (quotation cleaned up) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989)).

Here, the Amended Complaint doesn't allege a pattern of constitutional violations, so plaintiff's failure-to-train theory is viable only if it satisfies the single-incident criterion.  Where, as here, a plaintiff alleges municipal liability for failure to train based on a single incident, the plaintiff must allege "(1) the existence of a municipal policy or custom involving deficient training; (2) an injury caused by the policy that is obvious and closely related; and (3) that the municipality adopted the policy or custom with deliberate indifference to the injury." *Valdez*, 66 F.4th at 816–17 (quotation cleaned up and citation omitted).  To meet the pleading requirement for this third element, a plaintiff must allege "(i) the municipality's policymakers 'know to a moral certainty that their employees will confront a given situation'; (ii) the situation 'presents the employee with a difficult choice of the sort that training or supervision will make less difficult'; and (iii) 'the wrong choice will frequently cause the deprivation of a citizen's constitutional rights.'" *Id.* at 817 (quoting *Lance v. Morris*, 985 F.3d 787, 802 (10th Cir. 2021)).

Here, plaintiff's allegations of insufficient training are too conclusory to satisfy the exacting standard needed to state a claim for failing to train based on a single incident. Defendants make exactly that argument in their opening briefs.  Doc. 54 at 6–7; Doc. 58 at 16–18.  Plaintiff's Response merely quotes paragraphs from the Amended Complaint.  Doc. 77 at 4–

5. But she fails to offer any explanation how her allegations satisfy the stringent *Valdez* rubric for a failure-to-train claim based on a single incident.

   More specifically, the Amended Complaint alleges that Soyez and the City failed to train their officers on a range of topics. Doc. 35 at 64 (Am. Compl. ¶ 321) (alleging that Marion County and Sheriff Soyez didn't provide training on "the rights of the news media to be protected from government intrusion under the First Amendment, the federal Privacy Protection Act, and the Kansas Shield Law"); *id.* at 74–75 (Am. Compl. ¶ 377) (listing topics on which Marion County, the Marion County Sheriff, and the City of Marion failed to train officers). It also asserts the municipal defendants' failure to train was "the result of deliberate indifference[.]" *Id.* at 75 (Am. Compl. ¶ 378). Such bare allegations won't suffice to state a claim for failure to train. *Herbel*, 2024 WL 4416849, at *26 (explaining that it isn't "sufficient to merely allege general ways in which training was insufficient"). Plaintiff hasn't "alleged what additional specialized training or knowledge officers needed to be better equipped" for the situation alleged in the Amended Complaint. *Teetz v. Bd. of Cnty. Comm'rs*, No. 22-1134-EFM, 2023 WL 7698030, at *8 (D. Kan. Nov. 15, 2023).

   What's more, none of plaintiff's allegations provide any basis for a finding or inference of deliberate indifference to injuries that could result from the putative training inadequacy. *See Carr v. Castle*, 337 F.3d 1221, 1229 (10th Cir. 2003) (affirming decision granting summary judgment where plaintiff "merely enumerate[d] the multiple ways" the training was inadequate "without proffering any evidence of knowledge of the purported deficiencies on the part of the City"). Here, plaintiff didn't allege any facts "placing the City on actual or constructive notice that the asserted failures to train were substantially certain to result in a constitutional violation." *Id.* at 1230; *see also Waller v. City and County of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019)

("'The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm.'" (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998))). Plus, the allegations of deficient training here involve a host of subjects that City policymakers wouldn't have "a moral certainty" that the officers would confront. *Valdez*, 66 F.4th at 817 (quotation cleaned up). And except for quoting the Amended Complaint, plaintiff's brief never explains how the municipal defendants acted with deliberate indifference.

In sum, plaintiff hasn't stated a plausible failure-to-train claim against any of the municipal defendants. The court thus dismisses plaintiff's failure-to-train claim.

