DEPEW GILLEN RATHBUN & MCINTEER LC
8301 E. 21st Street North, Suite 450
Wichita, KS 67206-2936
Telephone: (316) 262-4000
Randy@depewgillen.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| PHYLLIS J. ZORN )<br><br>                    Plaintiff )<br><br> )<br>v. )<br> )<br> DAVID MAYFIELD, individually )<br>and in his official capacity; GIDEON CODY, )<br>individually and in his official capacity; )<br>ZACHARIAH HUDLIN, in his  individual )<br>capacity; SHERIFF JEFF SOYEZ, )<br>individually and in his official capacity; and )<br>AARON CHRISTNER, in his individual )<br>capacity. )<br> )<br>                    Defendants )<br>_____ ) | Case No. 24-2044-DDC-GEB |

## SECOND AMENDED COMPLAINT

COMES NOW the plaintiff and for her claims against the defendants, and each of them, alleges and states as follows:

1.     PHYLLIS J. ZORN is a resident of the State of Kansas.  At all times material to this action, Ms. Zorn was an award winning reporter for the Marion County Record ("the Record"), a weekly newspaper published in Marion, Kansas.

2.    Marion is a small town in central Kansas.  It is governed by a mayor and four council members.  DAVID MAYFIELD was the duly elected mayor of Marion at all times material to this action.  Mayfield was formerly a Kansas Highway Patrol trooper who later became Marion's police chief, and since 2020 has worked part-time for the Marion County Sheriff's Office transporting prisoners.

3.    GIDEON CODY was, at all times material to this action, the Chief of Police of Marion.

4.    Officer ZACHARIAH "ZACH" HUDLIN at all times material to this action was a member of the Marion Police Department.

5.    The defendant JEFF SOYEZ is the duly elected Sheriff of Marion County, Kansas.

6.    AARON CHRISTNER was, at all times material to this action, a detective with the Marion County Sheriff's Office.

7.    At all times material to this action, the defendants were acting under color of state law.  The Fourth Amendment to the United States Constitution forbids unreasonable searches and seizures.  The First Amendment to the United States Constitution guarantees that "Congress shall make no law ... abridging the freedom of speech, or of the press." Accordingly, this action arises under the laws

of the United States and presents a federal question within this Court's jurisdiction. It is brought pursuant to 28 U.S.C. §§1331, 1343 and 42 U.S.C. §1983, et seq.

8.     The parties are residents or political entities located in the state of Kansas—except GIDEON CODY who after the illegal raid in question fled the jurisdiction for parts unknown.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this action, including the unlawful practices alleged herein, occurred in this district.

*Background*

9.     Marion was in need of a new police chief in 2023. Sheriff Soyez contacted Gideon Cody and encouraged him to apply for the job. Prior to being appointed Marion County Sheriff in 2022, Soyez had been a railroad detective for the Union Pacific Railroad in Kansas City, Missouri.  During the time he lived in Kansas City, Soyez was friends with Captain Gideon Cody of the Kansas City, Missouri Police Department.

10.     Cody agreed and applied to be the Marion police chief in April 2023. By April, the city had identified three candidates: acting police chief Duane McCarty; Chris Mercer, who works as a fire investigator for the state fire marshal and part time Marion police officer; and Gideon Cody, a captain in the Kansas City, Missouri Police Department.

11.     Sheriff Soyez strongly urged Mayor Mayfield, who worked part-time for Soyez transporting prisoners, to hire Cody.

12.     Gideon Cody's candidacy was also strong supported by "Marion Crime." Marion Crime is a secretive Facebook group, which sent private messages to community leaders touting Cody's candidacy, saying he "is what the community needs."

13.     The group touted Cody's supposed SWAT experience, including "extensive training in active shooter and other highly stressful situations;" the group pushed for a SWAT operator as Marion's police chief even though Marion is so small it does not have a single stoplight.

14.     The messages said, "Marion should be proud that we have attracted someone with his credentials."

15.     The Marion Crime group compared Cody to Sheriff Soyez, saying Cody would bring "new blood" to the police department, just as Soyez did to the Sheriff's Office.

*Cody's Background*

16.     The Marion County Record is a weekly newspaper published in Marion, Kansas, and is the paper of record for the City of Marion and Marion County.

4

17.    Gideon Cody had experienced a number of problems in his former employment.  To the surprise of no one, when the Record reported that Gideon Cody was a candidate for the Marion police chief position, the newspaper began receiving tips about Cody from persons who were afraid to go on the record for fear of retribution by Cody.

18.    According to one source, Cody was "the absolute worst commander I ever experienced," said "his ego would not allow him to listen to what anyone below his rank said," and described him as a "toxic/ego-centric commander."

19.    Three sources told the paper that Cody ran over a dead body at a crime scene.  The tipsters also reported that Cody was about to be demoted by the Kansas City Police Department from captain to sergeant because of offensive conduct towards other officers.

20.    Multiple sources reported a conversation in which Cody expressed his disdain for working in dispatch, and said if he had not been transferred out of dispatch he would have found "the skinniest and prettiest girl down there and f*cked her" to force a reassignment.

21.    Cody soon became aware that the Record was looking into his background in Kansas City.  This infuriated Cody and he later suggested to the plaintiff that she leave the paper and start a competing paper in Marion. Cody told Zorn the Record in general—and editor Eric Meyer and reporter Deb Gruver (who

was investigating Cody) in particular—were too "negative" and he wanted to see a new, more positive newspaper replace it.  He promised her that he would invest with her and would enlist a number of others to do so as well.

22.    The plaintiff laughed off Cody's suggestion, not understanding the depth of his anger at the Record.  When Ms. Zorn disclaimed any interest in his proposal, she was moved to Cody's enemies list.

23.    In late April, Mayor Mayfield offered Cody the police chief position even before the City Council approved his hiring.  On May 1, Cody took the oath of office before the City Council had voted to hire him.  In his new position, Cody  was making only about half of what he had been making as a captain in the Kansas City, Missouri Police Department, where he had worked for 24 years.

24.    Cody was only "provisionally accredited" by the Kansas Commission of Peace Officers' Standards and Training.

*A Congressman Comes to Town*

25.    In late July, U.S. Congressman Jake LaTurner (R) announced he would be visiting Marion on August 1, 2023, for "Coffee With Your Congressman." Rep. LaTurner represents Kansas' Second Congressional District. Marion County had recently moved from the First Congressional District to the Second Congressional District as part of Kansas' 2022 congressional reapportionment.

26.     Rep. LaTurner's Communications Director specifically reached out to Record editor and publisher Eric Meyer and invited him to attend the event.

27.     The event was to be held at Kari's Kitchen, a Marion coffee shop owned by Kari Newell, who also owns the upscale Chef's Plate in the Historic Elgin Hotel across the street.  Kari's Kitchen posted its own invitation to the event on its Facebook page, describing it as an "open meet and greet."

28.     *Record* editor Eric Meyer and Ms. Zorn attended the August 1st "open meet and greet."  While waiting for Rep. LaTurner to arrive, Kari Newell told the plaintiff to leave, saying "I will not have members of the media in my establishment. You have to leave."

29.     Shortly thereafter, Chief Cody approached both Meyer and the plaintiff and told them to leave; he said that Newell asked that the two journalists "be evicted."  This action set the stage for what was about to happen and demonstrates the disdain that Cody held for the First Amendment in general and the plaintiff specifically.


*A Confidential Tip on Kari Newell*

30.     The following day, August 2, 2023, Ms. Zorn received a direct message on Facebook from Pam Maag, a resident of Marion, about Newell.  Maag, who

7

requested anonymity, stated that Newell's driver's license was suspended due to a prior DUI conviction.

31.    The tipster also told Zorn that local law enforcement had known for years that Newell was driving without a valid driver's license.  It is a violation of the ordinances of the City of Marion and the laws of this county and state to operate a vehicle without a license.

32.    That same day the tipster sent Zorn, via Facebook messenger, a copy of an August 1, 2023, letter from the Kansas Department of Revenue to Newell. The letter had come from Newell's husband–who was at the time going through a divorce with Ms. Newell.  Apparently, Mr. Newell was frustrated that his wife had been able to drive around town without a license for years.  Ms. Zorn received the message on August 2.

33.    The letter in question was addressed to Ms. Newell and includes her full name, address, driver's license number and date of birth.  The letter set forth various requirements Newell would have to meet in order to restore her driving privileges, including having an ignition interlock device installed on her car.

34.    The source told Ms. Zorn that she could confirm the information about Newell through the Kansas Department of Revenue website, by using Newell's name, address, driver's license number, and date of birth—all of which were on the letter from the Department of Revenue. The source also told Zorn she

could obtain a copy of the August 1, 2023, letter from the Department of Revenue to Newell from the same website.

35.    Ms. Zorn printed the copy of the letter from Facebook and shared it with Meyer.  The following day, Meyer located the webpage titled "Kansas Driver's License Status Check" on the Kansas Department of Revenue website by performing a Google search.

36.    This webpage allows anyone to check the status of a Kansas driver's license so long as that person knows the driver's license number, first and last name, and date of birth of the driver they are checking on.  It does not require a log-in, does not require a username or password, and does not contain any warning about accessing information on the site.  In fact, the so-called "Disclaimer" on the Department of Revenue's website merely warns users that the information "is a summary only and will not display any sanctions from another state."

37.    Using the information from the August 1, 2023, Department of Revenue letter which the source had provided Zorn (Newell's first and last name, address, driver's license number, and date of birth) Meyer used the Kansas Driver's License Status Check webpage to confirm Newell's DUI conviction and the fact Newell's license was suspended.

38.    Zorn then called the Kansas Department of Revenue and was told that the letter in question was available on the same public-facing website, a user

simply must keep clicking to find the link.  Ms. Zorn then went to the same website Eric Meyer had used and saw that at the bottom of the same screen showing Newell's DUI conviction and suspension there was a box to click to view "Documents."

39.    When Ms. Zorn clicked on that box a form appeared on the webpage and asked for "Requester's Information." Zorn then inserted her own name into the form and entered Newell's driver's license number and address.   40.    The Kansas Driver's License Status Check webpage then required Zorn to check a box that read: "I will use the information requested in a manner that is specifically authorized by Kansas law and is related to the operation of a motor vehicle or public safety. (See section VI on the front of this form)."

40.    After Zorn checked the box and clicked "Accept," nineteen "Documents" appeared on the screen—the first of which was the August 1, 2023, letter from the Kansas Department of Revenue to Newell concerning the ignition interlock device, i.e., the same document the source had previously provided Zorn.

41.    Having confirmed that the KDOR letter was legitimate, Zorn then closed the webpage and informed Meyer that she had verified that the information (and document) provided by the confidential source was accurate.  Ms. Zorn never claimed to be Ms. Newell at any time in her dealings with the website.