### 2. Acts of a Final Policymaker

As already explained, a plaintiff may hold a municipality liable for actions by a person with "final policymaking authority[.]" *Whitson v. Bd. of Cnty. Comm'rs*, 106 F.4th 1063, 1667 (10th Cir. 2024) ("[W]hen an official takes action over which he or she has final policymaking authority, the policymaker *is* the municipality, so it is fair to impose liability on that entity for that action." (emphasis in original)). Where a plaintiff alleges that a policy is facially unconstitutional, "'issues of fault and causation'" are ordinarily "'straightforward.'" *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1240 (10th Cir. 2020) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)); *see also Barney*, 143 F.3d at 1307 ("[W]hen an official municipal policy itself violates federal law, issues of culpability and causation are straightforward; simply proving the existence of the unlawful policy puts an end to the question."). But the "standard to meet the state-of-mind element changes depending on whether the plaintiff alleges that a policy is facially constitutional." *Velarde v. Bd. of Cnty. Comm'rs*, No. 23-cv-00878-DHU-JMR, 2024 WL 4692158, at *5 n.2 (D.N.M. Nov. 6, 2024)

(citing *Hinkle*, 962 F.3d at 1240).  When a "plaintiff bases her claims on a facially lawful policy, then the deliberate indifference standard applies."  *Velarde*, 2024 WL 4692158, at *5 n.2.

Here, the alleged acts of Sheriff Soyez and Chief Cody are facially unconstitutional and causally linked—at least plausibly—to plaintiff's constitutional injuries.  The unconstitutional nature of these acts satisfies the culpability requirement for a § 1983 claim against a municipality, *see Hinkle*, 962 F.3d at 1240, and plaintiff thus needn't make a separate showing of deliberate indifference.  These two actors are final policymakers, so their respective municipalities are liable for their unlawful acts.  *See Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1287 (10th Cir. 2007) ("Actions taken by a municipality's final policymakers, even in contravention of their own written policies, are fairly attributable to the municipality and can give rise to liability.").  So, plaintiff's municipal liability claim premised on decisions by Soyez and Cody as policymakers survives.

### 3.  Redundant Actors

The county defendants argue that plaintiff's claims against the Board of County Commissioners of Marion County and Sheriff Soyez, in his official capacity, are redundant. Doc. 54 at 4 n.3.  They suggest that the court should dismiss the Board of County Commissioners from this action.  *Id.*  Plaintiff agrees.  Doc. 77 at 7.  The court thus dismisses the Board of County Commissioners of Marion County from this action.  *See Swearingen v. Pleasanton Unified Sch. Dist. 344*, 641 F. Supp. 3d 1141, 1185 (D. Kan. 2022) (holding that action may proceed against sheriff in official capacity after dismissal of board of county commissioners).[17]

---

[17]    The court declined to dismiss the Board of County Commissioners in companion cases where the county defendants raised the same argument.  The difference here is that plaintiff expressly agreed that the court should dismiss the Board of County Commissioners.  Doc. 77 at 7.

### F.    Privacy Protection Act

Plaintiff also brings a claim against the City and Sheriff Soyez, in his official capacity, for a violation of the Privacy Protection Act (PPA).  Doc. 35 at 68–74 (Am. Compl. ¶¶ 341–75).  The PPA "creates a right of action for the improper seizure of media materials[.]"  *Mink v. Suthers*, 482 F.3d 1244, 1257 (10th Cir. 2007).

> Notwithstanding any other law, it shall be unlawful for a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize any work product materials possessed by a person reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication, in or affecting interstate or foreign commerce; but this provision shall not impair or affect the ability of any government officer or employee, pursuant to otherwise applicable law, to search for or seize such materials, if . . . there is probable cause.

*Id.* (ellipsis in original) (quoting 42 U.S.C. § 2000aa(a)).  In addition to protecting "work product materials," the PPA also applies to "documentary materials."  42 U.S.C. § 2000aa(b).