42.    The Kansas law on driver's license records is clear.  The very first sentence of the "Division of vehicles; records; disclosure" statute provides that all driver's license records "shall be subject to the provisions of the open records act, except" (a) "records which relate to the physical or mental condition of any person," (b) "records which have been expunged," or (c) "photographs [on] drivers' licenses." K.S.A. 74-2012(a)(1) & (b).

43.    Zorn's use of the Kansas Driver's License Status Check website to confirm that Newell's driver's license was suspended due to a DUI conviction—and that she could get her license reinstated only by installing an ignition interlock device—does not relate to any of the three exempted topics set forth in K.S.A. 74-2012(a)(1) & (b).

44.    Zorn's use of the Kansas Driver's License Status Check webpage to confirm that Newell's driver's license was suspended due to a DUI conviction—and that she could get her license reinstated only by installing an ignition interlock device—plainly related to the operation of a motor vehicle and to public safety.

45.    Accordingly, Zorn's use of the Kansas Driver's License Status Check website to confirm that Newell's driver's license was suspended due to a DUI conviction and that she could get her license reinstated only by installing an ignition interlock device was clearly legal.

*Federal Law Regarding Driver's License Records*

46.     The federal law regarding driver's license records is the Driver's Privacy Protection Act.

47.     The Driver's Privacy Protection Act was designed to protect the public from criminal conduct resulting from disclosure of "personal information" from state motor vehicle records (i.e., preventing stalkers from learning the name and address of a driver by looking up their vehicle license plate number) while at the same time ensuring access to information for legitimate purposes, such as public safety.

48.     The Act struck this balance in two ways.   First, the Act defines protected "personal information" as "information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status." 18 U.S.C. § 2725(3) (emphasis added).

49.     Therefore, an individual's "driver's status" is explicitly not "protected information" under the Driver's Privacy Protection Act.

50.    Thus, the "Kansas Driver's License Status Check" tool on the Kansas Department of Revenue's public-facing website is not covered by the Driver's Privacy Protection Act.

51.    To be clear, no one from the Record used the Driver's License Status Check tool to obtain "information that identifie[d]" Kari Newell; rather, the plaintiff had already been provided with Newell's name, address, driver's license number, and date of birth by the tipster when the tipster furnished the paper with a copy of the August 1, 2023 Kansas Department of Revenue letter.

52.    Instead, what Ms. Zorn did was use this information to obtain the status of Newell's driver's license, i.e., the fact her license was suspended due to a DUI conviction and that to restore her driving privileges, Newell would have to obtain an ignition interlock device.

53.    Because the Act explicitly states that protected personal information "does not include information on vehicular accidents, driving violations, and driver's status," the information which the plaintiff obtained from the Kansas Driver's License Status Check tool (i.e., the status of Newell's driver's license) is not covered by the Driver's Privacy Protection Act.

54.    Moreover, the Driver's Privacy Protection Act provides that "A State department of motor vehicles … shall not knowingly disclose or otherwise make available to any person … personal information." 18 U.S.C. § 2721(a)(1).

13

55.   It would therefore be illegal for the Kansas Department of Motor Vehicles to have a public-facing website that provides protected "personal information."

56.   The official spokesperson for the Kansas Department of Revenue, Zach Denney, has repeatedly confirmed that so long as the requester has the identifying information it is perfectly legal to use the Kansas Driver's License Status Check to verify the status of anyone's driver's license.

- "That's legal. The website is public facing, and anyone can use it." (AP)

- "As long as the requestor has the required information, this information is public record and available online." (KC Star)

- "The motor vehicle driver's checker is public-facing and free-use. If you have my [identifying] information, you can pull it [my driver's record] out." (NBC News)

57.   The second way the Driver's Privacy Protection Act achieves this balance is through a list of permitted exceptions.

58.   One permitted exception allows for personal information to be disclosed for "any ... use specifically authorized under the law of the State that holds the record, if such use is related to the operation of a motor vehicle or public safety." 18 U.S.C. § 2721(b)(14).

59.     As noted above, Kansas law provides that all driver's license records "shall be subject to the provisions of the open records act, except" (a) "records which relate to the physical or mental condition of any person," (b) "records which have been expunged," or (c) "photographs [on] drivers' licenses." K.S.A. 74-2012(a)(1) & (b).

60.     Thus, the information which the plaintiff accessed, i.e., that Newell's driver's license was suspended due to a DUI conviction, was specifically authorized under Kansas law, which states such information is subject to the Kansas Open Records Act.

61.     Another permitted exception allows for personal information to be disclosed "for use in connection with matters of motor vehicle or driver safety." 18 U.S.C. 2721(b)(2).

62.     The plaintiff's use of the Kansas Driver's License Status Check tool to confirm the authenticity of the source's letter and the fact that Newell had been driving with a suspended license was "for use in connection with matters of motor vehicle or driver safety" because the Record was investigating allegations that local law enforcement routinely permitted an unlicensed driver to drive in and around Marion, posing an obvious risk to other drivers. 18 U.S.C. 2721(b)(2).

63.    Another permitted exception allows personal information to be disclosed "for use in research activities . . . so long as the personal information is not published, redisclosed, or used to contact individuals."  18 U.S.C. 2721(b)(5).

64.    The plaintiff's use of the Kansas Driver's License Status Check tool to confirm the authenticity of the source's letter and the fact that Newell had been driving with a suspended license constituted "research," e.g. "studious inquiry or examination, the collecting of information about a particular subject." (https://www.merriam-webster.com/dictionary/research).

65.    Moreover, the plaintiff had no intent to publish that information, to redisclose that information, or to use the information to contact anyone; instead, it was the newspaper's intent only to report the failure of local law enforcement to stop an unlicensed person from driving.

66.    Thus, even if the information which the Ms. Zorn accessed was "personal information" under the Act—which it was not—her use of the Kansas Driver's License Status Check tool to confirm the authenticity of the letter and the fact that Newell's driver's license was suspended due to a DUI conviction and that she could get her license reinstated only by installing an ignition interlock device fell within one or more of the permitted exceptions under the Driver's Privacy Protection Act.

67.     Despite the fact that Zorn's use of the public-facing Kansas Department of Revenue website to confirm that Newell's driver's license was suspended due to a DUI conviction and that she could get her license reinstated only by installing an ignition interlock device was legal, Meyer subsequently decided not to publish the information about Newell because he believed the paper was being drawn into a bitter divorce.

68.     While Meyer elected not to publish a report on Newell's DUI conviction and the fact she was driving without a valid license, he did write the Marion Police Chief and the Marion County Sheriff to "alert" them about the on-going violation of the law by an individual in Marion.

69.     Specifically, on Friday, August 4, 2023, Meyer e-mailed Chief Cody and Marion County Sheriff Jeff Soyez and told them that a confidential source had provided the paper a letter from the Kansas Department of Revenue "to a Marion businesswoman who recently had been in the news."  Meyer stated that the letter outlined the steps the businesswoman—whom Meyer did not identify by name— would need to take to get her driver's license reinstated, including installing an ignition interlock device on her car.

70.     The e-mail explained that the Record had checked with the Department of Revenue and was told "that anyone could obtain the document if he or she possessed the recipient's Kansas identification card number, name, and date

of birth." The e-mail also noted that "[o]ur source contends that local law enforcement officers are fully aware that she ... ha[s] been driving for some time without [an] active, valid license."

71. Neither Chief Cody nor Sheriff Soyez ever responded to Meyer's offer to provide any additional information that might help in an investigation of an actual crime.

72. An hour and a half before Meyer sent his e-mail to Chief Cody and Sheriff Soyez, on Friday, August 4, 2023, the Marion Vice Mayor, Ruth Herbel, sent an e-mail to the Marion City Administrator, Brogan Jones (who has subsequently resigned).

73. Herbel attached to her e-mail a screenshot of the same August 1, 2023, letter from the Kansas Department of Revenue to Newell setting forth the requirement that Newell have an ignition interlock device installed on her car before her driver's license could be reinstated.

74. Herbel told the City Administrator she had received the copy of the letter from a local resident, Pam Maag, who Herbel said had law enforcement connections. Maag would later publicly identify herself as the person who had provided the August 1, 2023, letter to Phyllis Zorn at the Marion County Record on August 2.

*The City Refuses to Investigate the*
*Ongoing Driving Violation*

75.     The City Administrator notified Marion Mayor David Mayfield of his communications with Herbel the very same day.   Specifically, the City Administrator e-mailed the Mayor and the City Clerk and stated that Chief Cody and the police department would not be looking into this and the City needed to stay out of this "hear say."

76.     Despite the City Administrator's declaration "that Chief/PD will not be looking into this," Mayor David Mayfield had a different plan to retaliate against those that sought to shine a light on this criminal conduct in Marion.

77.     Ruth Herbel assumed office as a member of the Marion City Council in 2020.  Since that time, the pages of the Marion County Record are full of reports of attacks and counterattacks between Herbel and Mayor Mayfield—with Herbel accusing the mayor of repeatedly violating the city charter, giving out unauthorized raises to favored city employees, holding illegal secret meetings, and much more.

78.     During that same time, editorials in the Record had referred to Mayor Mayfield as a dictator, a bully, as someone who "shows his disdain for the democratic process," as someone who "desires to take all power for himself," and as someone who lies so much he "metaphorically set[s] his pants on fire" on a regular basis.

79.     Mayor Mayfield made his opinion clear in a Facebook post: The real villains in America are radical journalists, teachers and professors who do nothing but sow division between the American people.

*In Search of a Crime*

80.     At 7:53 a.m. on Monday, August 7, 2023, Brogan Jones, the City Administrator, forwarded to Mayor Mayfield and the other council members (but not Vice Mayor Herbel) Herbel's email from the Friday before in which Herbel had forwarded the August 1, 2023, Department of Revenue letter to Kari Newell.

81.     Shortly thereafter, both Mayor Mayfield and Council Member Zach Collett notified Kari Newell that Herbel had learned of Newell's DUI and falsely claimed that Herbel planned to use Newell's DUI conviction to oppose Newell's application for a liquor license for her upscale restaurant Chef's Plate, which was coming before the city council later that same day.  Mayor Mayfield also told Newell the only way he could get Herbel off the city council was if she (Herbel) was convicted of a crime.

82.     Accordingly, that same day, Mayor Mayfield overruled the City Administrator and authorized Chief Cody to begin an investigation into Herbel and the Marion County Record.

83.    Mayfield could do this because, according to the Marion City Code, the mayor "shall ... [h]ave superintending control of all officers and affairs of the city." Code of the City of Marion, Kan. § 1-205(a).

84.    Chief Cody contacted Newell and told her someone had stolen her mail. When Newell said she did not believe anyone had stolen her mail, Chief Cody said he would get back to her.  When Chief Cody got back to Newell, he told her someone had stolen her identity in order to access her driver's license record.

85.    Specifically, Chief Cody told Newell that a reporter at the Record had stolen Newell's identity and provided Herbel with a copy of her driver's license record.