#### 1.    Standing

The City and Soyez both argue that plaintiff lacks "standing" to assert a PPA claim because the *Record*—not plaintiff—owned the computer.  Doc. 54 at 17; Doc. 58 at 18–19.  The court disagrees.[18]

---

[18]    Defendants' argument, as the court understands it, argues that a PPA cause of action isn't available to plaintiff.  It doesn't contend that plaintiff lacks Article III standing to bring her claim.

In a case based on the same raid of the *Record*—*Bentz v. City of Marion*—the court concludes that the plaintiff in that case lacked Article III standing to assert her PPA claim.  The court doesn't have the same concerns here.  *First*, plaintiff alleges that defendants seized her cell phone.  Doc. 35 at 38 (Am. Compl. ¶ 172).  And that seizure is one manner in which defendants plausibly violated the PPA, because plaintiff used her phone for work as well as personal matters.  Defendants' seizure of plaintiff's phone plausibly violated her Fourth Amendment rights, which alone suffices to confer standing.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).  *Second*, seizure of plaintiff's workplace computer (and phone, for that matter) plausibly violated plaintiff's privacy rights, which our Circuit has held can support standing.  *See Seale v. Peacock*, 32 F.4th 1011, 1020–21 (10th Cir. 2022) (holding that harms from defendant's unauthorized access of plaintiff's online account that "contained electronic communications" "are closely connected to the harms protected by traditional privacy claims" and thus conferred standing).  Viewing plaintiff's allegations in the light most favorable to her, the court is

Any person "*aggrieved by* a search for or seizure of materials in violation" of the PPA may pursue a cause of action.  42 U.S.C. § 2000aa-6(a) (emphasis added).  The PPA statute doesn't require plaintiff to hold a possessory interest in the searched or seized items to pursue a cause of action.  *See Guest v. Leis*, 255 F.3d 325, 341 (6th Cir. 2001) (rejecting argument that plaintiff must "possess" searched or seized materials and concluding that "plaintiffs had standing to bring a PPA claim because they were 'aggrieved' by the seizure of their communications").

Attempting to avoid this outcome, defendants cite a 30-year-old, out-of-circuit district court opinion.  Doc. 54 at 17 (citing *Powell v. Tordoff*, 911 F. Supp. 1184, 1189–90 (N.D. Iowa 1995)); Doc. 58 at 18–19 (same).  This opinion—citing the legislative history of the PPA— concluded that a plaintiff must have "possessed" the searched or seized item.  *Powell*, 911 F. Supp. at 1189–90.  But legislative history can't "muddy clear statutory language." *Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019) (internal quotation marks and citation omitted).  And the statute allows an aggrieved person to bring a claim and because plaintiff has pleaded plausibly that defendants' search and seizure aggrieved her, plaintiff may pursue her claim.

The City also argues similarly that—apart from standing—plaintiff can't state a PPA claim because she didn't possess the searched or seized materials.  Doc. 58 at 19–20.  But the PPA doesn't require that *the plaintiff* "possess" the materials.  *See* 42 U.S.C. § 2000aa(a) (making unlawful search or seizure of "any work product materials possessed by *a person . . .*" (emphasis added)); *id.* § 2000aa(b) (same, for documentary materials).  That is, any person *aggrieved by* a search or seizure of work product materials may bring a cause of action so long as *some "person* reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication" possessed such materials.  *Id.*

_____

satisfied—at least for this early stage of the litigation—that plaintiff has Article III standing to assert her PPA claim.

§ 2000aa(a) (emphasis added).  Likewise, any person aggrieved by a search or seizure of documentary materials may bring a cause of action so long as the materials were "possessed by a person in connection with a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication[.]"  *Id.* § 2000aa(b).  So, the court rejects defendants' "standing" arguments.

### 2. Probable Cause

Soyez and the City next argue that the PPA doesn't apply when probable cause supported the search.  Doc. 54 at 17; Doc. 58 at 20.  But as the court has concluded already, *see above* § III.B.1.a., probable cause didn't support the search or seizure of plaintiff's computer or phone. The court thus declines to dismiss plaintiff's PPA claim on that basis.