86.    Chief Cody told Newell this whopper even though Cody knew that:

- Pam Maag—and not anyone at the Record—had provided Herbel with a copy of the letter; and

- Maag put the letter on Facebook on August 2, 2023—two days before the Record obtained a copy of the letter via the Kansas Department of Revenue website.

87.    Later the same day, Newell appeared before a meeting of the Marion City Council (at which Mayor Mayfield presided) as part of her attempt to obtain a liquor license for her restaurant, Chef's Plate. During her appearance, Newell lashed out at Ruth Herbel, calling her "vile," and repeated Chief Cody's false claim that the Record had "illegally" obtained Newell's driver's record and had provided Herbel with a copy of Newell's record.

88.     Following Newell's appearance, Meyer—who was there to report on the council meeting—stood up and said that no one at the Record had provided Vice Mayor Herbel with a copy of Newell's driver's record or the August 1, 2023, Department of Revenue letter. Newell also said that she was going to "place this with the County Attorney" and "this is going to become a case."

89.     Following the City Council meeting, Chief Cody stepped up his investigation into the non-existent "identity theft", coordinating his work with Mayor Mayfield and Marion County Sheriff Jeff Soyez. Sheriff Soyez appointed Marion County Sheriff's Detective Aaron Christner to assist in the investigation of Herbel, the plaintiff and the Marion County Record

*The "Investigation"*

90.     On Monday, August 7, 2023, Marion Police Officer Zach Hudlin, at the direction of Chief Cody, "made contact with someone at KDOR in their information technology department" and was told that on Friday, August 4, "Phyllis Zorn" had accessed Kari Newell's driver's record via the Kansas Driver's License Status Check; Hudlin did not record the name of the person he spoke with, noting only the unidentified person was "female."

91.     This information was true and entirely consistent with what Meyer had told Chief Cody and Sheriff Soyez in his e-mail to the two men on Friday. The act of accessing the Kansas Department of Revenue letter via the Kansas

Department of Revenue Status Check tool was perfectly legal and the defendants knew it.

*Marion County Sheriff Jeff Soyez*
*Joins the Investigation*

92.    The very next day, Tuesday, August 8, 2023, Chief Cody met with Marion County Sheriff Jeff Soyez.

93.    Like Chief Cody, Sheriff Soyez had expressed animus toward the Marion County Record, editor Eric Meyer, and its staff. For example, like Chief Cody, Sheriff Soyez regularly said he did not approve of Meyer's negative outlook, saying that Meyer and the paper should be more positive about Marion and, in particular, Marion government and Marion businesses.

94.    And like Chief Cody, Sheriff Soyez was worried that the plaintiff and the Marion County Record was going to expose his office—along with the Marion Police Department—for allowing Kari Newell to drive around Marion for years without a valid driver's license.

95.    During that meeting, Sheriff Soyez agreed to join with Chief Cody and Mayor Mayfield in their illicit plan to take down the Marion County Record.

96.    Nevertheless, the very next day, Chief Cody requested Det. Christner obtain a "preservation warrant" to serve on the Marion County Record's internet provider. Det. Christner, however, learned that the newspaper's "record domain is hosted by a small hosing [sic] company out of Wisconsin."

97.    Det. Christner told Chief Cody that he had "no legal authority" to make a request to the Wisconsin company and that "they may notify the Marion Record if I do so." Accordingly, Det. Christner told Chief Cody: "My advice is if you have PC for a search warrant is that we just write that and skip a preservation."

*The Search Warrant Application*

98.    By the next day, Det. Christner had drafted an eight page application for a search warrant for the Marion County Record; but in his e-mail forwarding the draft to Chief Cody, Christner stated he was unwilling to sign it himself.

99.    The application included multiple pages titled "DETAILS OF INVESTIGATION," even though Det. Christner—when he forwarded the draft to Chief Cody—admitted he "did not do the investigation."

100.    As a result, the application was replete with either intentional, knowing, or reckless false statements.

101.    For example, the affidavit included the false statement that in order to access the Kansas Department of Revenue website Zorn was required to select from several "options available on the Kansas DOR records website." Christner even included in his draft a screenshot from some website appearing to list the options.

102.    But the Kansas Driver's License Status Check tool has no such requirement and contains no such listing.

103.   If Christner had gone to the Kansas Driver's License Status Check tool, he would have known this statement was false. The Driver's License Status Check tool is readily available from the Kansas Department of Revenue homepage by clicking "Online Services."

104.   Det. Christner was directed to this webpage by the August 1, 2023 letter itself, which tells readers to go the Department of Revenue homepage to "check the status of your driving privileges."

105.   Det. Christner could also have found the tool with a simple Google search; for example, the Kansas Driver's License Status Check tool is among the first listing for searches of "kansas driver record lookup;" "kansas driver's license suspended;" "kdor driver's license;" "kdor driver suspended;" "kdor suspension;" and "kansas drivers license status."

106.   Det. Christner therefore either knew the information he stated in the affidavit, i.e., that someone has to provide a reason for accessing the records on the website, was false or he was grossly reckless in failing to perform even the most basic investigation, which would have revealed the falsity of his claims.

107.   Det. Christner also falsely stated that the only way Ms. Zorn could have accessed the Kansas Department of Revenue records was through "either impersonating or lying about the reasons why the record was being sought."

108.    As noted above, the records are open records under both federal and state law and Ms. Zorn did not have to impersonate another person or lie about her reasons for obtaining a record in order to lawfully use the Kansas Driver's License Status Check tool.

109.    Again, anyone who used the Kansas Driver's License Status Check tool would have known these statements were false.

110.    Det. Christner also falsely claimed that someone at the Record had supplied Vice Mayor Ruth Herbel with the August 1, 2023 letter as part of a plan to retaliate against Kari Newell for having Eric Meyer and Phyllis Zorn removed from the meet-and-greet for Rep. LaTurner.

111.    Det. Christner knew that Phyllis Zorn did not access the Kansas Department of Revenue website until Friday, August 4, 2023, but also knew that Ruth Herbel had received a copy of the letter from Pam Maag on Wednesday, August 2, 2023.

112.    Had Det. Christner been truthful, the affidavit would have failed to state even arguable probable cause.

113.    Det. Christner also either intentionally, knowingly, or recklessly omitted material facts which, if included, would have prevented a finding of probable cause, including:

26

(a)     the fact the Record already had Kari Newell's first name, last name, date of birth, and driver's license number, because as Meyer explained to Chief Cody and Sheriff Soyez, the Record was given the August 1, 2023 letter by a source, and the letter contained all this information;

(b)     the Driver's License Status Check tool permits any requester with Newell's first name, last name, date of birth, and driver's license number to view the status of Newell's driver's license;

(c)     the Driver's License Status Check tool permits any requester with Newell's first name, last name, date of birth, and driver's license number to view documents concerning the status of Newell's driver's license—including the August 1, 2023 letter—so long as they certify that "I will use the information requested in a manner that is specifically authorized by Kansas law and is related to the operation of a motor vehicle or public safety. (See section VI on the front of this form);"

(d)     the fact that the Kansas statute on driver's license records explicitly states that driver's license records are "open records" under the Kansas Open Records Act, with exceptions not applicable here;

(e)     the fact that records concerning a person's "driving violations" or "driver's status" are not covered by the federal Driver's Privacy Protection Act;

(f)     the fact the Driver's Privacy Protection Act allows "personal information" to be disclosed pursuant to state law; for matters of motor vehicle or driver safety; or for research purposes;

(g)     the fact it would be illegal for the State of Kansas to operate a public-facing webpage that allows users to access protected "personal information;"

(h)     the fact that both Chief Cody and Sheriff Soyez knew the Record was investigating allegations that local law enforcement had wrongly permitted Kari Newell to drive for years without a valid license;

(i)     the fact that Eric Meyer had offered to assist in any law enforcement investigation into this allegation;

(j)     the fact the United States Supreme Court has stated that "[w]here the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude;'"

(k)     the fact the United States Supreme Court has stated that "rummag[ing] at large in newspaper files" is not allowed;

(l)     the fact the United States Supreme Court has stated that "[w]here presumptively protected materials [under the First Amendment] are sought to be seized, the warrant requirement should be administered to leave as little as possible to the discretion or whim of the officer in the field." Zurcher v. Stanford Daily, 436 U.S. 547, 564 (1976);

(m)     the fact the United States Supreme Court has stated that "the warrant requirement [should be applied] with particular exactitude when First Amendment interests would be endangered by the search;"

(n)     the fact the federal Privacy Protection Act prohibits the search of a newsroom or other place where reporters maintain newsgathering materials, with certain exceptions not applicable here; and

(o)     the fact the Kansas Shield Law protects the disclosure of newsgathering material without a prior court hearing, during which a reporter can object to the production of such materials.

114.    Det. Christner knew all of the material facts listed above or would have known them had he performed even the most basic investigation.

115.    Det. Christner intentionally, knowingly, or recklessly omitted these material facts from the draft affidavit.

116.    The next morning, August 10, 2023, Chief Cody had taken Det. Christner's draft and prepared search warrant applications for the Marion County

28

Record, Vice Mayor Ruth Herbel, and Pam Maag.  Chief Cody shared those drafts with Det. Christner.

117.    Later the same day, Chief Cody discussed the drafts with Sheriff Soyez, and a decision was made to add a fourth target of the raids: Meyer's home. In his applications for the search of the Record and the Meyers' home, Chief Cody falsely stated that the federal Driver's Privacy Protection Act applied to the Kansas Department of Revenue letter and stated that in order to access the information someone from the Record had to "l[ie] about the reasons why the record was being sought."

118.    Each of Chief Cody's affidavits contain all the same false statements as Det. Christner's draft affidavit.

119.    Chief Cody knew or should have known these statements were false for the same reasons Det. Christner knew or should have known they were false.

120.    Chief Cody's affidavits also included additional false statements. For example, Chief Cody's affidavits state that:

> While the initial front page of the website is public, as seen above a selection must be made to show a legal reason to obtain the information according to the Drivers' Privacy Protection Act of 1994. To access the records a confidentiality agreement is displayed prior to a user accessing the search function. A section of the confidentiality agreement states 'Under the Driver's Privacy Protection Act of 1994, as amended (DPPA) (18 U.S.C. § 2721), personal information obtained by the Kansas Department of Revenue cannot be released unless the

request for information falls within one of the exceptions within the Act.

121.    This statement is false; the Kansas Driver's License Status Check tool contains no such language.

122.    Cody's affidavits also state that:

Under the confidentiality agreement it states "By proceeding past this screen, I declare that I am eligible and have the express authority to receive the requested information pursuant to the federal Drivers' Privacy Protection Act of 1994, as amended. I further declare that any personal information I receive will not be used to sell or offer for sale any property or service."

123.    Again, this statement is false; the Kansas Driver's License Status Check tool contains no "confidentiality agreement" and contains no such language.

124.    Had Chief Cody performed even the most basic of investigation, such as going to the actual Kansas Driver's License Status Check tool (which he could have found from either the August 1, 2023 letter or by performing a simple Google search) he would have known these statements were false.