### 3. Good Faith Exception

The PPA contains a good faith exception, which exempts "an officer or employee of a State" from liability if that "officer or employee had a reasonable good faith belief in the lawfulness of his conduct."  42 U.S.C. § 2000aa-6(a)(2) & (b).  Plaintiff offers no response to Soyez's assertion of this defense.  *See generally* Doc. 77.  But the court concludes that her silence is of no moment here.  The good faith provision of the PPA doesn't apply to suits against a "governmental unit[,]" like the City or Soyez, in his official capacity.  42 U.S.C. § 2000aa-6(a)(1).[19]

The PPA offers two different potential defendant groups.  The first—contained in subparagraph (1) of subsection (a)—authorizes suit "against the United States, against a State . . ., or against any other governmental unit[.]"  *Id.* § 2000aa-6(a)(1).  The second—contained in

---

[19]    An official capacity suit "is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (citation omitted).  The suit against Sheriff Soyez, in his official capacity, thus is a suit against the Marion County Sheriff's Office, which is a governmental unit.

subparagraph (2) of subsection (a)—authorizes suit "against an officer or employee of a State . . .

if such State has not waived its sovereign immunity[.]" *Id.* § 2000aa-6(a)(2).  By its clear terms,

the good faith defense applies only to the latter group—suits against officers or employees.  *Id.*

§ 2000aa-6(b) (restricting good faith defense to civil actions "brought under paragraph (2) of

subsection (a)").  Plaintiff asserts her PPA claim against governmental units and not individuals.

Doc. 35 at 74 (Count IV); *see also Davis v. Gracey*, 111 F.3d 1472, 1482 (10th Cir. 1997) ("The

PPA by its terms does not authorize a suit against municipal officers or employees in their

individual capacities." (emphasis omitted)).  The good faith defense thus doesn't apply here.

### 4.  Work Product Materials

Soyez's final argument—and the thrust of his Reply—is that plaintiff hasn't alleged any

search or seizure of "work product materials."  Doc. 54 at 17–18; Doc. 81 at 5–6.  He argues, in

essence, that plaintiff alleges that she didn't intend to publish information about Newell's driving

record and so that information doesn't qualify as protected "work product materials."  Doc. 54 at

18.  To be sure, to fall within the PPA's definition of "work product materials," a journalist must

have "prepared, produced, authored, or created" the materials "in anticipation of communicating

such materials to the public[.]" 42 U.S.C. § 2000aa-7(b)(1); *see also id.* § 2000aa-7(b)(2)

(including limitation that only materials that "are possessed for the purposes of communicating

such materials to the public" are "work product materials").  And sure enough, the Amended

Complaint alleges that "plaintiff had no intent to publish" information retrieved from the Kansas

Driver's Licenses Status check tool.  Doc. 35 at 15 (Am. Compl. ¶ 66).  Nonetheless, two

reasons convince the court that plaintiff has stated a plausible DPPA claim.

*First*, the Amended Complaint alleges seizures of data that extend well beyond

information pertaining to Newell's driving status.  *See, e.g.*, Doc. 35 at 69 (Am. Compl. ¶ 346)

(alleging that search warrant would return "reporter's notes about Newell" and "drafts of yet-to-

be-published newspaper articles about Newell"); *id.* (Am. Compl. ¶ 348) (alleging that search warrant preview search terms would return "drafts of yet-to-be-published newspaper articles about the state, the city administrator, and the vice-mayor").  Viewing these allegations in the light most favorable to plaintiff, defendants searched and seized "work product materials."