125.    Had Chief Cody been truthful, the affidavits would have failed to state even arguable probable cause.

126.    Chief Cody likewise made the same omissions of material fact in his affidavits that Det. Christner made in his draft.

127.    Chief Cody knew all of the material facts listed above or would have known them had he performed even the most basic investigation.

128.   Chief Cody intentionally, knowingly or recklessly omitted these material facts from the affidavits.  Had these facts not been omitted, the affidavits would have failed to state even arguable probable cause.

*Christner Drafts the Actual Search Warrants*

129.   After receiving Chief Cody's final draft of the affidavits, Det. Christner prepared the actual search warrants for the magistrate to sign (which would be submitted with the search warrant applications) and sent those draft warrants to Chief Cody.

130.   District Magistrate Judge Laura E. Viar signed the search warrants for the newsroom of the Marion County Record, the Meyer home, and the Herbel home, based on the false statements of material facts contained in the affidavits.

131.   Had the affidavits been truthful—and had the affidavits included the material facts which were omitted from the affidavits—Judge Viar would not have signed the search warrants.

*Chief Cody Did Not Personally Appear*
*Before Magistrate Viar*

132.   The Fourth Amendment to the United States Constitution states that "no Warrants shall issue, but upon probable cause, and supported by Oath or affirmation." U.S. Const. Amend. IV.

133. Kansas law similarly provides that a search warrant may only be issued "upon the oral or written statement … of any person under oath or affirmation." K.S.A. 22-2502(a) (emphasis added).

134. Pursuant to that provision, the written search warrant applications for the Record's offices, Joan and Eric Meyer's home, and Ruth Herbel's home each had a space for a notary to sign the application.

135. However, on each of the applications, Judge Viar scratched out "Notary" and signed the applications herself, attesting that Chief Cody swore the applications had been "SUBSCRIBED and SWORN to before me." (Emphasis added).

136. But Chief Cody never appeared before Judge Viar, making Judge Viar's statement that Cody swore to the applications "before me" false.

137. On August 30, 2023, former Marion County Record reporter Deb Gruver sued Chief Cody in the United States District Court of the District of Kansas for violating her civil rights when he raided the Record's offices, yanked her cell phone out of her hand and injured her, and searched her desk in the Record's newsroom.

138. In his Answer to Gruver's lawsuit, Chief Cody specifically states that "[t]he Applications for Search Warrant [were] taken by the County Attorney's

office to Judge Viar for approval." Answer ¶ 22, *Gruver v. Cody*, No. 23-cv-01179, Dist. of Kan. (Oct. 4, 2023).

139.  Additionally, Marion County Attorney Joel Ensey provided Jessica McMaster, an investigative reporter at KSHB-TV in Kansas City, a statement following the filing of Chief Cody's Answer in the *Gruver* case.

140.  In his written statement, Marion County Attorney Ensey confirmed that "my office staff did take the warrants up for the judge to review."

141.  Judge Viar's act of notarizing the applications was invalid under Kansas law, which provides as follows: "If a notarial act relates to a statement made in or a signature executed on a record, the individual making the statement or executing the signature shall appear personally before the notarial officer." K.S.A. 53-5a606 (a) (emphasis added).

142.  The search warrants were not issued "upon the oral or written statement … of any person under oath or affirmation" and were therefore invalid and void.

*The Illegal Raid*

143.  On Friday, August 11, 2023, Chief Cody spearheaded a team of armed law enforcement officers in conducting raids on the offices of the Marion County Record, the home of Joan and Eric Meyer, and the home of Ruth Herbel.

144.   The raids were conducted pursuant to the invalid search warrants which Chief Cody had obtained under false pretenses.

145.   The first raid occurred at the offices of the Marion County Record, where Chief Cody led a squad including himself, Marion police officer Zach Hudlin, and Marion County Sheriff's detective Aaron Christner.

146.   The officers approached the building from the rear, where they confronted Record reporters Ms. Zorn and Deb Gruver.  Chief Cody forcibly yanked Gruver's cell phone from her hand, which Gruver indicates has injured her.

147.   The officers then entered the offices of the Record led by Chief Cody.

*The Sham Preview Search*

148.   The warrant obligated the officers to conduct a "preview search" of any electronic devices so that the officers only seized items that were actually used in connection with the so-called "identity theft."

149.   In accordance with this requirement, Marion County Sheriff's Det. Aaron Christner connected an external drive via a USB port to reporter Phyllis Zorn's computer in the Record's newsroom.  He then executed a software application titled osTriage, which he had previously loaded onto the external drive.

150.   The program allows a user to conduct a keyword search on the connected computer and its storage media, thereby allowing a user to make a determination in the field as to whether the device was used in the commission of

34

a crime. But the keywords selected for the preview search of the Record's computers were so vague and indistinct they constituted a sham search. For example, one of the keywords was the word "vehicle," while another keyword was the word "Kansas."

151.    None of the "hits" from the "preview search" of the plaintiff's computer were even suggestive of a crime. Instead, it is obvious the keyword search terms were a sham and were never designed to comply with the search warrant's requirement that officers conduct a preview search "to exclude from seizure those which have not been involved in the identity theft." The name searches produced false "hits" 100% of the time.

152.    Despite the fact the "preview searches" revealed no evidence that the plaintiff's computer was used to commit any crime, Chief Cody nevertheless directed Zorn's computer be seized.

153.    While Det. Christner was running the preview search on Phyllis Zorn's computer, Ofc. Zach Hudlin was conducting a physical search of the Marion County Record newsroom, reading papers on countertops, going through reporter's purses, and rifling through files in reporter's desks.

154.    When Ofc. Hudlin got to Deb Gruver's desk (it was Gruver who had been investigating the tips which the paper had received about Chief Cody) Hudlin

paid particular attention to the files in the bottom, right-hand drawer in Gruver's desk.

155.    Among the files Hudlin observed in Gruver's desk drawer was Gruver's investigative file on the confidential tips the Record had received about Gideon Cody from officers with the Kansas City, Missouri, Police Department describing Cody's rampant misconduct; the file was in a folder titled "Capt. Gideon Cody," which was Cody's rank in the Kansas City Police Department when he applied to be Marion's top cop. Also inside the folder was information about other confidential sources who provided information about Gideon Cody.

156.    After Hudlin rifled through Gruver's files—and while he was standing next to Gruver's desk—Hudlin began the following conversation with Chief Cody:

> Hudlin: "You want to look through this desk?"
>
> Cody: "You have the right to look for yourself."
>
> Hudlin: "I know, I'm asking do YOU want to look through this desk?"
>
> Cody: "Man, you got a right to …"
>
> Hudlin: "I understand. You will understand shortly."

157.    Chief Cody is then seen on Hudlin's body camera footage bending down to look inside Gruver's bottom right-hand desk drawer, where Gruver's file on Cody was located.  A short time later, Chief Cody is recorded as saying: "Hmm. … Keeping a personal file on me."

158.    Chief Cody thereby admits to having viewed Gruver's file on her investigation of the many tips the Record had received about him, which included the name (and at least one photograph) of Gruver's confidential sources

159.    The Marion Police Department produced hours of video in response to a Kansas Open Records Act request for Chief Cody's body camera footage of the raids; that footage includes video of Cody relieving himself at Casey's General Store between the search of the Herbel home and the search of the Meyer home.

160.    While Chief Cody did not turn off his body camera while relieving himself, he apparently chose to turn it off while he reviewed Gruver's file on him, for the Marion Police Department did not produce any body camera footage from Cody of him looking through Gruver's file on him.

161.    According to the log created by the osTriage software application, Det. Christner began his "preview search" on Phyllis Zorn's computer at 11:11:57 a.m.. That same log shows Christner did not complete the "preview search" until 12:32:05 p.m.

162.    Following the completion of the "preview search" on Zorn's computer, Ofc. Hudlin said, "We'd be here all freakin' day if we were going to do that to all those computers." By noon, Chief Cody's body camera footage had already recorded him saying, "I'm "starvin."

163.    Shortly after Hudlin made his "all freakin' day" comment," Chief Cody spoke on the phone with Marion County Sheriff Jeff Soyez. Chief Cody brought Soyez up to speed on the search and is then heard saying, "Alright, we'll just take them all." Chief Cody then turned to Det. Christner and Ofc. Hudlin and said, "Let's get the f*ck out of here."

164.    Chief Cody's decision to ignore the requirement in the search warrant that he conduct a "preview search" to exclude devices not used in the so-called "identify theft" and, instead, to "just take them all," i.e. to seize the other newsroom computers without performing a "preview search" on them, was based on what he variously described on the body camera recordings as:

- "I have a feeling that numerous people had it in this office, and that's just the gut;"

- "I have a feeling it's on that one too;" and

- "This is just me playing instinct."

165.    Yet, Chief Cody was repeatedly caught on body camera footage acknowledging he was out of his element:

- "If I'm forgetting something guys, you gotta let me know, I'm out of practice, you know;" and

- " I'm out of practice. You see something I'm forgetting you just let me know."

166.    Based on his "gut" and his growling stomach, and after his consultation with his co-conspirator, Sheriff Soyez, Chief Cody then directed that

Meyer's computer, Deb Gruver's computer, and the network file server be seized without attempting a preview search on those computers.

167.    Chief Cody's action in ordering the seizure of the four computers was in clear violation of the search warrant's requirement to conduct a preview search "to exclude from seizure those which have not been involved in the identity theft." By seizing the computers of Eric Meyer, Phyllis Zorn, Deb Gruver, and the network file server, Chief Cody seized all of the computers in the Marion County Record's newsroom, effectively shutting down the newspaper.

168.    Similarly, Chief Cody directed that Ofc. Hudlin seize Ms. Zorn's cell even though no preview search of any sort was conducted on the phone.

169.    In addition to searching the newsroom and seizing the newsroom computers, Chief Cody also attempted to interrogate the Record staff, who were told they had to wait outside the Record's offices, even though the temperature was near 100 degrees.

170.    Chief Cody called the staff members inside, one-by-one, so he could question them.  Cody first called Ms. Zorn into the newsroom and attempted to give her the Miranda warning, but he couldn't recall the wording of the warning. He nevertheless attempted to get Zorn to incriminate herself, but she said she believed she had done nothing wrong.

171.   Chief Cody also tried to get Zorn to incriminate Meyer, telling her she could disregard orders she believed were illegal; Zorn said she did not believe she did anything illegal.  Chief Cody asked Zorn if she used her phone to access the Kansas Department of Revenue website and she said no.  Despite Zorn's denial, Chief Cody directed Ofc. Hudlin to seize Zorn's phone, without conducting a "preview search" of any sort on the phone.

172.   Chief Cody then asked Det. Christner for a copy of his (Det. Christner's) Miranda warning card so he could use it for continued interrogations. But when Gruver came into the newsroom for her interview, Chief Cody realized he did not have his reading glasses with him and he could not read the card, so he directed Ofc. Hudlin to read it to Gruver.