*Second*, and independently, the Amended Complaint plausibly alleges that defendants searched and seized "documentary materials."  The Privacy Protection Act furnishes a sweeping definition of "documentary materials":

> "Documentary materials", as used in this chapter, means materials upon which information is recorded, and includes, but is not limited to, written or printed materials, photographs, motion picture films, negatives, video tapes, audio tapes, and other mechanically, magentically [sic] or electronically recorded cards, tapes, or discs, but does not include contraband or the fruits of a crime or things otherwise criminally possessed, or property designed or intended for use, or which is or has been used as, the means of committing a criminal offense.

42 U.S.C. § 2000aa-7(a).  To state a claim for search or seizure of documentary materials, plaintiff must allege plausibly that defendants searched or seized documentary materials that she possessed "*in connection with* a purpose to disseminate to the public[.]"  42 U.S.C. § 2000aa(b) (emphasis added).  Plaintiff alleges that city and county officers searched and seized her workplace computer and cell phone.  Doc. 35 at 33–34 (Am. Compl. ¶¶ 150–53) (computer); *id.* at 37 (Am. Compl. ¶ 169) (phone).  Given the PPA's expansive definition of "documentary materials," it's reasonable to infer that defendants searched or seized documentary materials when they seized a journalist's workplace computer and cell phone.  The City's contention to the contrary is perfunctory and not persuasive.  *See* Doc. 58 at 19.  The court thus concludes that plaintiff has stated a plausible claim under the PPA for the search and seizure of documentary materials.  Defendants' arguments to the contrary are unavailing.  So the PPA claim thus survives defendants' Motions to Dismiss.

## IV.        Dismissal Without Prejudice[20]

Finally, the court must determine whether the claims dismissed by this Order are

dismissed with or without prejudice.  It's a close call.  The court is skeptical that plaintiff could

cure the shortcomings that led the court to dismiss certain claims.  Plaintiff is represented by

experienced counsel.  So, one would imagine—if plaintiff had the ability to plead facts that'd

cure the alleged shortcomings of her Amended Complaint—she promptly would have filed a

motion to amend.  Plaintiff didn't.

The way this case could unfold troubles the court.  Defendants filed their motions ten

months ago.  Plaintiff chose to litigate those motions on the merits instead of seeking leave to

amend at any point before the court published this Order.  Amending after the court adjudicates a

motion to dismiss represents a "wait-and-see approach[,]" which undermines judicial efficiency.

*Herbel*, 2024 WL 4416849, at *28 n.33 (internal quotation marks omitted).  And the court

wonders how any proposed amendment wouldn't represent an undue delay.  *See Minter v. Prime*

*Equip. Co.*, 451 F.3d 1196, 1206 (10th Cir. 2006) (explaining that "denial of leave to amend is

appropriate when the party filing the motion has no adequate explanation for the delay"

(quotation cleaned up)); *Castanon v. Cathey*, 976 F.3d 1136, 1145 (10th Cir. 2020)

("Unexplained delay alone justifies the district court's discretionary decision [to deny leave to

amend]." (quotation cleaned up)).

Still, the court concludes that it must dismiss plaintiff's claims without prejudice.

Whether to dismiss with prejudice is a matter committed to the court's discretion.  *Seale*, 32

---

[20]        In two companion cases, plaintiffs filed motions for leave to file a supplemental response after
briefing on motions to dismiss was complete.  Combined Motion for Leave to File Supplemental
Response, *Bentz v. City of Marion*, No. 24-cv-02120-DDC-GEB (D. Kan. Oct. 23, 2024), ECF No. 57;
Motion to Supplement, *Gruver v. Cody*, No. 23-cv-01179-DDC-GEB (D. Kan. Oct. 23, 2024), ECF No.
62.  Both of those motions reference this case in their caption, and plaintiff's counsel signed both of those
motions.  But plaintiff never filed that motion in this case, so it's not before the court.