173.   Gruver—having investigated Chief Cody and being aware of his incompetence— asserted her right to remain silent and did not answer Cody's questions.  Again, however, Chief Cody directed Ofc. Hudlin to seize Gruver's phone, even though Cody had no factual basis for believing that Gruver participated in the so-called "identity theft."

174.   When Meyer learned what was going on at his newspaper, he immediately drove to the office.  When Hudlin told Cody that Meyer was on his way to the Record, Cody told Hudlin, "if he interferes with anything put him in cuffs."

175.    When Eric Meyer arrived, he was denied entry by Chief Cody, who said Meyer could only enter the offices for the purpose of being Mirandized and then interrogated by Cody.  Meyer responded to Chief Cody by explaining that he needed access to his office to obtain the phone number of his attorney and that by denying him access to this office Cody was effectively denying him the right to counsel. Chief Cody told his fellow officers he found Eric Meyer's complaints about being denied his right to counsel "amusing."

176.    Meyer then waited outside the Record's offices for Chief Cody and his entourage to leave so that he could assess the damage done by the officers.

177.    As the raid was ongoing, Chief Cody received a text message from Kari Newell, wanting to talk about the status of the raid. Chief Cody later called Newell back and said, "we can't write anything," and Newell replied, "I understand."

178.    Chief Cody then proceeded to give Newell  a complete rundown on the status of the raids, telling her, for example, he tried to "download" files from the computers at the Record, "but that didn't work, so f*ck it," he just took the computers.

179.    After the raids were completed, Chief Cody then drove to the Marion County Sheriff's Office where he met with Sheriff Soyez to debrief him on the raids while sharing pizza and liquid refreshments.  As the pizza party was going on, Chief

Cody told Sheriff Soyez that when he yanked Deb Gruver's cell phone out of her hand it "made my day."

180.    When Sheriff Soyez pointed out to Chief Cody that he (Cody) had forgotten to turn off his body camera, Cody ordered Ofc. Hudlin to turn off Cody's body camera, saying "I can't get this damn thing to turn off."

181.    While Sheriff Soyez was hosting the pizza party, the plaintiff went to the Marion County Courthouse to request a copy of the probable cause affidavit in support of the search warrant on the Record's office.

182.    Remarkably, Zorn was told no such affidavit had been filed.

183.    On Sunday, August 13, 2023, the KBI issued a statement that it was taking over the investigation.   On Tuesday, August 15, 2023, Chief Cody and Marion County Sheriff's Deputy Aaron Christner exchanged drafts of probable cause affidavits supporting arrest warrants for Eric Meyer, Phyllis Zorn, and Ruth Herbel.

184.    Det. Christner also sent Chief Cody a draft of a probable cause affidavit supporting the arrest of Ruth Herbel, even though he admitted he could not find any state crime she had even arguably committed.

185.    Yet Det. Christner was so intent on satisfying his boss, Sheriff Soyez, he nevertheless prepared paperwork to have Ruth Herbel arrested on what he knew were bogus charges.

*The County Attorney Panics*

186.   The pretense behind the raid soon began to fall apart.   On Wednesday, August 16, 2023, Marion County Attorney Joel Ensey filed a motion to release the evidence seized during the raids, which District Court Judge Benjamin Sexton granted the same day. At the same time he filed his motion, Ensey issued a press release stating that "insufficient evidence" exists "to establish a legally sufficient nexus" between any crime Chief Cody may have been investigating and "the places searched and the items seized."

187.   The press release stated that Ensey was asking local enforcement to return the items seized to their owners.  Ensey, however, did not "clear" the Record or any of its staff of wrongdoing, meaning they remained under criminal investigation.

188.   The same day, the KBI issued a media release in which it stated its investigation was ongoing and that "[o]nce our investigation concludes we will present findings to the Marion County Attorney for review."

189.   Later that same day, a forensic examiner retained by the Record's attorney, arrived in Marion to retrieve the seized items, which were being stored at the Marion County Sheriff's Office.  The transfer of the items to the examiner was personally supervised by Sheriff Soyez.

190.   At the time, Sheriff Soyez made a point of telling the plaintiff that, 'It's not my search warrant; it was PD's search warrant."

191.   Sheriff Soyez even leaned into Zorn and said: "You didn't see me over there," referring to the offices of the Marion County Record.

192.   While it is true that Sheriff Soyez was not physically present during the raids, he actively participated in planning the raids, suggested the search of Joan and Eric Meyer's home, and personally participated in the decision to have all of the Record's newsroom's computers seized, even though the sham "preview" search conducted by his own deputy found no evidence of criminal wrongdoing. Sheriff Soyez made these misleading statements to Zorn in an intentional—and wrongful—attempt to divert attention from his personal involvement in the illegal raids.

193.   As part of the transfer, a forensic examiner was given an inventory of items seized from the Marion County Record during the raid.  The inventory did not include the digital drive which Det. Christner had used to extract data from Phyllis Zorn's computer during the raid on the Record's offices.

194.   As noted above, that drive revealed that the required "preview search" in fact showed no criminal activity, but instead produced "hits" for an advertisement for an animated children's movie, the district court's logo, and other

innocent files.  That drive was not given to the examiner when he came to retrieve the items which the Court had ordered released.

195.  It was not until August 29, 2023—after the Record's attorney threatened to seek to hold the Sheriff in contempt—that the contents of the drive were finally released to the *Record* pursuant to a second order from District Court Judge Ben Sexton.

*Chief Cody Destroys Evidence*

196.  As the unprecedented, unconstitutional, and illegal raids began to create international condemnation, Chief Cody became concerned his wrongdoing would be exposed. Accordingly, Chief Cody began e-mailing the contents of his file to his personal e-mail address.

197.  In addition, Chief Cody asked Kari Newell to destroy her text messages with Cody.  Chief Cody, apparently a modern day Nostradamus, explained these flirtatious text messages could be used against them.  Later, when Newell (who Cody referred to as "Honey") became concerned with her own criminal liability for deleting her text messages with the police chief, she texted Cody and asked, "If attorneys or kbi go digging and see I deleted the texts as you asked me to, will I get in trouble?"  Cody's response: "Quit being paranoid."

198.  On October 2, 2023, Marion Police Chief Gideon Cody resigned and fled the jurisdiction.  It is believed he may be somewhere in Hawaii.

*The City Council Ratifies Hudlin's*
*Rampant Illegal Actions*

199.   Also on October 2, 2023, the Marion City Council appointed Officer Zach Hudlin as Acting Police Chief.

200.   At the time the City Council made the appointment of Officer Hudlin as Acting Police Chief, its members were already aware of Hudlin's role in the illegal raids and, specifically, the City Council members were aware of Hudlin's role in (a) directing Chief Cody to inspect Deb Gruver's file containing the confidential tips the Record had received about Cody when he was employed by the Kansas City, Missouri Police Department, (b) physically removing the computers from the Record's newsroom and the Meyer home in violation of the "preview search" requirement in the search warrant, (c) physically seizing the cell phones of Eric Meyer, Phyllis Zorn, and Deb Gruver in violation of the "preview search" requirement in the search warrant, and (d) nearly arresting Joan Meyer for throwing her walker.

201.   In appointing Officer Hudlin the Acting Police Chief, the City Council ratified the rampant illegal actions taken by Officer Hudlin on August 11, 2023.

202.   The decision of the City Council to appoint Officer Hudlin the Acting Police Chief after its members were aware of Officer Hudlin's role in directing Chief Cody to inspect Deb Gruver's file containing the confidential tips the Record had received about Cody when he was employed by the Kansas City, Missouri Police

46

Department was tantamount to direct authorization by the City Council to Officer Hudlin to commit these illegal actions.

203.   Officer Hudlin remains the Acting Police Chief.

*Plaintiff's damages*

204.   The defendants' illegal raid has caused serious health problems for Ms. Zorn.  Within days after the raid, Ms. Zorn began to suffer from Tonic Clonic seizures (commonly known as Grand Mal seizures).

205.   Prior to the raid, her seizures were under good medical control and she had gone as long as five years without a seizure.   The seizures have been debilitating and have led to extreme depression and anxiety.

206.   The legal claims of the plaintiff are as follows:

COUNT I

*First Amendment – Direct Violation (42 U.S.C. § 1983)*
*(All Defendants excluding Mayfield)*

207.   Plaintiff realleges and incorporates by reference the allegations in Paragraphs 1-206.

208.   The First Amendment to the United States Constitution guarantees that "Congress shall make no law ... abridging the freedom of ... the press."

209.   The Fourteenth Amendment to the United States Constitution extends the protections of the First Amendment to actions taken by local governments and by local government officials.

210.   Prior to the August 11, 2023, unprecedented raids on the newsroom of the Marion County Record, it was clearly established that the First Amendment guaranteed the freedom of the press to gather and report information about matters of public concern.

211.   Prior to the August 11, 2023, unprecedented raids on the newsroom of the Marion County Record, it was clearly established that the First Amendment prohibited government officials, including the police, from interfering with the freedom of the press to gather and report information about matters of public concern.

212.   Prior to the August 11, 2023, unprecedented raids on the newsroom of the Marion County Record, it was clearly established that "[w]here the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude.'" *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978).

213.   The Fourth Amendment provides as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause,

supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

214. When the newsroom of the Marion County Record was raided, defendants knew that the plaintiff was a journalist engaged in gathering and reporting information on matters of public concern.

## COUNT II
### *Fourth Amendment Violations*
### (Defendants Cody, Hudlin, Soyez and Christner)

215. When the newsroom of the Marion County Record was raided, defendants did not have an objectively reasonable belief that Phyllis Zorn, or anyone else associated with the Record, was in possession of contraband, fruits, instrumentalities, or evidence of any crime.

216. No arguable probable cause existed to issue the search warrants for the Marion County Record newsroom and no reasonable police officer could have believed there was arguable probable cause to issue the search warrants.

217. The search warrants were issued based on materially false statements of fact by Chief Cody, including, but not limited to, the following:

a. the federal Driver's Privacy Protection Act applied to the August 1, 2023, letter from the Kansas Department of Revenue to Kari Newell;

b. in order to access a copy of the letter someone from the Record had to "l[ie] about the reasons why the record was being sought;"

c. in order to use the Kansas Driver's License Status Check tool a user has to provide a reason (or reasons) for accessing the information;

49

     d.    in order to use the Kansas Driver's License Status Check tool a user has to "show a legal reason to obtain the information according to the Driver's Privacy Protection Act of 1994;"

     e.    the Kansas Driver's License Status Check tool states: "Under the Driver's Privacy Protection Act of 1994, as amended (DPPA) (18 U.S.C. § 2721), personal information obtained by the Kansas Department of Revenue cannot be released unless the request for information falls within one of the exceptions within the Act;"

     f.    the Kansas Driver's License Status Check tool states: "By proceeding past this screen, I declare that I am eligible and have the express authority to receive the requested information pursuant to the Federal Driver's Privacy Protection Act of 1994, as amended. I further declare that any personal information I received will not be used to sell or offer for sale any property or service;"

     g.    the Driver's Privacy Protection Act protects the fact Kari Newell's driver's license was suspended; and

     h.    the Driver's Privacy Protection Act protects the fact Kari Newell was convicted to driving under the influence.