F.4th at 1027.  *But see id.* (explaining that the Circuit reviews de novo whether "leave to amend would be futile" (quotation cleaned up)).  A "'dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) *and* granting leave to amend would be futile.'"  *Id.* (emphasis in original) (quoting *Knight v. Mooring Cap. Fund, LLC*, 749 F.3d 1180, 1190 (10th Cir. 2014)).  But how can the court discern whether amendment is futile without a proposed amendment before it?  *See Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1131 (10th Cir. 1994) ("We do not require district courts to engage in independent research or read the minds of litigants to determine if information justifying an amendment exists.").  Our Circuit's precedent suggests that the court should err on the side of dismissing without prejudice.  *See id.* ("[W]here the record clearly reflects that the non-moving party possesses additional facts necessary for an amendment and where that party has repeatedly expressed a willingness to amend, the court should reserve to the non-movant leave to amend upon dismissal of the action."); *Seale*, 32 F.4th at 1029 (suggesting that dismissal with prejudice is appropriate only where claim's failure is "patently obvious"); *see also* 6 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1487 (3d ed. 2024) ("If a proposed amendment is not clearly futile, then denial of leave to amend is improper." (quoted and cited approvingly in *Seale*, 32 F.4th at 1029)).  *But see Seale*, 32 F.4th at 1028 (affirming dismissal with prejudice where pleading didn't "support the necessary elements" of the claim).

This Order's Rule 12(b)(6) dismissals are based on insufficient allegations, qualified immunity, and in some cases, both.  So, the court can't conclude that it's "patently obvious" that amendment "would be futile."  *Knight*, 749 F.3d at 1190 (quotation cleaned up).  The court thus makes this Order's dismissals ones without prejudice.  If plaintiff properly can plead facts to cure her claims' shortcomings, she must seek leave to amend within 20 days of this Order.  And that

request must strictly comply with our local rule, D. Kan. Rule 15.1.  Should plaintiff fail to file a motion for leave to amend within 20 days of this Order, the Rule 12(b)(6) dismissals will convert to dismissals with prejudice.[21]

**V.    Conclusion**

The court dismisses the following claims:

- all claims and theories of liability against former Mayor Mayfield;

- any Fourth Amendment claim against Sheriff Soyez based on the procurement of the warrant;

- any Fourth Amendment claim against Acting Chief Hudlin based on the procurement of the warrant;

- any Fourth Amendment claim based on the oath-or-affirmation requirement;

- any Fourth Amendment claim against Detective Christner based on the execution of the warrant;

- any Fourth Amendment claim based on the seizure of plaintiff's workplace computer;

- any First Amendment claim based on a right of access to information;

- any conspiracy theory against Acting Chief Hudlin;

- any conspiracy theory against Detective Christner;

- all claims against the Board of County Commissioners of Marion County, Kansas; and

- any municipal claim based on a failure to train.

All other claims survive.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants Aaron Christner; Board of County Commissioners of Marion County, Kansas; and Jeff Soyez's Motion

---

[21]    The court is mindful of *Herbel*'s decision to dismiss claims in that case with prejudice.  2024 WL 4416849, at *28 n.33.  The efficiency interest in that approach has some serious Rule 1 appeal.  But the pleading context of *this case* differs, so the court reads our Circuit's precedent to suggest that dismissal without prejudice here is the better outcome.  Still, it's a close call.

to Dismiss (Doc. 53) is granted in part and denied in part, as set forth above.  The court directs
the Clerk to terminate as a defendant the Board of County Commissioners of Marion County,
Kansas, from this case.

      **IT IS FURTHER ORDERED THAT** defendants Zach Hudlin; the City of Marion,
Kansas; and David Mayfield's Motion to Dismiss (Doc. 57) is granted in part and denied in part,
as set forth above.  The court directs the Clerk to terminate as a defendant David Mayfield from
this case.

      **IT IS FURTHER ORDERED THAT** defendant Gideon Cody's Motion to Dismiss
(Doc. 60) is granted in part and denied in part, as set forth above.

      **IT IS SO ORDERED.**

      **Dated this 28th day of March 2025, at Kansas City, Kansas.**

                                        **s/ Daniel D. Crabtree**
                                        **Daniel D. Crabtree**
                                        **United States District Judge**