218.    The true facts are that the Kansas Driver's License Status Check tool on the Kansas Department of Revenue's website is available for anyone to use.

219.    The Kansas Driver's License Status Check tool does not require a log-in, does not require a username or password, and does not contain any warning about accessing information on the site.

220.    The Kansas Driver's License Status Check tool is not covered by the Driver's Privacy Protection Act.

221.    The federal Driver's Privacy Protection Act protects what the statute calls "personal information." 18 U.S.C. § 2721(a)(1).

222.   The Driver's Privacy Protection Act explicitly states that "personal information" "does not include information on vehicular accidents, driving violations, and drivers' status." 18 U.S.C. § 2725(3) (emphasis added).

223.   Thus, the Kansas Driver's License Status Check tool on the Kansas Department of Revenue's public-facing website is not covered by the Driver's Privacy Protection Act.

224.   The information provided by the Driver's License Status Check tool concerning the status of Kari Newell's driver's license is not protected by either state or federal law.

225.   Moreover, the Driver's Privacy Protection Act further provides that "[a] State department of motor vehicles … shall not knowingly disclose or otherwise make available to any person … personal information." 18 U.S.C. § 2721(a)(1) (emphasis added).

226.   Thus, it would be illegal for the Kansas Department of Motor Vehicles to have a public-facing website that provides protected "personal information."

227.   Chief Cody either knew the statements he made in the applications were false or acted with reckless disregard for whether they were false.

228.   Chief Cody made these false statements for the purpose of inducing Magistrate Judge Viar to issue the search warrants for the newsroom of the Marion County Record.

229.   Magistrate Judge Viar issued the search warrants for the newsroom of the Marion County Record based on these materially false statements.

230.   Had the affidavits included truthful facts—and included the material facts that were omitted—Magistrate Judge Viar would not have issued the search warrants.

231.   Thus, the search warrants were not "issue[d] … upon probable cause," as required by the Fourth Amendment, nor were they supported by even arguable probable cause.

232.   As such, the search warrants were invalid and void.

233.   The search warrant applications for the Record's offices had a space for a notary to sign the application.

234.   However, Judge Viar scratched out "Notary" and signed the applications herself, attesting that Chief Cody swore the applications had been "SUBSCRIBED and SWORN to before me." (Emphasis added).

235.   But Chief Cody never appeared before Magistrate Viar, making Judge Viar's statement that Cody swore to the applications "before me" false. Judge Viar's act of notarizing the applications was invalid under Kansas law, which provides as follows: "If a notarial act relates to a statement made in or a signature executed on a record, the individual making the statement or executing the

signature shall appear personally before the notarial officer." K.S.A. 53-5a606 (a) (emphasis added).

236.   Accordingly, the search warrants were not issued "upon oath or affirmation," as required by the Fourth Amendment.  As such, the search warrants were invalid and void.

*The Search Warrants Were Overbroad – Part 1*

237.   The search warrants for the Record's newsroom did not "particularly describe the place to be searched, and the persons or things to be seized."

238.   This is particularly troubling given the U.S. Supreme Court's explicit direction that "[w]here presumptively protected materials [under the First Amendment] are sought to be seized, the warrant requirement should be administered to leave as little as possible to the discretion or whim of the officer in the field." *Zurcher v. Stanford Daily*, 436 US. 547, 564 (1976); Id. at 565 ("the warrant requirement [should be applied] with particular exactitude when First Amendment interests would be endangered by the search").

239.   For example, the search warrants authorized the seizure of "[d]ocuments and records pertaining to Kari Newell," as well as "[c]orrespondence or other documents (whether digital or written) pertaining to Kari Newell."

240.   Newell was a prominent local businessperson in Marion and, as such, she would be the subject of numerous materials held by the Record that have

nothing to do with the alleged crimes of identity theft and unauthorized use of a computer.

241. The search warrants also authorized the seizure of "[d]igital software and application software installation and operation media."

242. Such a search topic is plainly overbroad; for example, the Record's software for creating mailing labels for its subscribers has nothing to do with the alleged crimes of identity theft and unauthorized use of a computer.

243. The search warrants also authorized the seizure of "[d]igital storage media and the digital content which are, or have been, used to store documents and items of personal information as defined by K.S.A. 21-6107."

244. K.S.A. 21-6107 defines "personal identifying information" as including "[n]ame."

245. K.S.A. 21-6107 also defines "personal identifying information" as including "address."

246. K.S.A. 21-6107 also defines "personal identifying information" as including "telephone number."

247. K.S.A. 21-6107 also defines "personal identifying information" as including "credit or debit card information."

248. Thus, every computer hard drive or portable storage device which contained copies of the newspaper's published reports which included anyone's

"name" or the "address" of an incident, or the "address" or "telephone number" of an advertiser was subject to seizure.

249.   Similarly, every computer hard drive or portable storage device which contained reporter's work product, including the "name," "address," or "telephone number" of the reporter's sources, was subject to seizure.

250.   Likewise, every computer hard drive or portable storage device which includes subscribers' "name," "address" and "credit or debit card information" (which are used to mail and pay for subscriber's subscription) was subject to seizure.

251.   As a result, such a search violated not only the freedom of the press clause of the First Amendment, it also violates the First Amendment right of association as well. See *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958).

*The Seizure Exceeded the Scope of the Search Warrant*

252.   Prior to the August 11, 2023, raids on the newsroom of the Marion County Record and the home of Joan and Eric Meyer, it was clearly established that the Fourth Amendment prohibited the government, including the police, from conducting warrantless raids on a person's home or a corporation's offices except in strictly limited circumstances, such as exigent circumstances, with consent of the property owner, an item is in plain view, etc.

253.   No exceptions to the warrant requirement applied to the August 11, 2023, raid on the newsroom of the Marion County Record.

254.   Yet numerous items were seized which were not listed on the search warrant.

255.   For example, the search warrant authorized the seizure of "[a] computer or digital device that has been used to access the Kansas Department of Revenue records website." (Emphasis added).

256.   The search warrant also authorized the seizure of "[d]igital communications devices allowing access to the Internet or to cellular digital networks which were or have been used to access the Kansas Department of Revenue records website." (Emphasis added).

257.   Despite the requirement that any such device "has/have been used" to access the Kansas Department of Revenue website, computers and cell phones were seized that had never been used to connect to the Kansas Department of Revenue's records website.

258.   The search warrant also required officers to "conduct a preview search of all located digital communications devices and digital storage media to exclude from seizure those which have not been involved in the identity theft."

259.   Despite the fact the so-called "preview search" conducted by Det. Christner at the Record's office failed to identify a single device involved in the

alleged identity theft, the desktop computers of Eric Meyer, Phyllis Zorn, and Deb Gruver were seized, along with the Record's network server.

260.  Despite the fact the so-called "preview search" conducted by Det. Christner at the Record's office failed to identify a single device involved in the alleged identity theft, Phyllis Zorn's and Deb Gruver's cell phones were seized.

261.  Moreover, following the raid on the Record's newsroom, Record reporter Deb Gruver went to the Marion County Sheriff's office and asked Chief Cody to return her phone, explaining that she had nothing to do with any search of the Kansas Department of Revenue's website.

262.  Chief Cody responded, "I actually believe you," but refused to return Gruver's phone to her.

263.  Such "rummag[ing] at large in newspaper files" is plainly unconstitutional. *Zurcher v. Stanford Daily*, 436 U.S. 547, 565 (1978).

### The "Capt. Cody" File

264.  Moreover, Officer Hudlin and Chief Cody's review of the contents of Deb Gruver's file on "Capt. Cody" was plainly overbroad.

265.  Neither officer had any basis for believing that Gruver accessed the Kansas Department of Revenue website or reviewed the Newell letter and, as such, neither officer had a basis for believing that Gruver's files would contain evidence related to the website or the letter.

266.   Neither officer had any basis for believing the newspaper file on "Capt. Cody" would contain information about accessing the Kansas Department of Revenue website.

267.   Moreover, both officers knew the Record had promised confidentiality to sources who provided information about Cody.

268.   Despite that knowledge, both officers reviewed the contents of the "Capt. Cody" file.

269.   The officers did so to illegally obtain the newspaper's confidential research—and the identity of the newspaper's confidential sources—regarding Chief Cody's past, in retaliation for the newspaper's investigation into, and criticism of, Chief Cody.

270.   As noted above, on Wednesday, August 16, 2023, Marion County Attorney Joel Ensey filed a motion to release the evidence seized during the raids, which Chief District Court Judge Benjamin Sexton granted the same day.

271.   At the same time he filed his motion, County Attorney Ensey issued a press release stating that "insufficient evidence" exists "to establish a legally sufficient nexus" between any crime Chief Cody may have been investigating and "the places searched and the items seized."

272.   The press release stated that Marion County Attorney Ensey was asking local enforcement to return the items seized to their owners.

273.   Thus, even the County Attorney agrees "the places searched and the items seized" exceeded the allowable scope under the Fourth Amendment.

*"Do YOU want to look through this desk?"*

274.   Prior to the August 11, 2023, unprecedented raids on the newsroom of the Marion County Record and the home of Joan and Eric Meyer, it was clearly established that a reporter's promise of confidentiality to a source was protected by the First Amendment. See *Silkwood v. Kerr-McGee Corp.*, 563 F.2d 433, 438 (10th Cir. 1977); *In re Pennington*, 224 Kan. 573, 574, 581 P.2d 812, 814 (1978).

275.   Moreover, the Kansas Shield Law extends the journalist's privilege to "any information gathered, received or processed by a journalist, whether or not such information is actually published, and whether or not related information has been disseminated, and includes, but is not limited to, all notes, outtakes, photographs, tapes and other recordings or other data of whatever sort that is gathered by a journalist in the process of gathering, receiving or processing information for communication to the public." K.S.A. 60-480(b) & 60-481 (emphasis added).

276.   The Kansas Shield Law provides that "[t]he party claiming the privilege … shall be entitled to a hearing" before that party can be compelled to provide any protected information. K.S.A. 60-483.

277.   The Kansas Shield Law also provides that "[i]f the court finds that the party seeking to compel disclosure had no reasonable basis to request such disclosure, the court may assess costs and attorney's fees against the party seeking to compel disclosure." K.S.A. 64-484.

278.   The Kansas Shield Law further provides that "[t]he rights and privileges by this act are in addition to any other rights guaranteed by the constitutions of the United States or the state of Kansas." K.S.A. 60-485.

279.   When Officer Hudlin rifled through Deb Gruver's desk and identified Gruver's file on "Capt. Cody," he violated both the First Amendment and the journalist privilege enshrined in the Kansas Shield Law.

280.   When Officer Hudlin beckoned Chief Cody—with his "Do YOU want to look through this desk?" invitation—he violated both the First Amendment privilege and the journalist privilege enshrined in the Kansas Shield Law.

281.   When Chief Cody reviewed the Record's file on him—which included both the identity of, and information from, numerous confidential sources—he violated both the First Amendment and the journalist privilege enshrined in the Kansas Shield Law.

282.   When all the other Defendants searched the newsroom of the Marion County Record, they violated both the First Amendment and the journalist privilege enshrined in the Kansas Shield Law.

*The Raids Interfered with*
*the Freedom of the Press*

283.   When defendants seized the computers of Eric Meyer, Phyllis Zorn, Deb Gruver, and Joan Meyer, as well as the network server for the Marion County Record and the cell phones of Eric Meyer, Phyllis Zorn, and Deb Gruver, defendants abridged the First Amendment rights of the Record and its owners by restricting their ability to gather and report information about matters of public concern.

284.   For example, while the Record's website was hosted on an off-site computer network that was not seized, the staff had no ability to access the website to timely report the news.

285.   Without their cell phones and without access to their e-mail accounts, the staff had no way to contact sources of information and obtain the news.

286.   Because the Record's network server was seized, the Record's page layouts, advertisements—even the newspaper nameplate (the title of the newspaper on the front page)—were inaccessible.

287.   The Record had to cobble together a patchwork computer network from borrowed and otherwise obsolete computers in an attempt to publish the weekly print edition of the newspaper.

288.   That effort required back-to-back all-nighters, during which the staff was unable to gather and report on other news events.

*The Chilling Effect*

289.    The unprecedented raids on the newsroom of the Marion County Record, and threatened pursuit of criminal charges against Eric Meyer and Phyllis Zorn, would chill a person of ordinary firmness from reporting on local events in Marion.

290.    In fact, the month following the raids, Record reporter Deb Gruver—who had worked as a reporter for more than 30 years— resigned.

291.    Gruver, who lives in Wichita, stated she was afraid to come to Marion for fear of what the local police might do.

292.    That fear did not dissipate when Chief Cody resigned, because Officer Zach Hudlin—who had rummaged through Gruver's desk, found her file on "Captain Cody," and showed the file to Chief Cody—was appointed acting police chief.

293.    As such, the proverbial fox was now guarding the henhouse.

*The Defendants' Malicious and Wanton Actions*

294.    Defendants acted maliciously and wantonly in violating the First Amendment rights of the Marion County Record, Joan and Eric Meyer, Deb Gruver and Phyllis Zorn.

295.    Defendants' actions were prompted by ill will or spite towards the Record and its reporters, as evidenced, for example, by Chief Cody's repeated prior

actions to harass the Record, including gleefully removing Eric Meyer and Phyllis Zorn from the "open" meet and greet for Rep. LaTurner, offering to fund a competing newspaper, refusing to provide clear open records to the Record, etc.

296.   Defendants' actions were also motivated by ill will or spite towards Ms. Zorn and the Record because Eric Meyer informed Chief Cody and Sheriff Soyez the paper was investigating the allegations that the Marion Police Department and the Marion County Sheriff's Office permitted Kari Newell to drive without a license for years.

297.   Defendants' actions demonstrate a conscious desire to violate the constitutional rights of the Record and its reporters, as well as an awareness of the consciousness of their guilt, such as when they tried to hide their illegal activities.

298.   Such actions include, for example, Sheriff Soyez' dissembling comments to Phyllis Zorn while witnessing the return of the illegally seized devices.

299.   At that time, Sheriff Soyez said to Zorn, "You didn't see me over there," referring to the raid of the Marion County Record newsroom.

300.   But it was Sheriff Soyez who personally told Chief Cody "just take them all" when Cody called Soyez from the Record's newsroom and told Soyez about the failed "preview search."

301.  Such actions also include Chief Cody's explicit warning to Kari Newell "we can't write anything," as well as his direction to Newell to destroy the couple's text messages.

302.  Such actions also include Officer Hudlin's use of coded language to inform Chief Cody that he (Hudlin) had successfully found Deb Gruver's file on Cody in Gruver's desk.

303.  Officer Hudlin, who knew he was being recorded on his body camera, tried to hide his wrongdoing by saying to Chief Cody:

Hudlin:    "You want to look through this desk?

Cody: "You have the right to look for yourself."

Hudlin:    "I know, I'm asking do YOU want to look through this desk?

Cody: "Man, you got a right to ..."

Hudlin:    "I understand. You will understand shortly."

304.  Such actions also include Mayor Mayfield's public comments after the raids in which he falsely claimed he did not believe Chief Cody did anything wrong.

*Municipal Policies and Mayor Mayfield*

305.  The Marion City Code gave Mayor Mayfield "superintending control of all officers and affairs of the city." Code of the City of Marion, Kan. § 1-205(a).

306. Accordingly, Mayor Mayfield's actions, along with the actions of the Marion police officers who participated in the illegal searches under the direction of Mayor Mayfield, were undertaken pursuant to official municipal policy.

307. The Marion City Code gave Chief Cody "power to make such rules and regulations as may be necessary for the proper and efficient conduct of the department." Code of the City of Marion, Kan. § 10-103.

308. Accordingly, Chief Cody's actions, along with the actions of the Marion police officers who participated in the illegal searches under the direction of Chief Cody, were undertaken pursuant to official municipal policy.

309. Moreover, the Marion City Council ratified the illegal search when it appointed Officer Zach Hudlin the Acting Police Chief, despite the Council's knowledge of Hudlin's illegal actions undertaken during the search.

310. Accordingly, the actions of the Marion police officers who participated in the illegal searches were undertaken pursuant to official municipal policy.

311. The Kansas statutes provide that the Sheriff is a separately elected official whose terms, duties, training, and authorities are established by statute. K.S.A. 19-801a.

312. The Sheriff is charged by statute with "keep[ing] and preserv[ing] the peace in their respective counties." K.S.A. 19-813.

313. Sheriff Soyez, therefore, sets official municipal policy for the Marion County, Kansas, Sheriff's Office.

314. Accordingly, Sheriff Soyez's actions, along with the actions of the Marion County Sheriff's personnel who participated in the illegal searches under the direction of Sheriff Soyez (including Det. Christner), were undertaken pursuant to official municipal policy.

*Count III*

*First Amendment – Retaliation and Civil Conspiracy (42 U.S.C. § 1983)*
*( Former Mayor Mayfield, Former Chief Cody,*
*and Sheriff Soyez)*

315. Plaintiff realleges and incorporates by reference the allegations in Paragraphs 1-314.

316. The First Amendment to the United States Constitution guarantees that "Congress shall make no law ... abridging the freedom of speech."

317. The Fourteenth Amendment to the United States Constitution extends the protection of the First Amendment to actions taken by local governments and by local government officials.

318. Prior to the August 11, 2023, raids on the newsroom of the Marion County Record, it was clearly established that the government, including the police, cannot retaliate against a person for engaging in protected activity under the First Amendment.

*"Silence the MCR"*

319.    Prior to the raids, the Marion County Record had published numerous reports, columns, and editorials about Marion city government generally, about Mayor Mayfield specifically, and about Chief Cody.

320.    Additionally, Chief Cody knew the Record was investigating his prior employment with the Kansas City, Missouri Police Department and the failure of the City to enforce the laws regarding the illegal operation of a motor vehicle by a leading city business person .

321.    Each of these activities is a protected First Amendment activity. Both Mayor Mayfield and Chief Cody were incensed over these activities and both verbalized an intent to seek retribution against the Record and its reporters. Specifically, Mayor Mayfield had vowed to "silence the MCR" and Chief Cody had offered to fund a competing newspaper in an effort to put the Record out of business.

*Sheriff Soyez's Support of Mayor*
*Mayfield and Chief Cody's Plan*

322.    Sheriff Soyez had solicited Gideon Cody to become the Marion Police Chief and had urged Mayor Mayfield to select Cody as the police chief; Soyez believed that criticism of Chief Cody was also therefore criticism of his recommendation.

323.    Sheriff Soyez also harbored his own personal animus against the Record and the plaintiff.

324.    Both Sheriff Soyez and Chief Cody also knew the Record and Ms. Zorn were threatening to expose them for allowing Kari Newell to drive around Marion for years without a valid license.

325.    Sheriff Soyez therefore affirmatively chose to join with both Mayor Mayfield (his own employee) and Chief Cody (his Kansas City law enforcement 'brother') in their illicit plan to take down the Marion County Record.

326.    In the eyes of Sheriff Soyez, Chief Cody and Mayor Mayfield, the three men were fulfilling Marion Crime's mandate of inserting "new blood" into Marion.

*The Retaliatory Acts*

327.    Mayor Mayfield's actions in overruling the City Administrator and authorizing Chief Cody to investigate the newspaper and its staff, and his actions in authorizing Chief Cody to raid the Record's newsroom was motivated by his desire to seek retribution against the Record and its reporters.

328.    Chief Cody's actions in seeking the search warrants for the Record's newsroom, in making false statements in the applications for the search warrants, as well as his actions in executing the illegal search warrants, were motivated by his desire to seek retribution against the Record and its reporters.

329.   Sheriff Soyez's actions in assisting Chief Cody with the investigation, in planning the raids with Chief Cody, in supplying Sheriff's deputies for the illegal raids, and in agreeing with Chief Cody to disregard the preview search requirement before seizing the computers and other devices, were motivated by his desire to seek retribution against the Record and its reporters.

330.   Each of these actions were intended to intimidate the owners and reporters of the Marion County Record.

331.   And when the owners and reporters of the Marion County Record were defiant in the face of this attempted intimidation, Chief Cody, working with Sheriff Soyez's office, drew up applications for arrest warrants for Eric Meyer and Phyllis Zorn.

332.   On August 8, at 8:07 p.m. Mayor Mayfield notified the city manager by text about a meeting he had with the co-conspirators. He indicated the following:

> I went and visited with Cody and the sheriff and I
> told Cody I was behind him and his investigation
> 100 percent. Can't wait to see how this plays out.

333.   The co-conspirators agreed on the common-and unconstitutional-goal of fabricating false criminal changes and conducting an unconstitutional search and seizure against the *Record* and its employees, including the plaintiff,

69

who were perceived enemies of the co-conspirators. The ultimate goal was to "take down" the *Record*.

334. The specific actions taken by the co-conspirators included conducting a sham investigation with phonied up allegations that the conspirators knew were false. The sham "investigation" was not supported by even a reasonable suspicion of a crime. They procured search warrants ty knowingly or recklessly including false information in and omitting material facts from the search warrant applications. They employed those warrants to raid the *Record* and the reporters that worked there in retaliation for using their First Amendment rights.

335. Mayor Mayfield, under the City Code, had "superintending control" of all officers and affairs of the city. He directed Chief Cody to conduct a sham "investigation" as a pretext for his desire to retaliate against the *Record* and the plaintiff. He convinced Kari Newell to play the role of complaining victim, falsely convincing her that the *Record* and Zorn were conspiring against her. And Mayfield provided Cody with Herbel's emails to use as 'evidence against Herbel and Zorn.' All of these actions were in furtherance of the conspiracy.

*COUNT IV*
*Privacy Protection Act (42 U.S.C. § 2000aa)*
*(Marion County*
*and Sheriff Soyez, in his official capacity)*

336.   Plaintiff realleges and incorporates by reference the allegations in Paragraphs 1-335.

337.   The Privacy Protection Act of 1980 provides that "it shall be unlawful for a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize any documentary [or work product] materials possessed by a person in connection with a purpose to disseminate to the public a newspaper ... or other similar form of public communication, in or affecting interstate or foreign commerce." 42 U.S.C. § 2000aa.

338.   The Act defines "documentary materials" as "materials upon which information is recorded," including "written or printed materials," was well as "other mechanically,  magnetically [sic] or electronically recorded cards, tapes, or discs." 42 U.S.C. § 2000aa-7(a).

339.   The Act defines "work product materials" as materials prepared in connection with a purpose of communicating such materials to the public and which include mental impressions, conclusions, opinions, or theories of the author. 42 U.S.C. § 2000aa-7(b).

340.   The search warrants for the Marion County Record newsroom and the home of Joan and Eric Meyer sought both "documentary" and "work product materials."

341.   For example, the search warrant sought "Documents and records pertaining to Kari Newell," which would include reporter's notes about Newell, drafts of yet-to-be-published newspaper articles about Newell, internal communications about Newell, etc.

342.   Additionally, the search terms which were used to conduct the so-called "preview search" included "Kansas" and "Brogan Jones" (the Marion City Administrator) and "Ruth Herbel" (the Marion Vice-Mayor).

343.   These terms would include reporter's notes about the state, the city administrator, and the vice-mayor; drafts of yet-to-be-published newspaper articles about the state, the city administrator, and the vice-mayor; internal communications about the state, the city administrator, and the vice-mayor, etc.

344.   The Marion County Record is a newspaper "in or affecting interstate commerce" in that prior to the raids it regularly mailed copies of the newspaper to subscribers in, inter alia, Arizona, California, Colorado, Illinois, Iowa, Minnesota, Missouri, and Wisconsin.

345.   Additionally, the Marion County Record hosts a website, marionrecord.com, on which it posts the content of its newspaper.

346.   That website is an "other similar form of public communication" under the Act and is regularly accessed by readers outside the State of Kansas.

*Probable Cause Did Not Exist*

347.   At the time of the raids, probable cause did not exist to believe that Eric or Joan Meyer, Phyllis Zorn, Deb Gruver, or anyone else at the Marion County Record had committed or were committing any criminal offense.

348.   Specifically, at the time of the raids, probable cause did not exist to believe that Eric or Joan Meyer, Phyllis Zorn, Deb Gruver, or anyone else at the Marion County Record had violated or were violating K.S.A. 21-6107 or K.S.A. 21-5839.

349.   Eric Meyer and Phyllis Zorn's use of the Kansas Driver's License Status Check tool on the public-facing website of the Kansas Department of Revenue was 100% legal and did not violate any Kansas law.

350.   Quite the contrary, the very first sentence of the "Division of vehicles; records; disclosure" statute provides that all driver's license records "shall be subject to the provisions of the open records act, except" (a) "records which relate to the physical or mental condition of any person," (b) "records which have been expunged," or (c) "photographs [on] drivers' licenses." K.S.A. 74-2012(a)(1) & (b).

351.   Thus, the information which the Record accessed, i.e., that Newell's driver's license was suspended due to a DUI conviction, was specifically authorized

under Kansas law, which states such information is subject to the Kansas Open Records Act.

352.  As such, neither Meyer, Zorn, nor anyone else at the Record, committed identity theft, identity fraud, or unlawfully accessing a computer.

*"The Receipt [or] Possession … of Such Materials"*

353.  The Privacy Protection Act explicitly provides that "a government officer or employee may not search for or seize [documentary or work product] materials under the provisions of this paragraph if the offense to which the materials relate consists of the receipt, possession, communication, or withholding of such materials or the information contained therein." 42 U.S.C. § 2000aa(a)-(b).

354.  The Act provides that such materials (or the information in such materials) can only be obtained by a court ordered subpoena, which would allow the party in possession of materials an opportunity to object to the subpoena.

355.  As described by Chief Cody in the search warrant applications, the purpose of the search was to seize the "Department of Revenue record" of Kari Newell, the "letter" to Newell, and the "information" in the "record" and "letter."

356.  As such, the purpose of the search of the Record was to seize the very items which the Act states cannot be seized with a search warrant and must instead be sought with a court ordered subpoena.

357.  Neither Chief Cody, nor any other law enforcement officer, ever sought a subpoena and, as a result, neither the Record, its owners, its staff, or its lawyers ever had an opportunity to object to the subpoena.

*No Other Exceptions Apply*

358.  At the time of the raids, there was no reason to believe that the immediate seizure of any materials was necessary to prevent the death of, or serious bodily injury to a human being.

359.  Prior to the time of the raids, no subpoena duces tecum had been issued for any of the materials sought in the search warrants for the newsroom of the Marion County Record.

360.  At the time of the raids, there was no reason to believe that the giving of notice pursuant to a subpoena duces tecum would result in the destruction, alteration, or concealment of such materials.

361.  Quite the contrary, it was Eric Meyer who originally notified both Chief Cody and Sheriff Soyez of the existence of the August 1, 2023, letter from the Kansas Department of Revenue, and explicitly offered to cooperate in any subsequent criminal investigation into how the source obtained the letter or in why local law enforcement had knowingly allowed Kari Newell to drive without a license for years.

*Plaintiff's Claims*

362.   The Act provides that "[a] person aggrieved by a search for or seizure of materials in violation of this chapter shall have a civil cause of action for damages for such search or seizure against ... any other governmental unit, ... which shall be liable for violations of this chapter by their officers or employees while acting within the scope or under color of their office or employment." 42 U.S.C. § 2000aa-6(a)(1).

363.   The plaintiff is a "person[s] aggrieved by a search for or seizure of materials in violation of" the Act.

364.   The Act defines "any other governmental unit" as "any local government, unit of local government, or any unit of State government." 42 U.S.C. § 2000aa-7(c).

365.   The  Marion County Sheriff  is an "other governmental units" under the Act.

366.   Chief Cody, Officer Hudlin, and Det. Christner were "acting within the scope or under color of their office or employment" when they raided the newsroom of the Marion County Record.

367.   Sheriff Soyez was "acting within the scope or under color of [his] office or employment" when he directed the raids on the newsroom of the *Marion County Record*. Sheriff Soyez, Mayor Mayfield and Former Chief Cody were

"acting within the scope or under color of [their] office or employment" when they conspired to raid the newsroom of the *Marion County Record.*

368.  The plaintiff has been damaged by Defendants' wrongful actions.

369.  Defendants acted maliciously and wantonly in violating the rights of the plaintiff and the *Marion County Record.*

370.  The Act provides that in addition to actual damages, a person having a cause of action under the Act is entitled to recover their attorney's fees. 42 U.S.C. § 2000aa-6(f).

*COUNT V*
*Failure to Train, Supervise, and Have Proper Policies (42 U.S.C. ¶ 1983)*
*(City of Marion,  and Sheriff Soyez, in his official capacity)*

371.  Plaintiff realleges and incorporates by reference the allegations in Paragraphs 1-370.

372.   The Marion County Sheriff failed to properly hire, train, supervise, discipline, and control  his officers regarding:

  a.    the constitutional protections afforded the press under the First Amendment,

  b.    the constitutional requirements contained in the Fourth Amendment,

  c.    the statutory protections contained in the Privacy Protection Act,

  d.    the statutory protections of the Kansas Shield Law,

e.  the methods and manner of preparing a valid search warrant application,

f.  the methods and manner of properly executing a search warrant, and

g.  the methods and manner of conducting a valid "preview search" of a digital device.

373.  The Marion County Sheriff failed to have proper policies, procedures, or practices concerning these subjects. That failure to train is the result of deliberate indifference on the part of the Sheriff's Office.

374.  The failures of the Marion County Sheriff in this regard led to, and/or contributed to, the wrongful acts committed by his officers in obtaining and conducting the illegal raids.

375.  As a result, the Marion County Sheriff is responsible for the actions of his officers in obtaining and conducting the illegal raids.

WHEREFORE, the Plaintiff requests she be awarded actual and punitive damages against Defendants former Mayor David Mayfield, in his official and individual capacities; former Marion Police Chief Gideon Cody, in his official and individual capacities; Officer Zach Hudlin, in his individual capacity; Sheriff Jeff Soyez, in his official and individual capacities; and Det. Aaron Christner, in his individual capacity, for compensatory damages in the amount of $950,000, punitive damages in the amount of $250,000 together with Plaintiff's attorneys'

fees pursuant to 42 U.S.C. § 1988(b) and K.S.A. 60-484, the costs of this action,

and such other and further relief as this Court deems just.

Respectfully submitted,

DEPEW GILLEN RATHBUN & MCINTEER LC

/s/Randall K. Rathbun
Randall K. Rathbun #09765
8301 E. 21st Street N., Suite 450
Wichita, KS 67206-2936
(316) 262-4000
Randy@depewgillen.com
*Attorneys for Plaintiff*

## DESIGNATION OF PLACE OF TRIAL

COMES NOW the plaintiff and designates Kansas City, Kansas as the

place of trial of this action.

Respectfully submitted,

DEPEW GILLEN RATHBUN & MCINTEER LC

/s/Randall K. Rathbun
Randall K. Rathbun #09765
8301 E. 21st Street N., Suite 450
Wichita, KS 67206-2936
(316) 262-4000
Randy@depewgillen.com
*Attorneys for Plaintiff*

## REQUEST FOR JURY TRIAL

COMES NOW the plaintiff and respectfully requests a trial by jury with

regard to the above-captioned action.

Respectfully submitted,

/s/Randall K. Rathbun
Randall K. Rathbun #09765
8301 E. 21st Street N., Suite 450
Wichita, KS 67206-2936
(316) 262-4000
Randy@depewgillen.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of November, 2025, the above and

foregoing Second Amended Complaint was filed via CM/ECF and notice sent to:

Jeffrey M. Kuhlman
Watkins Calcara Chtd.
1321 Main Street, Suite 300
PO Drawer 1110
Great Bend, KS 67530
*Attorneys for Defendants Soyez, Christner*

Edward Keeley
Jennifer Hill
McDonald Tinker PA
300 West Douglas, Suite 500
PO Box 207
Wichita, KS 67202

*Attorneys for Defendants Cody,  et al*

/s/Randall K. Rathbun
Randall K. Rathbun #09765